UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LEONIDAS SIERRA,

                                        Plaintiff,

v.                                                        9:22-cv-0711
                                                         (BKS/TWD)
JOHN DOE 22, et al.,

                                        Defendants.

_____

APPEARANCES:                                OF COUNSEL:

LEONIDAS SIERRA
*Plaintiff, pro se*
66094-054
FCI Hazelton
P.O. BOX 5000
Bruceton Mills, WV 26525

NEW YORK STATE ATTORNEY GENERAL          AIMEE COWAN, ESQ.
Attorneys for Defendants
New York State Attorney General - Syracuse Regional Office
300 South State Street - Suite 300
Syracuse, NY 13202


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## <u>REPORT-RECOMMENDATION AND ORDER</u>

## I.    INTRODUCTION

   This matter has been referred for a report and recommendation by the Hon. Brenda K.

Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Plaintiff Leonidas Sierra ("Plaintiff") commenced this action pursuant to 42 U.S.C. §

1983 based on events which occurred while he was incarcerated in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS").  Dkt. No. 1,

Complaint; Dkt. No. 13, Amended Complaint.  As relevant here, Plaintiff's remaining claims

include Eighth Amendment excessive special housing unit ("S.H.U.") confinement claims

against Defendants Joseph Bellnier (formerly John Doe #4), DOCCS Commissioner Anthony

Annucci, and DOCCS Assistant Commissioner Sandra Amoia.[1]  Dkt. No. 14, Decision and

Order, at 15-16.[2]  Currently before the Court is Defendants Annucci, Bellnier, and Amoia's

motion to dismiss.  Dkt. No. 54.  Plaintiff also requests the appointment of counsel.  *See*

*generally*, Dkt. No. 64, Plaintiff's Response in Opposition to Defendants' Motion; Dkt. No. 65,

Letter.  For the reasons set forth below, the Court recommends Defendants' motion be granted in

part and denied in part and Plaintiff's renewed request for appointment of counsel is denied.

## II.    BACKGROUND

On July 31, 2014, Plaintiff was remanded back to DOCCS custody following conviction

on federal charges in the Southern District of New York.  Dkt. No. 13 at 18.  He was briefly

housed at Downstate Correctional Facility.  *Id*. at 18-19.

On August 4, 2014, he was transferred from Downstate Correctional Facility to Attica

Correctional Facility, where he was placed under keep-lock status.  *Id*. at 19.  The following day,

Plaintiff was served a Tier III misbehavior report charging him with a violation of Rule 1.00,

based on Plaintiff's entry of a plea of guilty and criminal conviction for conspiracy to participate

in a racketeering enterprise.  *Id*.; *see also* 7 N.Y.C.R.R. § 270.2; 18 U.S.C. § 1962(d).  Following

a hearing, Plaintiff was found guilty and sentenced to one year of solitary confinement in the

S.H.U. and a one year loss of package, commissary, and telephone privileges.  *Id*.

---

[1] Although Assistant Commissioner Amoia's last name is spelled "Amaya" in previous filings, the Court uses the spelling provided in the Defendants' motion. Dkt. No. 54 at 1. The Clerk is directed to correct the spelling to Amoia on the docket.
[2] Citations to docket entries will refer to the pagination generated by CM/ECF, the Court's electronic filing system unless otherwise noted.

In November of 2014, Plaintiff was transferred from Attica Correctional Facility to Upstate Correctional Facility, where he continued his S.H.U. sentence. *Id*. at 20.  On or about May 26, 2015, Plaintiff was instructed to pack his personal belongings as he would be released from the S.H.U. the following morning. *Id*. at 22.  The following day, a corrections officer informed him his transfer had been canceled and served him with an administrative segregation recommendation dated May 27, 2018. *Id*. at 22-23.  Plaintiff was not allowed to call witnesses during the related hearing which concluded on August 11, 2015, and the Commissioner's Hearing Officer ultimately imposed administrative segregation. *Id*. at 23.

On or about December 9, 2015, Plaintiff was transferred from Upstate Correctional Facility to Auburn Correctional Facility. *Id*. at 27-28.  He was placed in the S.H.U. upon his arrival. *Id*. at 28, 30.  Auburn Correctional Facility officials restricted or denied privileges Plaintiff had previously received at Upstate, Plaintiff filed multiple grievances, and staff members "would drop hints to Plaintiff that he should stop complaining and bringing attention to the horrible living conditions in S.H.U." *Id*. at 28-31.[3]  "Soon thereafter Sgt. Donnelly and the line staff started writing false misbehavior reports accusing Plaintiff of fabricated misbehaviors." *Id*. at 31-32.

At a hearing for one of the aforementioned reports, Deputy Superintendent of Programs Mr. Janea: (1) told Plaintiff "everyone of the administration wanted [him] out of that facility[,]" *id*. at 34; (2) "was advising him to plead guilty; even though [Janea] knew [he] did not threaten anyone[,]" *id*. at 35; and (3) "he would give Plaintiff his word as a man that he would transfer him if he plead guilty[,]" *id*. at 35 (internal quotations omitted).  Accordingly, Plaintiff "plead

---

[3] Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

guilty to a charge he did not commit . . . ." *Id*. at 35. A counselor advised Plaintiff he had been put in for a transfer but, approximately two weeks later, the transfer was denied. *Id*. at 36. Plaintiff was subjected to additional false misbehavior reports, threats, and sexual harassment, and reported "he was feeling suicidal and depressed . . . hearing voices and . . . felt unsafe because he had a history of self cutting behaviors." *Id*. at 37. He was prescribed anti-depressants, but the medication did not help, then "Plaintiff had a mental health crises and was placed on suicide watch." *Id*. at 38.

After one day, the mental health unit chief informed Plaintiff the unit was ordered to return him to his cell. *Id*. at 38-39. Soon thereafter, the facility Deputy Superintendent of Security wrote another fabricated misbehavior report and, after Plaintiff was found guilty, he was transferred to Southport Correctional Facility. *Id*. at 40-43.

In sum, Plaintiff was housed in the S.H.U. at Upstate and Auburn Correctional Facilities from November, 2014, until May 28, 2016. *See id*. at 44 (further explaining Plaintiff was housed in the S.H.U. in DOCCS custody "from July 31, 2014 until May 27, 2015 . . . for a disciplinary sanction and, then, from May 27, 2015 until February 13, 2020, under Ad. Seg. status.").

## III.    LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

*Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*, 550 at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice

for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422

(2d Cir. 2011) (citation and internal quotation marks omitted).

> The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at *6 and n.41 (N.D.N.Y. Oct. 22, 2008)

(collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro*

*se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to

the extent they are consistent with the allegations in the complaint."), *vacated in part on other*

*grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

## IV.    DISCUSSION

### A.    Motion to Dismiss

Defendants contend Plaintiff's amended complaint should be dismissed as against

Defendants Annucci, Amoia, and Bellnier pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state

a claim. Dkt. No. 54-1, Defendants' Memorandum of Law. Plaintiff opposed the motion. Dkt.

No. 64, Plaintiff's Response. Defendants submitted a reply in further support of their motion.

Dkt. No. 66, Defendants' Reply.

#### 1.    Defendant Annucci

Plaintiff avers Defendant Annucci: (1) "has final policy-making and supervisory

authority within NYS-DOCCS, and is personally involved in authorizing and maintaining the

unconstitutional policies, practices and customs challenged by Plaintiff[;]" (2) "is familiar with

and has even defended many of the policies, practices and customs being challenged by

Plaintiff" because he previously served as "Deputy Commissioner and Counsel for NYS-

DOCCS[;]" and (3) as "Executive Deputy Commissioner, he was instrumental in creating what is known as the 'Pilot Incentives Program' for Administrative Segregation Inmates." Dkt. No. 13 at 3.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)) (additional citations omitted); *Iqbal*, 556 U.S. at 676. "A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986); *see also Iqbal*, 556 U.S. at 676 ("vicarious liability is inapplicable to . . . § 1983 suits."). "Where, as here, the defendants are supervisory officials, a mere 'linkage' to the unlawful conduct through 'the prison chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 233 (N.D.N.Y. 2019) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981)) (additional citations omitted). "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Therefore, "in the context of an Eighth Amendment claim against a supervisory official, a plaintiff must establish that the supervisory official himself 'acted with deliberate indifference–meaning that the official personally knew of and disregarded an excessive risk to the plaintiff's health or safety.'" *Sorrentino v. Annucci*, No. 9:23-CV-0582 (LEK/TWD), 2023 WL 4824852, at *2 (N.D.N.Y. July 27, 2023) (quoting *Tangreti*, 983 F.3d at 619) (alterations in original).

Here, Plaintiff has failed to plausibly allege Defendant Annucci personally knew of and disregarded a substantial risk of serious harm to Plaintiff. "[G]iven the abrogation of the *Colon* factors previously used to establish supervisory liability, the allegations regarding Annucci's policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead his subjective knowledge as to Plaintiff's situation specifically." *Williams v. Annucci*, No. 9:20-CV-1417 (BKS/TWD), 2021 WL 4775970, at *5 (N.D.N.Y. Oct. 13, 2021); *see also Tangreti*, 983 F.3d at 612 ("Following *Ashcroft v. Iqbal*, . . . courts may not apply a special rule for supervisory liability."); *Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS/DJS), 2022 WL 991402, at *7 (N.D.N.Y. Mar. 31, 2022) (explaining "the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*.").

Moreover, to the extent Plaintiff contends Defendant Annucci's conduct in "creating . . . the 'Pilot Incentives Program' for administrative segregation inmates[,]" *see* Dkt. No. 13 at 3,[4] establishes Defendant Annucci's personal involvement in the alleged constitutional violation, Plaintiff has not plead any connection between the "Pilot Incentives Program" and his excessive S.H.U. confinement. Therefore, this allegation fails to connect Defendant Annucci to the alleged violation of Plaintiff's Eighth Amendment rights.

Plaintiff also pleaded that "[t]hroughout this whole time period, Plaintiff's sister . . . and his mother . . . were concerned for Plaintiff's safety and his mental health and constantly called

---

[4] *See also*, *e.g.*, *Encarnacion v. Connors*, No. 9:21-CV-0986 (MAD/TWD), 2023 WL 6546247, at *3 (N.D.N.Y. Aug. 7, 2023) ("'the active conduct standard necessary to impose § 1983 liability on a supervisor requires the supervisor either directly participate in the alleged constitutional violation or create a policy or custom under which the alleged unconstitutional practices occurred.'") (quoting *Harrison v. Broderick*, No. 1:18-CV-0821, 2022 WL 16837366, at *11 (W.D.N.Y. Aug. 18, 2022), *report and recommendation adopted*, 2022 WL 16836406 (W.D.N.Y. Nov. 8, 2022)) (additional quotations and citations omitted), *report and recommendation adopted*, 2023 WL 6057393 (N.D.N.Y. Sept. 18, 2023).

the facility and wrote letters to the commissioner and Governor Cuomo, trying to get the mental Health treatment the plaintiff needed." *Id*. at 39.  However, Defendant Annucci's alleged receipt of letters from Plaintiff's family members is insufficient to demonstrate Defendant Annucci's personal involvement in the alleged violation of Plaintiff's rights.  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) ("Courts in this circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement.") (collecting cases); *see also*, *e.g.*, *Bonie v. Annucci*, No. 7:20-CV-0640, 2023 WL 2711349, at *6 (S.D.N.Y. Mar. 30, 2023) ("The receipt of letters or grievances, by itself, does not amount to personal involvement" and dismissing the plaintiff's claims against DOCCS Acting Commissioner Annucci despite the defendant's alleged receipt of multiple grievances) (citations omitted).[5]

Finally, Plaintiff cites *Satchell v. Dilworth* in support of the proposition that "Courts have allowed prisoners to keep high-level supervisors as defendants . . . for the purposes of discovery to determine who the proper defendants are."  Dkt. No. 64 at 7-8 (citing 745 F.2d 781, 786 (2d Cir. 1984)).  The remaining Doe Defendants in Plaintiff's surviving claims include John Doe #5 and John Doe #6, both members of central office administrative segregation review committees; John Doe #22, an Upstate Correctional Facility Guidance Offender Rehabilitation Coordinator who served as a member of the facility's administrative segregation review committee; John Doe #24, an Auburn Correctional Facility Guidance Counselor who served on the facility's administrative segregation review committee.  *See* Dkt. No. 13 at 8-12; *see also* Dkt. No. 14 at 15-16.  However, nothing in Plaintiff's papers indicate Defendants Annucci or Amoia were

---

[5] In his response to the Defendants' motion to dismiss, Plaintiff also asked the Court to "consider that the Plaintiff personally wrote Anthony J. Annucci . . . ."  Dkt. No. 64 at 14.  Plaintiff's contention he personally wrote letters to Defendant Annucci is similarly insufficient to demonstrate Defendant Annucci's personal involvement as required for § 1983 liability.

involved in the process of reviewing Plaintiff's administrate segregation status, either at the central office or facility level, therefore, it is unlikely Defendants Annucci or Amoia have knowledge relevant to the identification of the remaining Doe Defendants. On the contrary, the remaining ten named defendants other than Annucci and Amoia appear better suited to identify the four Doe Defendants.

Accordingly, the Court recommends granting Defendants' motion to dismiss Plaintiff's Eighth Amendment claim against Defendant Annucci for failure to state a claim.

### 2. Defendant Amoia

Plaintiff alleges Defendant Amoia "is responsible for helping the commissione[r] with developing and implementing the unconstitutional policy, practices and customs being challenged by Plaintiff." *Id*. at 4.

For the same reasons discussed above in connection with Plaintiff's claim against Defendant Annucci, Defendant Amoia's policymaking authority and familiarity with allegedly unconstitutional practices and customs is insufficient to demonstrate her personal involvement in the alleged Eighth Amendment violation. *See*, *supra*, Section (IV)(A)(1); *see also Williams*, 2021 WL 4775970, at *5.

In his response, Plaintiff requested the Court consider he "spoke with Sandra Amoia, while she was on rounds and wrote her." Dkt. No. 64 at 14. As an initial matter, Plaintiff did not plead these allegations in his amended complaint, nor are these allegations consistent with that operative pleading which merely alleges Defendant Amoia is responsible for helping Defendant Annucci with the allegedly unconstitutional policies and practices. *See* Dkt. No. 13 at 4. In any event, Plaintiff's assertion he "spoke with" Defendant Amoia, without more– specifically, any information concerning the timing or contents of these alleged exchanges –is wholly insufficient

to plausibly connect Defendant Amoia to the alleged constitutional violations. Moreover, Plaintiff's contention he "wrote" to Defendant Amoia would not establish personal involvement even if Plaintiff had written to her during the ongoing constitutional violation about his allegedly excessive confinement because, as explained above, receipt of letters does not amount to personal involvement. *See*, *supra*, Section (IV)(A)(1).

Accordingly, the Court recommends granting Defendants' motion to dismiss Plaintiff's Eighth Amendment claim against Defendant Amoia for failure to state a claim.

### 3. Defendant Bellnier

Plaintiff alleges Defendant Bellnier: "disregarded and ignored Plaintiff's deteriorating mental and physical health. He has final policy-making and supervisory authority within NYS-DOCCS and is personally involved in maintaining and authorizing the unconstitutional policies, practices and customs being challenged by Plaintiff. He is also the last official to sign off on retaining Plaintiff in the unconstitutional conditions described in this complaint." Dkt. No. 13 at 7-8.

For the same reasons previously stated with respect to Defendants Annucci and Amoia, Defendant Bellnier's policy-making and supervisory authority within DOCCS is insufficient to adequately plead his subjective knowledge as to Plaintiff's condition. *See*, *supra*, Sections (IV)(A)(1)-(2); *see also Williams*, 2021 WL 4775970, at *5. Similarly, Plaintiff's assertion Defendant Bellnier disregarded and ignored Plaintiff's mental and physical health, without more– *i.e.*, the pleading of facts indicating Bellnier had observed or, by some other means, obtained subjective knowledge of the substantial risk of serious harm to Plaintiff –is insufficient to demonstrate Bellnier's personal involvement in the alleged violation of Plaintiff's constitutional rights.

Plaintiff's contention Defendant Bellnier signed off on retaining Plaintiff in administrative segregation/S.H.U. confinement in his capacity as DOCCS Deputy Commissioner, however, plausibly alleges Bellnier's personal involvement in the alleged violation concerning Plaintiff's conditions of confinement. *See H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 376 (N.D.N.Y. 2020) (concluding plaintiff had established defendant's "personal involvement in the alleged Eighth Amendment violation related to his conditions of confinement because . . . [the Deputy Commissioner was] directly involved in the decision to keep Plaintiff in Ad Seg, and the conditions of confinement challenged here [were] the general Ad Seg/SHU conditions."). In his response,[6] Plaintiff averred "every Ad. Seg. review period [he] submitted a statement explaining to the facility and central office three-member review committee . . . that the prolonged periods of solitary confinement where affecting and hurting his mental and physical health" which Defendant Bellnier "reviewed before he made his decissions to continue Plaintiff's Ad. Seg. placement in S.H.U." Dkt. No. 64 at 14. Plaintiff continued that, "by regulations," Defendant Bellnier was "the only person authorized to release a Central Office Ad. Seg. inmate" such as Plaintiff from that status citing 7 N.Y.C.R.R. § 301.4. *Id.* at 15-16.

Under the regulations in effect at the relevant time, § 301.4 provided "[a]n inmate in administrative segregation status shall have such status reviewed every sixty days[.]" 7

---

[6] "[I]n the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint-to the extent those papers are consistent with the allegations in the complaint." *Solomon v. Hum. Servs. Coal. of Tompkins Cnty. Inc.*, No. 5:11-CV-0226 (GTS/ATB), 2012 WL 3996875, at *7 (N.D.N.Y. Sept. 11, 2012) (citing *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 170 n. 1 (2d Cir. 1998) ("we deem [the plaintiff]'s complaint to include the facts contained in his memorandum of law filed in response to [the defendant]'s motion to dismiss.")) (additional citations omitted). While Plaintiff did not explicitly identify the N.Y.C.R.R. provisions or Bellnier's review of his letters to the committee in his amended complaint, his motion response statements are consistent with Plaintiff's pleading that Bellnier was "the last official to sign off on retaining Plaintiff in the [S.H.U.]." Dkt. No. 13. at 7-8.

N.Y.C.R.R. § 301.4(d).[7]  During the review process, a three-member committee "examine[s] the inmate's institutional record and prepare[s] a report" containing:

> (i) reasons why the inmate was initially determined to be appropriate for administrative segregation;
> (ii) information on the inmate's subsequent behavior and attitude; and
> (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

7 N.Y.C.R.R. § 301.4(d)(1)(i)-(iii).  "Where the deputy commissioner for correctional facilities has notified the superintendent that an inmate in administrative segregation is to receive central office review, the superintendent" is required to "refer the committee report, and any written statement received from the inmate, to a three-member central office committee[.]"  *Id*. § 301.4(d)(3).  Next, the central office committee conducts a review and forwards the paperwork and a recommendation to the deputy commissioner for correctional facilities.  *Id*.  "Upon receipt of the materials from the central office committee, including *any written statement received from the inmate*, *the deputy commissioner shall make the determination to retain the inmate in or release the inmate from administrative segregation*."  *Id*. (emphasis added).

In sum, from Plaintiff's allegation that Deputy Commissioner Bellnier "approved Plaintiff's continued placement in solitary confinement, it is reasonable to infer that [defendant] was subjectively aware of the risk that Plaintiff's constitutional rights were being violated by prolonged confinement in isolation, and that he disregarded that risk by approving his continued placement."  *Williams*, 2021 WL 4775970, at *6 (concluding the plaintiff plausibly alleged the defendant's personal involvement in the claimed violation of plaintiff's rights where the plaintiff

---

[7] As stated above, Plaintiff was held in the S.H.U. under Ad. Seg. status from May 27, 2015, until February 13, 2020.  *See* Dkt. No. 13 at 44.  Section 301.4 was amended effective December 16, 2020.  The Court cites to the version of Section 301.4 that was in effect at the time Plaintiff was confined under Ad. Seg. status.

asserted "[DOCCS Deputy Commissioner] O'Gorman was the 'final arbiter' of his continued

placement in solitary confinement . . . and . . . 'approved [Plaintiff's] continued confinement in

solitary confinement . . . for a period of time relevant to this action'" (citing 7 N.Y.C.R.R. §

301.4(d)(3)).  Accordingly, the Court recommends Defendants' motion to dismiss Plaintiff's

Eighth Amendment claim against Bellnier for failure to state a claim be denied.

### B.    Request for Assignment of Counsel

Plaintiff also asks the Court to consider assignment of counsel.  *See* Dkt. No. 65 at 4-7.

Plaintiff's previous request for counsel, *see* Dkt. No. 18, was denied by this Court on April 4,

2023.  Dkt. No. 21, Decision and Order.[8]

Plaintiff avers appointment of counsel is appropriate at this juncture because: (1) "due to

Plaintiff's incarceration . . . he does not have the ability to investigate the claims to procure the

proper discovery[;]" (2) "there will be conflicting testimony since the Defendants never admit

these wrongs[;]" (3) "Plaintiff is indigent[;]" (4) Plaintiff has "no legal training . . . [and] because

of U.S.P. Hazleton's constant lockdowns has very limited access to legal materials[;]" (5) "the

issues presented in this case are legally complex and will require mental health and medical

experts[;]" and (6) "Plaintiff's case has merit.  Which is why NYS-DOCCS, changed their

S.H.U. and administrative segregation programs."  Dkt. No. 65 at 4-7.[9]

---

[8] The Court's decision further advised: "Plaintiff may file another motion for appointment of counsel in the event he can demonstrate that, in light of specific changed circumstances, consideration of the above factors warrants granting the application. Plaintiff, however, is advised that any renewed motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector." Dkt. No. 21 at 5.

[9] Plaintiff recommended appointment of "Chad A. Davenport, Esq." as counsel "because he is currently working on similar claims dealing with the unconstitutional practices, policies and customs of NYS-DOCCS Ad Seg program."  Dkt. No. 65 at 7.

The legal standard governing motions for appointment of counsel was discussed at length in the April 2023 Order and will not be restated herein. *See* Dkt. No. 21 at 3-5. In deciding whether to appoint counsel, the Court must first determine whether the indigent's position seems likely to be of substance then, if so, consider:

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason . . . why appointment of counsel would be more likely to lead to a just determination.

*Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986). Even assuming, *arguendo*, Plaintiff's case has merit, the Court finds no reason why, at this time, appointment of counsel would lead to a more just determination of this case.

The Court first notes Plaintiff has not presented any specific changed circumstances supporting his renewed request for the appointment of counsel, nor has he provided documentation substantiating his efforts to obtain counsel beyond his identification of an attorney "currently working on similar claims . . . ." *See* Dkt. No. 65 at 7. Next, on June 15, 2023, this Court issued a Mandatory Pretrial Discovery and Scheduling Order, *see* Dkt. No. 57, requiring the Defendants to provide to Plaintiff documents and other materials related to his claims. "This will help to frame the issues in the case, and will help plaintiff investigate the 'crucial facts' without the need for counsel." *Young v. Annucci*, No. 9:16-CV-0566 (DNH/ATB), 2017 WL 11569210, at *2 (N.D.N.Y. Mar. 9, 2017).

Moreover, Plaintiff's incarceration and limited access to legal materials do not warrant a different ruling. Plaintiff has successfully filed a complaint and application for *in forma pauperis* relief, amended his complaint, and responded to Defendants' motion to dismiss; therefore, he has been able to successfully litigate this matter while incarcerated thus far. *See,*

*e.g.*, *Stegemann v. Rensselaer Cnty. Sheriff's Off.*, No. 1:15-CV-21 (TJM/CFH), 2017 WL 11716632, at *4-5 (N.D.N.Y. Oct. 2, 2017) (denying plaintiff's motion for appointment of counsel where plaintiff alleged "his status as an inmate and his limited access to resources render[ed] him unable to . . . adequately investigate the case, or participate in discovery.") (internal quotations omitted). Furthermore, although Plaintiff avers this case involves legally complex issues, the Court has not identified any reason to reach the same conclusion since its April 2023 order. Plaintiff's surviving claims are limited to allegations of excessive restrictive confinement against various defendants. *See* Dkt. No. 7, Decision and Order (dated August 4, 2022); Dkt. No. 14. While resolution of Plaintiff's claims may involve conflicting testimony and require the testimony of experts, as the Court noted in its aforementioned prior order, "if at least one of plaintiff's Eighth Amendment claims survives a dispositive motion filed by the defendants, it is highly probable that trial counsel will be appointed at the final pretrial conference." Dkt. No. 21 at 5.

Accordingly, the Court denies Plaintiff's renewed motion for the appointment of counsel without prejudice to renew at a time that is closer to trial.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 54) be **GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment claims against Defendants Annucci and Amoia be **DISMISSED**; and it is further

**ORDERED** that Plaintiff's letter request for appointment of counsel (Dkt. No. 65) is **DENIED without prejudice** to renew at some future time; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: January 26, 2024
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, David L. Cochran, Esq., of Counsel, New York,
NY, for Defendants.

## DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant
to 42 U.S.C. § 1983, was referred to the Hon. George
H. Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c).

The Report-Recommendation dated September 12, 2008
recommended that Defendants motion to dismiss be
granted in part and denied in part. Specifically, Judge
Lowe recommended that Plaintiff's Fourteenth Amendment
procedural due process claim against Defendant Varkiar
regarding his disciplinary hearing be dismissed if, within
thirty (30) days from the filing of this Final Order, Plaintiff
does not file an Amended Complaint that successfully states a
Fourteenth Amendment procedural due process claim. It was
recommended that Plaintiff's remaining claims be dismissed
with prejudice.

Plaintiff filed objections to the Report-Recommendation,
essentially raising the same arguments presented to the
Magistrate Judge.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." *See* 28 U.S.C. § 636(b)(1). After such a review, the
Court may "accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge.
The judge may also receive further evidence or recommit the
matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation of
Magistrate Judge Lowe for the reasons stated in the Report-
Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be
**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

## *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant
to 42 U.S.C. § 1983, has been referred to me by the Honorable
Thomas J. McAvoy, Senior United States District Judge, for
Report and Recommendation with regard to any dispositive
motions filed, pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c). Generally, in his Complaint, Raymond Robles
("Plaintiff") alleges that three employees of the New York
State Department of Correctional Services ("DOCS"), as
well as DOCS itself, violated his rights under the Eighth
and Fourteenth Amendments when they (1) required him to
submit to a random urinalysis test when they knew he was
taking a medication that would prevent him from providing a
urine sample, and (2) charged, convicted, and punished him
with eighty-seven days in a Special Housing Unit for refusing
to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s
Compl.].) Currently pending before the Court is Defendants'
motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that

Robles v. Bleau, Not Reported in F.Supp.2d (2008)

follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31]

However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5**  More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality . [40]

**\*6**  For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [43] Of course, an opportunity to amend is not required where "the problem

with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... " [51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide

**a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

**E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation,

but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

*10 Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

or immunities secured by *the Constitution and laws,* shall be liable to the party injured ....." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, under penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be **DISMISSED** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be **DISMISSED with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1    *See, infra,* note 41 of this Report-Recommendation (citing cases).

2    (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4    (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching

completed form entitled, "Request for Urinalysis Test".)

5    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9    (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10    (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11    (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (Id.)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for

relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27      *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,*

01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28      *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29      *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31      *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32      2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33      *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after

*Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*

] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that

sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the

papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109,

at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46      *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47      *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48      *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes

by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49      *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50      *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e) (2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60    *See, supra,* note 44 of this Report-Recommendation.

61    *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62    *See, supra,* note 44 of this Report-Recommendation.

63    *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general

population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64    *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65    *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985)

("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66    *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67    *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68    *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990)

(district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4824852
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernard J. SORRENTINO, Plaintiff,

v.

Anthony J. ANNUCCI and Tierney, Defendants.

9:23-CV-0582 (LEK/TWD)
|
Signed July 27, 2023

**Attorneys and Law Firms**

Bernard J. Sorrentino, Wallkill, NY, Pro Se.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

**\*1** The Clerk has sent to the Court a civil rights complaint filed by pro se plaintiff Bernard Sorrentino pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Acting Commissioner of Prisons Anthony Annucci ("Annucci") and Correction Officer Tierney ("Tierney") (collectively, "Defendants"). Dkt. No. 1 ("Complaint"). Plaintiff, who is currently incarcerated at Wallkill Correctional Facility, has paid the filing fee for this action.

## II. BACKGROUND

The Complaint asserts allegations of wrongdoing based on events that occurred while Plaintiff was incarcerated at Eastern Correctional Facility in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). See generally Compl. The following facts are set forth as alleged by Plaintiff in his Complaint.

On an unidentified date in 2020, Plaintiff was issued "a false misbehavior report" by Defendant Corrections Officer Tierney. Id. at 4. At the conclusion of Plaintiff's disciplinary hearing, an unidentified corrections official found Plaintiff guilty of the charges in the misbehavior report and sentenced him to fifty days of confinement in the special housing unit ("SHU"). Id.

At the conclusion of Plaintiff's SHU confinement, one or more unidentified corrections officials placed Plaintiff "under administrative segregation" for 60 days. Id.

Plaintiff filed a grievance and commenced a state court proceeding regarding the false misbehavior report. Id. On October 5, 2021, the "[disciplinary] charge was affirmed" by the state court, and Plaintiff was "denied entry to the New York Court of Appeals" on April 26, 2022. Id.

On July 25, 2022, Plaintiff filed another state court action wherein he sought monetary relief "for [his] segregation time only, not the false misbehavior report." Id.

Liberally construed, the Complaint asserts the following Section 1983 claims against Defendants: (1) Eighth Amendment claims based on Plaintiff's restrictive confinement; and (2) Fourteenth Amendment due process claims based on the issuance of the false misbehavior report and imposed disciplinary sentence. Id. at 7. Plaintiff seeks an award of monetary damages. Id.

## III. LEGAL STANDARD

Pursuant to 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (finding that Section 1915A applies to all actions brought by prisoners against government officials); Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both 28 U.S.C. § 1915 and 28 U.S.C. § 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, a court has a duty to show liberality toward pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Although a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has stated that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Twombly, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (cleaned up).

## IV. DISCUSSION

**\*2** Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

### A. Section 1983 Claims Against Annucci
It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)); Iqbal, 556 U.S. at 676. "[A Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). "[V]icarious liability is inapplicable to ...§ 1983 suits." Iqbal 556 U.S. at 676.

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is

insufficient to show his or her personal involvement in that unlawful conduct. See Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 676). Thus, in the context of an Eighth Amendment claim against a supervisory official, a plaintiff must establish that the supervisory official himself "acted with deliberate indifference—meaning that [the official] personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety." Id. at 619 (internal quotation marks and citation omitted).

Here, the Complaint names DOCCS Commissioner Annucci as a defendant, but fails to allege that this official was involved in any of the wrongdoing described in the Complaint. See generally Compl. Plaintiff does not, for example, allege that Annucci was involved in investigating the misbehavior report authored by Tierney. Nor does Plaintiff allege that Annucci participated in his disciplinary hearing or appeal of the disciplinary determination, or was in any way involved in the decision to place him in administrative segregation. Thus, the Court has no basis to infer that Annucci was personally involved in the alleged wrongdoing described in the Complaint.

Accordingly, Plaintiff's Section 1983 claims against Annucci are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### B. Eighth Amendment Claim Against Defendant Tierney
The Eighth Amendment protects prisoners from "cruel and unusual punishments" at the hands of prison officials. See Wilson v. Seiter, 501 U.S. 294, 296–97 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976). Although it is clear that the Eighth Amendment "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody. Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (first citing Farmer v. Brennan, 511 U.S. 825, 832 (1994); and then citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).

**\*3**  "Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety." Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276, at \*8 (N.D.N.Y. Aug. 19, 2014). To satisfy the deliberate indifference standard, a plaintiff must show that: (1) "he is incarcerated under conditions posing a substantial risk of serious harm;" and (2) "the defendant prison officials possessed sufficient culpable intent." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " Helling v. McKinney, 509 U.S. 25, 30, 33 (1993) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." Hayes, 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Id. As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Courts in this Circuit have held that as a general rule, "administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of the penalty that criminal offenders pay for their offenses against society." Tavares v. Amato, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) (quotations and alterations omitted); Bowens v. Smith, No. 11-CV-784, 2013 WL 103575, at \*10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), report and recommendation adopted 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013).

"However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.' " Smith v. Annucci, No. 18-CV-06261, 2019 WL 539935, at \*6 (W.D.N.Y. Feb. 11, 2019) (quoting Peoples v. Annucci, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for

extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation." Smith, 2019 WL 539935, at \*6 (citing Peoples v. Fischer, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)); see also Hamilton v. Fisher, No. 10-CV-1066, 2012 WL 987374, at \*8 (N.D.N.Y. Feb. 20, 2012) ("SHU confinement is not cruel and unusual unless it is 'totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain.' ") (quoting Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir. 1984)), report and recommendation adopted, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

Here, Plaintiff has not alleged any cognizable deprivation or exposure to any excessive risk to his health or safety during his segregated confinement. See generally Compl.

Accordingly, Plaintiff's Eighth Amendment claim against Defendant Tierney is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. Fourteenth Amendment Claims Against Defendant Tierney

To successfully state a claim under Section 1983 for denial of procedural due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d 106, 118 (2d Cir. 2004) (citing Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989)). Procedural due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

**\*4**  An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. Id.

Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, the Second Circuit has defined general guidelines. See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004). The Second Circuit has found that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. See Colon

v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 589–90 (2d Cir. 1999)). As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." Bunting v. Nagy, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing Sealey, 197 F.3d at 589); see also Palmer, 364 F.3d at 64–65 ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." (citing Colon, 215 F.3d at 232)).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include: "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some reliable evidence." Id. (citing Superintendent v. Hill, 472 U.S. 445, 455 (1985)).

Here, Plaintiff alleges that Defendant Tierney issued a "false misbehavior report," and he was thereafter found guilty of the charges in that report and sentenced to fifty days of confinement in the SHU. Compl. at 4. Insofar as Plaintiff has asserted a due process claim against Tierney based on the alleged issuance of a false misbehavior report, it is well settled that "the filing of unfounded charges is not *per se* a constitutional violation under section 1983[.]" Freeman v. Rideout, 808 F.2d 949, 950 (2d Cir. 1986); Willey v. Kirkpatrick, 801 F.3d 51, 63 (2d Cir. 2015) (noting that "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the [allegedly false] report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right[,]" the alleged creation of a false report may give rise to a constitutional claim); Mitchell v. Senkowski, 158 F. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of false testimony against an inmate ... violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, ... or where the fabrication of evidence was motivated by a desire to retaliate

for the inmate's exercise of his substantive constitutional rights ...." (internal citations omitted)). Moreover, the Complaint lacks allegations regarding the events that formed the basis misbehavior report, and any prior history between Plaintiff and Tierney. Thus, the Court has no basis to infer that the misbehavior report was issued as retaliation for the exercise of substantive constitutional rights.

**\*5** Furthermore, insofar as Plaintiff has asserted a due process claim against Defendant Tierney based on the alleged disciplinary sanction that he received, Plaintiff's pleading is deficient for two reasons. First, the Complaint does not include any allegations regarding Plaintiff's restrictive confinement, and fifty days of SHU confinement is not atypically long in and of itself. See Colon, 215 F.3d at 231; Elleby v. Martucello, No. 16-CV-1335, 2018 WL 3769965, at \*3 (N.D.N.Y. Aug. 9, 2018) ("The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by Sandin."). [1] Second, the Complaint does not provide any facts relating to Plaintiff's disciplinary hearing. Thus, the Court also has no basis to plausibly infer that Plaintiff was denied due process in connection with his disciplinary hearing.

[1]        The law is well settled that "[i]t is the length of the actual punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and, not the length of the sentence imposed." Burroughs v. Mitchell, 325 F. Supp. 3d 249, 276 (N.D.N.Y. 2018) (citing Scott v. Albury, 156 F.3d 283, 287–88 (2d Cir. 1998)).

Accordingly, Plaintiff's Fourteenth Amendment due process claims against Tierney are dismissed pursuant to 28 U.S.C. § 1915(b) for failure to state a claim upon which relief may be granted. Any prior complaint shall be incorporated into his amended complaint by reference.

### D. Dismissal with Leave to Amend

Based on the foregoing, the Court finds that Plaintiff's Complaint is subject to dismissal under 28 U.S.C. § 1915(b) for failure to state a claim upon which relief may be granted. In light of Plaintiff's pro se status, the Court will afford him the opportunity to file an amended complaint. See Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir. 1999). In any amended complaint that Plaintiff submits in response to this Memorandum-Decision and Order, he must set forth a short and plain statement of the facts to

support his claim that any individual named as a defendant engaged in misconduct or wrongdoing that violated Plaintiff's constitutional rights. Plaintiff is advised that any amended complaint will completely replace the prior Complaint in the action, and that no portion of any prior complaint shall be incorporated into his amended complaint by reference.

Plaintiff is forewarned that, if he fails to submit an amended complaint within forty-five (45) days of the filing date of this Decision and Order, the Court will dismiss this action without prejudice, and without further order, pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED**, that if Plaintiff wishes to proceed with this action, he must file an amended complaint as directed above **within forty-five (45) days** from filing date of this Decision and Order; and it is further

**ORDERED**, that, if Plaintiff timely files an amended complaint, this matter be returned to the Court for further review; and it is further

**ORDERED**, that if Plaintiff fails to timely file an amended complaint as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED without prejudice** without further order of this Court pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. In that event, the Clerk is directed to close this case; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

 *6  **ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on Plaintiff in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 4824852

---

2021 WL 4775970
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wonder WILLIAMS, Plaintiff,

v.

Anthony ANNUCCI, Acting Commissioner, Department
of Corrections and Community Supervision, James
O'Gorman, Deputy Commissioner for Correctional
Facilities, John Colvin, Superintendent of Five
Points, Matthew Thoms, Superintendent of Mid-
State, Donald Venettozzi, Director of DOCCS Special
Housing and Inmate Disciplinary Program, John or
Jane Does 1–5, Members of the DOCCS SHMC at
Five Points, and John or Jane Does 6–10, Members
of the DOCCS SHMC at Mid-State, Defendants.[1]

[1] While Plaintiff's original complaint asserted claims
against Defendants Joseph Bellnier and Albert
Prack, (*see* Dkt. No. 1), the First Amended
Complaint does not name either Bellnier or Prack
as a Defendant, (*see* Dkt. No. 24). The parties'
briefs likewise do not mention Defendants Bellnier
and Prack or include them in the case caption. (Dkt.
Nos. 28-1, 30, 33). Accordingly, the Court deems
Plaintiff's claims against Defendants Bellnier and
Prack to be waived. *See Elliot v. City of Hartford*,
649 F. App'x 31, 32 (2d Cir. 2016) (summary order)
(noting that it is "generally the case that '[a]ll
causes of action alleged in an original complaint
which are not alleged in an amended complaint are
waived' " (quoting *Austin v. Ford Models, Inc.*,
149 F.3d 148, 155 (2d Cir. 1998), *abrogated on
other grounds by Swierkiewicz v. Sorema N.A.*, 534
U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))).
The Clerk of the Court is respectfully directed to
terminate Defendants Bellnier and Prack on the
docket.

9:20-cv-1417 (BKS/TWD)
|
Signed 10/13/2021

**Attorneys and Law Firms**

For Plaintiff: James D. Arden, Julia L. Bensur, Laura Sorice,
Sidley Austin LLP, 787 Seventh Avenue, New York, NY
10019.

For Defendants Annucci, O'Gorman, Colvin, Thoms, and
Venettozzi: Letitia James, Attorney General of the State of
New York, Keith J. Starlin, Assistant Attorney General, of
Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*1 Plaintiff Wonder Williams brings this action under
42 U.S.C. § 1983 against Defendants Anthony Annucci,
James O'Gorman, John Colvin, Matthew Thoms, Donald
Venettozzi, and John or Jane Does 1–10, alleging violations
of his Eighth and Fourteenth Amendment rights during
Plaintiff's incarceration in New York State Department
of Corrections and Community Supervision ("DOCCS")
correctional facilities. (Dkt. No. 24). Presently before the
Court is Defendants' motion, pursuant to Fed. R. Civ. P.
12(b)(1) and 12(b)(6), to dismiss Plaintiff's first amended
complaint ("FAC"). (Dkt. No. 28). Plaintiff has opposed the
motion, (Dkt. No. 30), and Defendants have responded, (Dkt.
No. 33). For the following reasons, Defendants' motion is
granted in part and denied in part.

**II. FACTS [2]**

[2] The facts are drawn from the FAC. The
Court assumes the truth of, and draws
reasonable inferences from, the well-pleaded
factual allegations. *Faber v. Metro. Life Ins. Co.*,
648 F.3d 98, 104 (2d Cir. 2011).

Plaintiff was placed into DOCCS custody on March 6,
2010 for charges "stemming from his involvement in a
shooting and murder-for-hire plot." (Dkt. No. 24, ¶ 32).
Immediately upon entering DOCCS custody, Plaintiff was
placed in administrative segregation ("Ad Seg"), a form of
solitary confinement in the Special Housing Unit ("SHU"),
at Auburn Correctional Facility ("Auburn"). (*Id.* ¶ 33).
Plaintiff's placement on Ad Seg was recommended by S.B.
Duncan and Superintendent Graham at Auburn, because
they believed Plaintiff's placement in the general population

posed an "extreme risk to staff, inmates and the general public as well as the safety, security, and good order of the facility." (*Id.* ¶¶ 3, 33). In support of this determination the correctional staff cited Plaintiff's "use of telephones, U.S. Mail, Western Union, and jail visits while he was incarcerated on Riker's Island in 2007 to coordinate a failed murder-for-hire plot." (*Id.* ¶ 33). Plaintiff remained confined in Ad Seg at Auburn until July 6, 2015. (*Id.* ¶ 34). On July 6, 2015, Plaintiff moved to Ad Seg at Five Points Correctional Facility ("Five Points"). (*Id.*).

While in Ad Seg, Plaintiff was housed in a concrete cell "roughly the size of a standard parking space" for about 23 hours per day. (*Id.* ¶ 41). Plaintiff's cells were dirty, "with dirty water sometimes coming out of the sinks," and there was always a bright light kept on in or outside his cell. (*Id.*). He was allowed to shower three times per week, although he often had to shower in cold water or was not taken to the showers by corrections officers at his allotted time. (*Id.* ¶ 42). Plaintiff was allowed one hour of outdoor recreation each day. (*Id.* ¶ 43). Plaintiff did not have access to group meals, recreation, or education and had "minimal human interaction." (*Id.* ¶¶ 44–46).

New York regulations required DOCCS to periodically conduct reviews of Plaintiff's status on Ad Seg. (*Id.* ¶ 61; *see id.* (alleging that DOCCS was required to review his status every 30 days)); *see also* 7 N.Y.C.R.R. § 301.4(d) ("An inmate in administrative segregation status shall have such status reviewed every 60 days in accordance with the [specified] procedure."). [3] However, Plaintiff alleges that he never received any meaningful review of his Ad Seg status. (Dkt. No. 24, ¶ 62). The reviews conducted by DOCCS contained "substantially similar, sometimes even identical, language to prior reviews and used formulaic, boilerplate language" that did not consider any changed circumstances. (*Id.* ¶ 63). Plaintiff's reviews from May 2010 to November 2017 contained "the same recitation" of his criminal history, his status as a gang member, and details regarding his crime of conviction and stated "no other basis" for keeping Plaintiff in Ad Seg. (*Id.* ¶¶ 64–65). Plaintiff was not released from Ad Seg even when the reviews acknowledged his positive behavior. (*Id.* ¶¶ 67–72; *see, e.g., id.* ¶¶ 68 (February 12, 2014 review stating: "[Plaintiff's] current behavior is within acceptable and appropriate limits."), 69 (October 10, 2014 review noting that Plaintiff "has a clean disciplinary record"), 70 (September 8, 2015 review noting that "[w]hile in administrative segregation [Plaintiff] has exhibited respectful behavior")). Moreover, Plaintiff was not given any indication

as to how he could change his behavior to be taken off Ad Seg status. (*Id.* ¶ 63).

3    Section 301.4 was amended effective December 16, 2020. In this decision, the Court cites to the version of Section 301.4 that was in effect at the time Plaintiff was confined in Ad Seg and the step-down program.

**\*2** On December 1, 2017, Plaintiff was placed into the step-down program and housed in the SHU at Mid-State Correctional Facility ("Mid-State"). (*Id.* ¶¶ 35–36). The step-down program is designed to provide for a "phased transition for individuals in Ad Seg to return to the general population." (*Id.* ¶ 37). Plaintiff alleges, however, that the "conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement." (*Id.* ¶ 37). Plaintiff remained confined in his cell for 23 hours a day, and often was denied his one hour of daily recreation. (*Id.* ¶ 50). Although Plaintiff did receive an "additional four hours of inmate programming sessions each week," he was chained during the sessions. (*Id.*). Plaintiff "was not afforded any hearing or subsequent review of his segregated status" while in the step-down program and therefore "spent over a year in the step-down program without a meaningful review of his status, even though the conditions constituted continued solitary confinement." (*Id.* ¶¶ 35, 52, 74–75).

As a result of the time he spent in solitary confinement, Plaintiff suffered from medical and mental health conditions. (*Id.* ¶ 53). Plaintiff suffered from sleep disturbances, migraines, weight loss due to a thyroid condition, and back and neck pain. (*Id.* ¶¶ 55–58). He also suffered from "anxiety, depression, hopelessness, insomnia, and noticeable changes to his personality including increased introversion and difficulty focusing on daily tasks." (*Id.* ¶ 59). Plaintiff alleges that Defendants knew the deleterious effects of solitary confinement and that they were aware, by means of administrative grievances and written complaints, that Plaintiff was suffering "significant and lasting physical and mental injury as a result of his solitary confinement." (*Id.* ¶¶ 77–78).

On February 6, 2019, Plaintiff was moved to the general population. (*Id.* ¶ 38). On February 23, 2021, Plaintiff was released from DOCCS custody on parole. (*Id.* ¶ 31).

### III. STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## IV. DISCUSSION

### A. STATUTE OF LIMITATIONS

Defendants argue that Plaintiff's claims regarding any acts or omissions prior to November 16, 2017 should be dismissed as barred by the statute of limitations. (Dkt. No. 28-1, at 9–13); *see DeSuze v. Ammon*, 990 F.3d 264, 271 (2d Cir. 2021) ("[Section 1983] claims ... are subject to a three-year statute of limitations."). Plaintiff responds that his Eighth Amendment claims are timely because the continuing violation doctrine applies and that his Fourteenth Amendment procedural due process claims are timely because the FAC alleges actions "that either apply to the entire duration" of Plaintiff's solitary confinement or which "expressly occurred after November 2017." (Dkt. No. 30, at 13–17).

The continuing violation doctrine applies to claims that are "composed of a series of separate acts that collectively constitute one unlawful [ ] practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)) (internal quotation marks omitted). Where applicable, the doctrine provides an "exception to the normal knew-or-should-have-known accrual date." *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)) (internal quotation marks omitted). The continuing violation doctrine applies to

"claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). It does not, however, apply to "discrete unlawful acts," even if those discrete unlawful acts are part of "serial violations." *Id.*

**\*3** To assert a timely claim under the continuing violation doctrine, a plaintiff must allege "some non-time-barred acts" contributing to the alleged violation. *Id.* (quoting *Harris*, 186 F.3d at 250).[4] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Connecticut Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). In the context of an alleged continuing violation, if a plaintiff can demonstrate "some [ ] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, "the mere allegation of the existence of such a [continuing] policy would be sufficient to withstand a challenge for failure to state a claim," *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

4    Moreover, where a plaintiff brings a claim against multiple defendants, he must allege non-time-barred act as to *each* defendant. *See Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."); *Lucente*, 980 F.3d at 310 (holding that Section 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period").

The Second Circuit has applied the continuing violation doctrine to Eighth Amendment deliberate indifference claims. *See, e.g.*, *Gonzalez*, 802 F.3d at 224 (applying the doctrine to an Eighth Amendment claim for cruel and unusual punishment); *Shomo*, 579 F.3d at 182 (holding that the doctrine can apply to an Eighth Amendment claim for deliberate indifference to serious medical needs); *Smith v.*

*Annucci*, No. 18-cv-06261, 2019 WL 539935, at *7, 2019 U.S. Dist. LEXIS 21888 (W.D.N.Y. Feb. 11, 2019) (applying the doctrine to an Eighth Amendment claim challenging long-term confinement in SHU). Accordingly, Plaintiff's Eighth Amendment claims are subject to the continuing violation doctrine, and at what point his claims accrued "is a question of fact." *Gonzalez*, 802 F.3d at 224. Moreover, even where a claim subject to the continuing violation doctrine accrues before the statute of limitations expires, it will still be timely "as long as the violation of rights continued past" the expiration of the limitations period—i.e., as long as the plaintiff alleges a non-time-barred act contributing to the alleged violation. *Id.* (citing *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061); *Lucente*, 980 F.3d at 309.

Here, Plaintiff alleges that he was held in solitary confinement from March 6, 2010 to February 6, 2019. (Dkt. No. 24, ¶¶ 25, 32–38). Therefore, regardless of when Plaintiff's Eighth Amendment claim challenging his long-term confinement in isolation accrued, Plaintiff has alleged that the violation of his rights continued until February 6, 2019, less than two years before he commenced this action on November 16, 2020. (*See* Dkt. No. 1). The Court therefore cannot conclude from the face of the FAC that Plaintiff's Eighth Amendment claims are barred as a matter of law. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 19-cv-10256, 2020 WL 6274826, at *40, 2020 U.S. Dist. LEXIS 198655 (S.D.N.Y. Oct. 24, 2020) ("The Court declines to parse how the continuing violation doctrine may apply to [the plaintiff's] claims at the motion to dismiss stage.") (quotation marks omitted).

 **\*4** On the other hand, the continuing violation doctrine is not applicable to claims asserting a violation of the plaintiff's procedural due process rights. *See, e.g.*, *Gonzalez*, 802 F.3d at 223 (noting the "inapplicability" of the doctrine to procedural due process claims); *Smith*, 2019 WL 539935, at *5, 2019 U.S. Dist. LEXIS 21888 (holding the doctrine did not apply to the plaintiff's claims for procedural due process violations and collecting cases). Even though successive denials of a plaintiff's procedural due process rights "may combine to form a 'serial violation,' " each denial is a discrete act which triggers the accrual of a discrete claim. *Gonzalez*, 802 F.3d at 223. Accordingly, Plaintiff has a discrete claim for each alleged denial of "meaningful and timely periodic review" of his detention in Ad Seg or of "meaningful notice of what he must do to earn release," (Dkt. No. 24, ¶ 114), and each of those claims is subject to a three-year statute of limitations. Therefore, Plaintiff's procedural due process claim would be

able to proceed as to any reviews—or lack thereof—occurring within three years of the filing of his complaint.

However, dismissal under Federal Rule of Civil Procedure 12(b)(6) on the ground of a statutory bar, such as lack of timeliness, is appropriate only when "it is clear from the face of the complaint" that "the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). Here, Plaintiff alleges that he exhausted his administrative remedies by appealing the finding of his initial Ad Seg hearing, appealing his Ad Seg reviews, and submitting various grievances to the Inmate Grievance Resolution Committee. (Dkt. No. 24, ¶¶ 82–86). The Second Circuit has held that "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011). The parties have not addressed how long it took Plaintiff to complete the exhaustion process regarding his procedural due process claims and for how long the statute of limitations applicable to his claims should be tolled. Accordingly, the Court cannot determine from the face of the FAC that any of Plaintiff's claims are "barred as a matter of law." *Sewell*, 795 F.3d at 339.[5] Accordingly, Defendants' motion to dismiss on statute of limitations grounds is denied.

[5]     Because factual issues regarding the length of time for which the statute of limitations should be tolled would remain in any case, the Court does not consider the records of Plaintiff's Ad Seg reviews submitted by Defendants with their motion to dismiss, (*see* Dkt. No. 28-3), and confines its consideration to the FAC.

### B. PERSONAL INVOLVEMENT

Defendants argue that Plaintiff's claims must be dismissed because the FAC fails to allege the personal involvement of any Defendant in the alleged violation of his constitutional rights. (Dkt. No. 28-1, at 13–25). Plaintiff responds that the FAC sufficiently alleges the personal involvement of each Defendant by alleging each Defendant's knowledge of ongoing constitutional violations in solitary confinement. (Dkt. No. 30, at 18–26).

It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 44 of 128

Williams v. Annucci, Not Reported in Fed. Supp. (2021)

plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). The Second Circuit recently held that the *Colon* test for showing the personal involvement of supervisory officials was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Specifically, the Second Circuit held that "there is no special rule for supervisory liability" and that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). [6] Thus, the "factors" necessary to plead and establish a Section 1983 violation " 'will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id.* (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). To state an Eighth Amendment claim, which requires a *mens rea* of deliberate indifference, a plaintiff must allege that the supervisor had "subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *See id.* at 616 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). To state a Fourteenth Amendment claim for violation of procedural due process rights, a plaintiff must allege a protected liberty or property interest and that the plaintiff was deprived of that interest without sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

[6]   Plaintiff is incorrect that *Tangreti* is "inapposite" because there "the court set the standard for liability under Section 1983 at the *summary judgment* stage, not the motion to dismiss stage." (*See* Dkt. No. 30, at 18). *Tangreti* makes clear that a plaintiff "must *plead* and prove" that each individual defendant violated the Constitution. 983 F.3d at 618 (emphasis added).

### 1. Acting Commissioner Annucci

**\*5**  The FAC alleges that Annucci, as Acting Commissioner of DOCCS, "is responsible for the overall management and operation of DOCCS" and that his "responsibilities include reviewing and approving the transfer of prisoners to DOCCS Special Housing Units ('SHU'), including administrative Segregation ('Ad Seg') and the step-down program, under

a Central Office placement." (Dkt. No. 24, at ¶ 12). The FAC further alleges that, "[u]pon information and belief, ANNUCCI approved [Plaintiff's] continued solitary confinement for a period of time relevant to this action." (*Id.*). Plaintiff also alleges that Annucci "has final policy-making and supervisory authority within DOCCS and is personally involved in authorizing and maintaining the unconstitutional policies and practices" challenged by Plaintiff, and that he "is well aware" of the "unconstitutional risk of harm to inmates" resulting from lengthy periods of solitary confinement. (*Id.* ¶¶ 12–13).

The Court finds that the FAC does not plausibly allege constitutional claims under Section 1983 against Annucci. Although the FAC alleges that Annucci approved Plaintiff's solitary confinement at some point, it does not plausibly allege facts indicating that Annucci had "subjective knowledge of a substantial risk of serious harm" to Plaintiff in particular and disregarded that risk. *See Tangreti*, 983 F.3d at 616. Moreover, given the abrogation of the *Colon* factors previously used to establish supervisory liability, the allegations regarding Annucci's policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead his subjective knowledge as to Plaintiff's situation specifically. To the extent that Plaintiff asks the Court to infer that Annucci was aware of and personally involved in Plaintiff's injuries based simply on his position as Acting Commissioner, that is "precisely the kind of inference about supervisory officials held impermissible by the Second Circuit in *Tangreti*." *Zielinski v. Annucci*, No. 17-cv-1042, —— F. Supp. 3d. ——, 2021 WL 2744684, at *8, 2021 U.S. Dist. LEXIS 124088 (N.D.N.Y. July 2, 2021).

Plaintiff also alleges that "Defendants" deprived him of "a protected liberty interest in avoiding long-term solitary confinement," "meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release," in violation of the Fourteenth Amendment's Due Process Clause. (Dkt. No. 24, ¶ 114). However, the FAC contains no allegations regarding Annucci's individual actions with respect to Plaintiff and therefore does not plausibly allege his personal involvement in the alleged violation of Plaintiff's procedural due process rights. *Cf. Jackson v. Annucci*, No. 20-cv-02008, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276 (S.D.N.Y. June 23, 2021) (finding no personal involvement where the allegations did not "connect Annucci to the specific constitutional violations" alleged).

Accordingly, Plaintiff's Section 1983 claims against Annucci are dismissed.

### 2. Deputy Commissioner O'Gorman

The FAC alleges that O'Gorman, as Deputy Commissioner of DOCCS, had "policy-making and supervisory authority within DOCCS" and was "personally involved in authorizing and maintaining the unconstitutional policies and customs" at issue. (Dkt. No. 24, ¶ 14). The FAC further alleges that, "[u]pon information and belief," O'Gorman "instituted policies that facilitated [Plaintiff's] placement in Ad Seg, including the lack of meaningful review of his status." (Id.). Plaintiff alleges that O'Gorman was "responsible for the overall management and operation of the correctional institutions within DOCCS" and that his "responsibilities included reviewing and approving the transfer and assignment of prisoners to SHU, including Ad Seg and the step-down program." (Id. ¶ 15). Plaintiff alleges that O'Gorman was the "final arbiter" of his continued placement in solitary confinement, (id. (citing 7 N.Y.C.R.R. § 301.4(d)(3))), and that, upon information and belief, O'Gorman "approved [Plaintiff's] continued confinement in solitary confinement ... for a period of time relevant to this action." (Id.). O'Gorman's approval "included signing each review despite lacking any justification for continuing" Plaintiff's detention or allowing Plaintiff's continued placement in solitary without meaningful review. (Id.). The FAC further alleges that O'Gorman, "on at least one occasion since November 2017" and "as mandated by New York regulations," "reviewed, approved, and signed off on the disciplinary review boards' [7] continued decisions to keep [Plaintiff] confined in solitary confinement, in knowing disregard of the lack of penological justification for such confinement." (Id. ¶ 16). Finally, Plaintiff alleges that O'Gorman, like Annucci, "has been on notice of the constitutional violations suffered by inmates" subjected to prolonged solitary confinement. (Id. ¶ 17).

[7]    This case does not implicate disciplinary hearings or the disciplinary process. The FAC does not explain what a "disciplinary review board" is, or its relevance here.

**\*6** The Court finds that the FAC plausibly alleges O'Gorman's personal involvement in the alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights. Contrary to Defendants' argument that the FAC is "bereft

of factual detail" to support the allegation that O'Gorman was personally involved, (see Dkt. No. 28-1, at 18), the FAC specifically alleges that O'Gorman was the "final arbiter" of Plaintiff's continued placement in solitary confinement and that he therefore approved Plaintiff's continued placement in "solitary confinement, including administrative segregation and the step-down program," (Dkt. No. 24, ¶ 15); see also 7 N.Y.C.R.R. § 301.4(d)(3) (providing that, where an inmate in Ad Seg "is to receive central office review," the deputy commissioner, "[u]pon receipt of the materials from the central office committee ... shall make the determination to retain the inmate in or release the inmate from administrative segregation"). From the allegations that O'Gorman approved Plaintiff's continued placement in solitary confinement, it is reasonable to infer that O'Gorman was subjectively aware of the risk that Plaintiff's constitutional rights were being violated by prolonged confinement in isolation, and that he disregarded that risk by approving his continued placement. See Farmer, 511 U.S. at 837, 114 S.Ct. 1970; see also H'Shaka v. O'Gorman, 444 F. Supp. 3d 355, 376 (N.D.N.Y. 2020) (finding personal involvement of DOCCS defendants where they "were directly involved in the decision to keep Plaintiff in Ad Seg"). [8] Moreover, these allegations "connect" O'Gorman to the review of Plaintiff's continued status in solitary and the alleged violation of Plaintiff's procedural due process rights. Cf. Jackson, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276.

[8]    Defendants argue that Plaintiff's original complaint alleged that Joseph Bellnier occupied the position of Deputy Commissioner until his retirement in September 2017, and that O'Gorman therefore did not become Deputy Commissioner until after that time. (Dkt. No. 28-1, at 19). However, "[i]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted). Accordingly, the Court does not credit this argument and confines its analysis to the allegations of the FAC.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Section 1983 claims against O'Gorman.

### 3. Superintendents Colvin and Thoms

The FAC alleges that Colvin, the Superintendent at Five Points, and Thoms, the Superintendent at Mid-State, "are responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction." (Dkt. No. 24, ¶ 18). The FAC further alleges that Colvin and Thoms "managed DOCCS facilities where [Plaintiff] was housed in SHU" and had "policy-making and supervisory authority over all operations" at their respective facilities. (*Id.* ¶ 19). The FAC alleges that the DOCCS Superintendents "were personally involved in the decision to confine inmates, including [Plaintiff], to Ad Seg and SHU." (*Id.*). More specifically, Plaintiff alleges: "Under DOCCS regulations, the Superintendent of each facility is required to make an independent determination as to whether an inmate remains in solitary confinement or is released from Ad Seg or the step-down program." (*Id.* (citing 7 N.Y.C.R.R. § 301.4(d) (2) (providing that "the superintendent shall, except where the superintendent or designee refers the matter to central office," "make a determination to retain the inmate in or release the inmate from administrative segregation"))). Plaintiff alleges that Colvin and Thoms "denied [Plaintiff] his right to meaningful review of his Ad Seg status, approved the disciplinary review boards'[9] continued decisions to keep [Plaintiff] in solitary confinement, and failed to provide [Plaintiff] with adequate living conditions." (*Id.*). The FAC alleges that Colvin and Thoms "signed off on the perfunctory Ad Seg reviews" "in knowing disregard of their lack of justification." (*Id.* ¶ 20). With respect to SHU, the FAC alleges that DOCCS utilized a committee at each facility to make recommendations to the Superintendent regarding whether "a SHU prisoner should be granted a time-cut to his SHU sentence under the Superintendent's discretionary authority." (*Id.* ¶ 23).

[9]       *See supra* Section IV.B.2., n.7.

At this stage, and for similar reasons as discussed above regarding O'Gorman, the Court finds that the FAC plausibly alleges Colvin and Thoms's personal involvement in the alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights. While the Court agrees with Defendants that this case does not implicate the Superintendents' authority to review disciplinary hearings imposing punishment and that Section 301.4 does not on its face address a Superintendent's responsibilities in connection with the step-down program, (*see* Dkt. No. 28-1, at 20–23), the FAC plausibly alleges the Superintendents' personal involvement in the decision to continue an inmate's placement in Ad Seg and SHU. With respect to Ad Seg, Plaintiff

has alleged that Colvin and Thoms were required to make independent determinations regarding his continued status on Ad Seg and that they signed off on the reviews which prolonged his solitary confinement. (Dkt. No. 24, ¶¶ 19–20). It is therefore reasonable to infer that, because they were involved in decisions approving Plaintiff's continued solitary confinement, Colvin and Thoms were subjectively aware of and disregarded the risk that Plaintiff's constitutional rights were being violated. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Moreover, by alleging that Colvin and Thoms "signed off" on "perfunctory" reviews that deprived Plaintiff of his right to meaningful review of his status in solitary confinement and, with respect to SHU, had discretionary authority to make time-cuts, the FAC plausibly alleges the Superintendents' personal involvement in the alleged denial of Plaintiff's procedural due process rights. *Cf. Jackson*, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276.

### 4. Director Venettozzi

**\*7** The FAC alleges that Venettozzi's authority as Special Housing Unit Director includes "reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings." (Dkt. No. 24, ¶ 21). The FAC also alleges that, "[u]pon information and belief," Venettozzi denied Plaintiff meaningful review of his status in solitary confinement "on at least one occasion since November 2017 by reviewing, approving, and signing off on the disciplinary review boards' repeated decisions" to keep him there. (*Id.* ¶ 22).

The Court finds that the FAC does not plausibly allege Venettozzi's personal involvement in the alleged violations of Plaintiff's constitutional rights. Although Plaintiff suggests in his opposition that Venettozzi's authority over dispositions imposed at Tier III Hearings extends to the hearing that "resulted in [Plaintiff's] initial placement in Ad Seg," (Dkt. No. 30, at 23), this allegation is not contained in the FAC. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself."). Indeed, the FAC does not allege that Venettozzi was in fact involved in Plaintiff's initial placement in solitary, or that the initial placement in Ad Seg itself violated Plaintiff's constitutional rights. The only other allegation regarding Venettozzi is a conclusory statement that Venettozzi at some point reviewed, approved, and signed off on the "disciplinary review boards' repeated decisions to keep [Plaintiff] in solitary confinement." (*Id.* ¶ 22).[10] This

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 47 of 128

Williams v. Annucci, Not Reported in Fed. Supp. (2021)

allegation is insufficient to plausibly allege facts indicating that Venettozzi had "subjective knowledge of a substantial risk of serious harm" to Plaintiff specifically and disregarded that risk. *See Tangreti*, 983 F.3d at 616. The FAC also does not plausibly allege Venettozzi's personal involvement in the alleged violation of Plaintiff's procedural due process rights. *Cf. Abdul-Halim v. Bruyere*, No. 19-cv-740, 2021 WL 3783087, at *3, 2021 U.S. Dist. LEXIS 161441 (N.D.N.Y. Aug. 26, 2021) (noting that affirming the outcome of a prison hearing is not sufficient to establish personal involvement).

10      *See supra* Section IV.B.2., n.7.

Accordingly, Plaintiff's Section 1983 claims against Venettozzi are dismissed.

### C. PROCEDURAL DUE PROCESS CLAIMS

Defendant argues that Plaintiff's procedural due process claim should be dismissed because Plaintiff did not have a liberty interest in not being placed in the step-down program and therefore was not entitled to any review of his placement there. (Dkt. No. 28-1, at 25–26). [11] Plaintiff responds that he has a liberty interest in not being subjected to extended time in solitary confinement, which includes the step-down program, and that his time in the step-down program therefore triggered procedural due process protections. (Dkt. No. 30, at 28–31).

11      Defendants' argument does not address any procedural due process claims accruing before Plaintiff's move to the step-down program on December 1, 2017, on the view that those claims are time-barred. However, for the reasons discussed above, *supra* Section IV.A, Defendants' motion to dismiss any claims on statute of limitations grounds is denied.

To state a claim under Section 1983 for the denial of procedural due process, a plaintiff must allege both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur*, 391 F.3d at 118 (citing *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions and duration 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

Confinement to segregated housing may trigger procedural due process protections, depending on the length, frequency, and conditions of the confinement. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that the "duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical" (citations omitted)); *see also Williams v. Chuttey*, No. 15-cv-1278, 2017 WL 9673722, at *4, 2017 U.S. Dist. LEXIS 144253 (N.D.N.Y. Sept. 5, 2017) (noting that there is no "bright line rule that a certain period of confinement in keeplock or a segregated housing unit automatically gives rise to due process protection"), *report-recommendation adopted by* 2018 WL 1413049, 2018 U.S. Dist. LEXIS 45931 (N.D.N.Y. Mar. 21, 2018), *aff'd*, 767 F. App'x 105 (2d Cir. 2019). A sufficiently long confinement, even under normal SHU conditions, is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (holding that procedural due process protections were required for a confinement in SHU of 305 days).

**\*8** At this stage, the Court finds that Plaintiff has adequately alleged that he had a liberty interest in avoiding his restricted confinement, whether in Ad Seg or the step-down program, triggering procedural due process protections. Plaintiff alleges that he was in solitary confinement from March 6, 2020 until February 6, 2019, a total of almost nine years. (Dkt. No. 24, ¶¶ 25, 32–38). Plaintiff was placed into the step-down program on December 1, 2017 and remained there for approximately 432 days before being released into the general population. (*Id.*). Moreover, the FAC alleges that "conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement." (*Id.* ¶¶ 47–48). Plaintiff remained housed in SHU while in the step-down program and was confined to his cell for 23 hours a day. (*Id.* ¶¶ 49–50). Plaintiff alleges that the "only minor difference" between Ad Seg and the step-down program was that he received "an additional four hours of inmate programming sessions each week," although he was "chained" during the sessions. (*Id.* ¶ 50). While an inmate may not have a liberty interest in participating in the step-down program to facilitate early release into the general population, *Animashaun v. Fischer*, No. 19-cv-820, 2020 WL 374578, at *17, 2020 U.S. Dist. LEXIS 11093 (N.D.N.Y. Jan. 23, 2020), Plaintiff's allegations regarding his confinement in SHU while in the step-down program, for approximately 432 days, plausibly allege a "sufficient departure from the ordinary incidents of prison life to require

procedural due process protections," *Howard*, 215 F.3d at 231 (holding procedural due process protections were triggered by a typical SHU confinement lasting 305 days).

The Court also finds that Plaintiff plausibly alleged that he was deprived of his liberty interest in avoiding long periods of solitary confinement without sufficient due process. Defendants cite to the fact that there are no allegations about the step-down program in the due process "lack of meaningful review" cause of action. (Dkt. No. 28-1, at 26). But all of the earlier allegations in the FAC were expressly incorporated into the due process cause of action, (Dkt. No. 24, ¶ 113), and this included Plaintiff's allegations that solitary confinement is imposed in the step-down program "with no requirement of reviews of any sort" and that he "spent over a year in the step-down program without a meaningful review of his status." (Dkt. No. 24, ¶¶ 51–52; *see also id.* ¶ 74 ("[Plaintiff] received no reviews at all during his time in the step-down program.")). [12] Defendants have not addressed what process was due or how due process was satisfied with respect to Plaintiff's confinement in the step-down program. Accordingly, without deciding what process Plaintiff was entitled to while in the step-down program, the Court finds that the allegations that he received *no* reviews of his status for more than one year are sufficient to state a claim. *See Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) ("It is well established that whenever process is constitutionally due, no matter the context, 'it must be granted at a meaningful time and in a meaningful manner.' " (citations omitted) (internal brackets and punctuation omitted)).

[12]    In his opposition to Defendants' motion to dismiss, Plaintiff relies on 7 N.Y.C.R.R. § 316.3 to suggest what process he was due while in the step-down program. (Dkt. No. 30, at 30 (citing 7 N.Y.C.R.R. § 316.3(c) (providing that, upon an inmate's admission to a step-down unit, "a program management team shall" "develop an individual rehabilitation plan" for the inmate and "conduct periodic reviews of the incarcerated individuals"))). However, Section 316.3 is a new section of the regulations that was first effective December 16, 2020, after Plaintiff was moved out of the step-down program. Plaintiff has not pointed to regulations pertaining to the step-down program that were in effect during the relevant time period.

Accordingly, Defendants' motion to dismiss Plaintiff's procedural due process claims is denied.

## D. QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity on Plaintiff's Section 1983 claims because there is no controlling caselaw showing that Plaintiff had a "well-established right to avoid transfer to the Step-Down program upon release from Ad Seg" and no "rule" requiring Defendants to review Plaintiff's status in the step-down program. (Dkt. No. 28-1, at 27). Plaintiff responds that Defendants violated his clearly established Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment, to be free from confinement that serves no legitimate penological purpose, and to have meaningful review of his detention in Ad Seg and the step-down program. (Dkt. No. 30, at 26–28).

**\*9** "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an affirmative defense on which defendants bear the burden of proof. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). For a qualified immunity defense asserted in a motion to dismiss to be successful, the "facts supporting the defense [must] appear on the face of the complaint," and the plaintiff "is entitled to all reasonable inferences from the facts alleged ... that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

The Court finds that Defendants are not entitled to qualified immunity at this early stage. Contrary to Defendants' argument, the FAC does not appear to allege that Defendants violated Plaintiff's rights by placing him in the step-down program instead of the general population upon his release from Ad Seg. Rather, Plaintiff challenges the total amount of time he spent in solitary confinement—whether in Ad Seg or the step-down program—as well as the lack of meaningful and timely reviews of his status in solitary confinement. (*E.g.*, Dkt. No. 24, ¶¶ 2–3, 39, 51–52). However, prisoners have a clearly established right to be free from cruel and unusual punishment, which includes extremely long confinements in isolation and punishments or conditions which have no legitimate penological justification. *See, e.g., Gonzalez*, 802 F.3d at 224 (noting that "whether incarceration in the SHU

violates the Eighth Amendment" "depends on the duration and conditions of the confinement"); *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (holding that among the "unnecessary and wanton inflictions of pain" forbidden by the Eighth Amendment are "those that are totally without penological justification" (quotation marks and citations omitted)). Moreover, it is well-settled in this Circuit that a "period of confinement under typical SHU conditions lasting longer than 305 days" triggers a protected liberty interest and procedural due process protections. *Gonzalez*, 802 F.3d at 223. The absence of a DOCCS "rule" requiring Defendants to review Plaintiff's status in the step-down program is not sufficient to establish qualified immunity at the motion to dismiss stage.

Accordingly, the Court denies Defendants' motion to qualified immunity without prejudice to raising the defense at a later time.

### E. ELEVENTH AMENDMENT

Finally, Defendants argue that the Eleventh Amendment requires dismissal of Plaintiff's claims "[t]o the extent Plaintiff seeks damages against Defendants in their official capacities." (Dkt. No. 28-1, at 27). Plaintiff responds that he does not seek damages against Defendants in their official capacities, "but rather only seeks declaratory relief" against the DOCCS Defendants. (Dkt. No. 30, at 28).

The Eleventh Amendment bars suits against state officials in their official capacities unless Congress has abrogated the state's sovereign immunity, the state has consented to suit, or the plaintiff is "seeking injunctive relief against a state official for an ongoing violation of law or the Constitution." *N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2012) (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Declaratory judgments are a form of injunctive relief that may be allowed under the third exception, so long as it is prospective. *Id.* at 129 (citations omitted). Declaratory relief against an official sued in his official capacity is not

permitted, however, "when it would serve to declare only past actions in violation of federal law." *Id.*; *see also Finch v. N.Y. State Office of Children & Family Servs.*, 499 F. Supp. 521, 538 n.138 (S.D.N.Y. 2007) ("[T]he Eleventh Amendment 'does not permit judgments against state officers declaring that they violated federal law in the past.' " (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993))).

**\*10** Here, Plaintiff alleges that he was released into the general population of Mid-State on February 6, 2019 and released from DOCCS custody on February 23, 2021. (Dkt. No. 24, ¶¶ 31, 38). He does not allege that any of the Defendants continues to violate his federal rights or will do so in the future. Moreover, Plaintiff seeks retrospective declaratory relief in the FAC. (*Id.* at 31 (asking the Court to "[d]eclare that the Defendants' acts and omissions violated [Plaintiff's] constitutional rights")). Accordingly, because Plaintiff does not seek prospective declaratory relief, the Court grants Defendants' motion to dismiss Plaintiff's claims brought against Defendants in their official capacities.

### V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's claims against Defendants Annucci and Venettozzi are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants in their official capacities are **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 28) is otherwise **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2021 WL 4775970

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and
Inmate Discipline; Michael Dixon, Sergeant; Jeffery
Rock, Lieutenant; Earl Bell, Deputy Superintendent
of Security; Jerry Kowalowski, Recreation Program Leader;
and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ.,
PRISONERS' LEGAL SERVICES OF NY, Counsel for
Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, ERIK B. PINSONNAULT, ESQ., Assistant
Attorney General, Counsel for Defendants, The Capitol,
Albany, NY 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

*1 Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), [1] Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Special Housing and Inmate
Discipline Director Donald Venettozzi, Sergeant Michael
Dixon, Deputy Superintendent of Security Earl Bell, Sergeant
Jeffery Rock, Recreation Program Leader Jerry Kowalowski,
and Transfer Coordinator Richard Houck ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 69.)
For the reasons set forth below, Defendants' motion is granted
in part and denied in part.

[1] The Court notes that, for the ease of reading, it will
still refer to Francisco DeJesus as a plaintiff in this
action.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Amended Complaint
Generally, Plaintiffs' Amended Complaint alleges that
Defendants violated their due process rights and took various
adverse actions against them at Clinton Correctional Facility
("Clinton") in 2015 and 2016 as a result of Plaintiffs' election
(by fellow prisoners) to Clinton's Inmate Liaison Committee
("ILC") following the well-publicized escape of two inmates
(Richard Matt and David Sweat) from Clinton's Honor
Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the
Amended Complaint survived the Court's Decision and Order
of September 23, 2019: (1) a First Amendment retaliation
claim by Plaintiff DeJesus against Defendants Dixon and
Rock; (2) a First Amendment retaliation claim by Plaintiff
Emerenciano against Defendants Kowalowski and Bell; (3) a
First Amendment retaliation claim by Plaintiff Scott against
Defendant Houck; (4) a Fourteenth Amendment due process
claim by Plaintiff Emerenciano against Defendants Bell and
Venettozzi; and (6) a supervisory liability claim by Plaintiffs
against Defendant Venettozzi. (Dkt. No. 40, at 50.)

### B. Undisputed Material Facts on Defendants' Motion
### for Summary Judgment
Before reciting the undisputed material facts on Defendants'
motion, the Court observes that, in addition to their Rule 7.1
Response, Plaintiffs have submitted what they characterize as
a "Statement of Additional Facts" that "are either undisputed
or at least supported by sufficient record evidence that the
jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.)
Of course, no Statement of *Undisputed* Additional Facts is
permitted under the District's Local Rules of Practice. *See*
N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's
Response may set forth any assertions that the opposing party
contends are in dispute in a short and concise Statement of
Additional Material Facts *in dispute* ....") (emphasis added).
Furthermore, many of Plaintiffs' additional factual assertions
are immaterial to the resolution of the issues presented
by Defendants' motion. *Id.* (permitting a "Statement of
Additional *Material* Facts in Dispute....") (emphasis added).
However, to the extent Plaintiffs actually assert additional
material facts not in dispute, the Court will take them
into consideration in its below recitation of the undisputed
material facts.

**\*2**  The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

### Defendant Dixon's Misbehavior
### Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

[2]      The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

[3]      The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

### Defendant Kowalowski's Misbehavior
### Report Against Plaintiff Emerencio

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

[4]      The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at \*2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at \*1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at \*2, n.6 (S.D.N.Y. Oct. 17, 2000)

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 52 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

**\*3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison. [5]

[5]    The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats. [6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

[6]    The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' ").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

Defendant Houck's Transfer of Plaintiff Scott

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility—ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

**\*4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 53 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

## I. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[7]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. Standard Governing Retaliation Claims Under the First Amendment

**\*5** To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Rosebro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

**\*6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### 3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 55 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy

the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

[8]
> In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

[9]
> In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing

supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021)) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

**\*8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against Plaintiff DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

[10]     Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

**\*9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

[11]     The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at *1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at *7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

Case 9:22-cv-00711-BKS-TWD   Document 69   Filed 01/26/24   Page 58 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

**\*10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made

against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

**\*11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 59 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

[12]     The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13] (*Id.*)

[13]     The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant

Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

 **\*12**  During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14] (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes. (*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

Case 9:22-cv-00711-BKS-TWD   Document 69   Filed 01/26/24   Page 60 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

14     Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor." (Dkt. No. 73, Attach. 13, at 1.)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU. (*Id.*) After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day. (*Id.*) On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.) On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski. (*Id.*) According to this misbehavior report, at the ILC meeting, "[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation. While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation ... where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]). In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action. *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983. (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].) Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].) In fact, Plaintiff Emerenciano testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski issued him the misbehavior report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].) Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that they did not recall hearing Plaintiff Emerenciano remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18, 20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues that, given his role on the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration regarding the prison yard policy, and proposing possible solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n Mem. of Law].) Finally, of at least some materiality is the fact that Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

**\*13** For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one particular thing" that would motivate Defendant Bell to retaliate against him. (Dkt. No. 69, Attach. 2, at 14 [Defs.' Mem. of Law.])

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record evidence from which a reasonable juror could find that (1) Emerenciano had engaged in constitutionally protected conduct by voicing generalized inmate concern over the newly implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty at his Tier III disciplinary hearing and then punished by Defendant Bell. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 61 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

**\*14** For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 62 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted). When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

**\*15** To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton." (*Id.*)

[15]     In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level. [16] (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes. (Dkt. No. 69, Attach. 30, at 4.) According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69, Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff

Scott was transferred from Clinton to the Green Haven hub. (Dkt. No. 69, Attach. 31.)

[16]     The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer. (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].) This review includes an interview of the inmate. (*Id.*)

[17]     Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request. Simply put, Plaintiff Scott overlooks the fact that he had no right to be confined to an institution of his choosing. *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York. [18] (*Id.* at 5.) As a result, these hubs have the longest waiting list for inmates seeking a transfer to them. [19] (*Id.*) Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns. (*Id.*) Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations). (*Id.*) Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to. (*Id.*)

[18]     The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub. (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

[19]     According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year. (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].) However, the

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 63 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

**\*16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at \*14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*11 [N.D.N.Y. June 7, 2018]). Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at \*12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC. [20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

[20]    The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

**B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them**

**1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell**

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

**2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi**

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 64 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

"not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

**\*17** In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on

officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21    The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

**\*18** On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 65 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This

letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

**\*19** As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon*, 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt*, 10-CV-1440, 2014 WL 4576569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez*, 2021 WL 4248917, at \*14 (citing *Washington v. Fitzpatrick*, 20-CV-0911, 2021 WL 966085, at \*10 [S.D.N.Y. Mar. 15, 2021]).

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 66 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

 **\*20**  To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive. There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 67 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

retaliation." (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/ or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson,* 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

**\*21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument

assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay,* 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord,* 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena,* 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman,* 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer,* 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 68 of 128

Keyes v. Venettozzi, Not Reported in Fed. Supp. (2022)

eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd,* 453 F. App'x 80 (2d Cir. 2011).

**\*22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry,* 2011 WL 5975027, at *4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

**\*23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **SURVIVE** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 991402

---

End of Document                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6546247
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

Lt. CONNORS, et al., Defendants.

9:21-cv-00986-MAD-TWD
|
Signed August 7, 2023

**Attorneys and Law Firms**

BERNABE ENCARNACION, 91-B-0943, Attica Correctional Facility, Box 149, Attica, NY 14011, Plaintiff, pro se.

LETITIA JAMES, Attorney General of the State of New York, STEVE NGUYEN, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** This matter has been referred for a report and recommendation by the Hon. Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). At all times relevant, Plaintiff was an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Shawangunk Correctional Facility ("Shawangunk"). (Dkt. No. 1.) On September 3, 2021, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging a First Amendment retaliation claim against Corrections Officer ("CO") Vitarius, and Eighth Amendment conditions of confinement claims against Lt. Connors, CO Olivo, and CO Vitarius. [1] *Id.*; (*see also* Dkt. No. 8 at 17-21, 27, 33.)

---

[1]    Although CO Vitarius' last name is spelled "Vitarious" in previous filings, the Court uses the spelling provided in his declaration. (Dkt. No. 24-4

at 1, 5.) The Clerk is directed to correct the spelling to Vitarius on the docket.

Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 24-2.) For the reasons set forth below, the Court recommends Defendants' motion be granted in part and denied in part.

**II. LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see* Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " *Jeffreys*, 426 F.3d at 554 (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks

omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

**\*2** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")

## III. DISCUSSION

On July 10, 2018, Plaintiff was placed in a cell in the Special Housing Unit ("SHU") at Shawangunk. (Dkt. No. 1 at 1, 5.) Plaintiff claims while he was in the SHU, CO Vitarius, CO Olivo, and "all of the other Officers" in the SHU refused to pick up Plaintiff's laundry, "violated" his kosher meal trays by opening the sealed items on the tray, harassed him as they passed his cell, and did not allow Plaintiff to use his medically prescribed walking boots or cane. [2] *Id.* at 6, 12-13. Because he was denied access to his boots and cane, Plaintiff could not leave his cell to shower or exercise during his 60 day stay in the SHU. (Dkt. No. 1 at 6, 53; Dkt. No. 24-3 at 62.) Plaintiff reported these "violation[s] and deprivations" verbally and in written grievances to Lt. Connors and Supt. Collado, among other supervisors. (Dkt. No. 1 at 6.) Supt. Collado responded, in relevant part, Plaintiff was not allowed his cane in the SHU, but could have his medical boots if he had a valid permit. *Id.* at 6, 53. Plaintiff then showed Supt. Collado's response along with his medical permit for his boots to Lt. Connors, CO Vitarius, and CO Olivo. *Id.* at 6, 50. In response, they began heating up everything in his kosher

meal trays including cold cereal, fresh fruit, and "cold salad" making the food "unconsumable." *Id.* at 7. As a result of being "deprive[d]" of his food, he lost 27 pounds while in the SHU. *Id.* Plaintiff also alleges CO Vitarius threw out his medical boots in retaliation for filing grievances against him. *Id.*

[2]      Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

### A. Lt. Connors' Personal Involvement

Defendants seek summary judgment and dismissal of Plaintiff's Eighth Amendment conditions of confinement claim against Lt. Connors for lack of personal involvement. (Dkt. No. 24-2 at 8-9.) For the reasons set forth below, the Court recommends granting summary judgment as to this claim.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citation omitted). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks and citation omitted).

**\*3** The Second Circuit has concluded "there is no special rule for supervisory liability" and has held a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). To avoid summary judgment, a plaintiff must establish the defendant violated the constitution by his or her "own conduct, not by reason of [the defendant's] supervision of others who committed the violation" and cannot "rely on a separate test of liability specific to supervisors." *Id.* at 619. Thus, a "supervisor's 'mere knowledge of his subordinate's discriminatory purpose' is not sufficient because that knowledge does not 'amount[ ] to the supervisor's violating the Constitution.' " *Id.* at 616-17

(alteration in original) (quoting *Iqbal*, 556 U.S. at 677). "Failing to correct another officer's violation does not suffice; rather ... the 'active conduct' standard necessary to impose § 1983 liability on a supervisor requires the supervisor either directly participate in the alleged constitutional violation or create a policy or custom under which the alleged unconstitutional practices occurred." *Harrison v. Broderick*, No. 18-CV-821JLS(F), 2022 WL 16837366, at *11 (W.D.N.Y. Aug. 18, 2022) (quoting *Tangreti*, 983 F.3d at 617 n.4), *report and recommendation adopted*, 2022 WL 16836406 (W.D.N.Y. Nov. 8, 2022).

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016), *report and recommendation adopted*, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016), *rev'd on other grounds sub nom. Brandon v. Kinter*, 938 F.3d 21 (2d Cir. 2019).

The record evidence establishes Lt. Connors was not personally involved in any of the constitutional violations Plaintiff allegedly experienced. Due to his rank, Lt. Connors was not responsible for confirming callouts or conducting escorts to showers and recreation. (Dkt. No. 24-3 at 3.) Nor was he responsible for collecting laundry or receiving, delivering, and/or inspecting Plaintiff's food. *Id.* at 3, 6. Moreover, Plaintiff does not assert, beyond general conclusory allegations, Lt. Connors took part in tampering with his food or denying him showers, recreation, laundry, his medical boots, and his cane. (*See* Dkt. No. 1 at 6-7); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact."). Lt. Connors also denies knowledge of any other officers doing as such. (Dkt. No. 24-3 at 3, 4, 6.) While Plaintiff claims generally Lt. Connors was aware of this activity due to the grievances Plaintiff had filed, mere knowledge, and even failure to correct such behavior, is not enough to constitute personal involvement in the alleged violations. (Dkt. No. 1 at 6-7; Dkt. No. 28 at 6-7); *see also Tangreti*, 983 F.3d at 616-17; *Harrison*, 2022 WL 16837366, at *11. Finally, Plaintiff does not assert Lt. Connors created a policy or custom under which these alleged unconstitutional practices occurred. (*See generally* Dkt. Nos. 1, 28, 28-1); *see also Harrison*, 2022 WL 16837366, at *11. Therefore, Plaintiff has failed to raise a genuine issue of material fact and

Lt. Connors is entitled to summary judgment due to lack of personal involvement.

For these reasons, the Court recommends granting Defendants' motion with regard to Plaintiff's Eighth Amendment claims against Lt. Connors.

**B. Eighth Amendment Conditions of Confinement Claims**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Second Circuit has held in order for a plaintiff

> **\*4**  [t]o demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test. First, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. Second, the plaintiff must demonstrate that the defendants imposed those conditions with deliberate indifference.

*McAllister v. Garrett*, No. 10-CIV-3828, 2011 WL 3875423, at *10 (S.D.N.Y. Sept. 1, 2011) (alteration in original) (quoting *Welch v. Bartlett*, 125 F. App'x 340, 342 (2d Cir. 2005)).

Although the Constitution does not mandate a comfortable prison setting, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Brown v. Doe*, No. 13 Civ 8409, 2014 WL 5461815, at *6 (S.D.N.Y. Oct. 28, 2014) (internal quotation marks and citations omitted). "Therefore, to establish the objective element of an Eighth Amendment violation, a prisoner

'must prove that the conditions of his confinement violate contemporary standards of decency.' " *Id.* (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)).

Under the subjective element, deliberate indifference "involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 826, (1994)). Put another way, "the officials acted, or omitted to act, with a sufficiently culpable state of mind, *i.e.*, with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

"Restrictive SHU conditions on their own do not, per se, rise to the level of cruel and unusual punishment." *Booker v. Maly*, No. 12-CV-246 (NAM/ATB), 2014 WL 1289579, at *16 (N.D.N.Y. Mar. 31, 2014). "Normal" SHU conditions include being kept in solitary confinement for twenty-three hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

**1. Food Tampering and Kosher Meals**

Plaintiff asserts Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius for allegedly tampering with his kosher meals. (Dkt. No. 1 at 6-7.) Specifically, Plaintiff claims CO Olivo, CO Vitarius, and other COs "opened his kosher meal trays and each food items in his kosher meals 3 times a day." (Dkt. No. 1 at 6.) According to Plaintiff, "[a]s soon as they open it, that food is no longer Kosher." (Dkt. No. 24-6 at 22.) Plaintiff further alleges COs Olivo and Vitarius microwaved and heated up "everything inside his kosher tray" including "cold cereal, fresh fruits-banana, apple or orange and cold saled daily" making the food "unconsumable." [3] (Dkt. No. 1 at 7.) As a result, he refused to eat the alleged non-kosher food and lost 27 pounds while in the SHU. *Id.*

[3] While these allegations primarily relate to the retaliation claim against CO Vitarius, the Court finds they are also relevant to the discussion of the alleged food tampering. *See infra* Section III.D.

**\*5** "[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.' " *Calvin v. Schmitt*, No. 15 CV-6584 (NSR), 2017 WL 4280683, at *5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007)).

To begin, while Plaintiff claims all of his food was microwaved and was therefore "unconsumable," he fails to allege the food provided to him at Shawangunk was prepared and served under conditions which would present an immediate danger to his health and wellbeing. *See Dove v. Broome Cty. Corr. Facility*, No. 9:10-CV-0002 (DNH/DEP), 2011 WL 1118452, at *11 (N.D.N.Y. Feb. 17, 2011), (recommending dismissal of Eighth Amendment claims where plaintiff failed to allege the food provided in prison was prepared and served in a manner that endangered his health), *report and recommendation adopted*, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011); *see also Robles*, 725 F.2d at 15.

Further, denial of kosher food does not necessarily rise to an Eighth Amendment violation. *See Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301 (KMK), 2018 WL 1626175, at *20 (S.D.N.Y. Mar. 30, 2018); *Ward v. Goord*, No. 9:06-CV-1429 (DNH/DRH), 2009 WL 102928, at *7 (N.D.N.Y. Jan. 13, 2009). Here, on July 16, 2018, Plaintiff filed a grievance complaining COs were tampering with his kosher meals by removing the plastic wrappers "somewhere outside [his] presence" thus making the food non-kosher. (Dkt. No. 1 at 53; Dkt. No. 24-3 at 62.) In response, Supt. Collado explained the cellophane used around the kosher trays is not allowed in the SHU and is removed. (Dkt. No. 1 at 53.) However, the "food inside the tray is still wrapped and the meal is considered Kosher." *Id.* Even if the food was not, in fact, kosher and "plaintiff may claim that he did not

eat the non-kosher meals provided to him[,] such a claim, while perhaps cognizable under the First Amendment or the [Religious Land Use and Institutionalized Persons Act], does not also implicate cruel and unusual punishment in violation of the Eighth Amendment." *Dove*, 2011 WL 1118452, at *11. Moreover, Plaintiff testified he would still sometimes eat the fruit and oatmeal provided to him and "thus[,] the deprivation of kosher meals cannot reasonably be expected to result in plaintiff not eating." *Id.*; (Dkt. No. 24-6 at 24.) "Indeed, the plaintiff has not [and cannot] provide[ ] any authority for the proposition that denial of [kosher] food in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment." *Dove*, 2011 WL 1118452, at *11 (internal quotation marks and citations omitted) (alterations in original).

Therefore, the Court recommends granting summary judgment as to the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius with regard to Plaintiff's food tampering and kosher meal claims. *See Ackridge*, 2018 WL 1626175, at *20 (finding the plaintiff failed to allege a sufficiently serious deprivation required to state an Eighth Amendment claim when he chose not to eat the non-kosher meals provided to him and failed to plead the denial of kosher meals posed an unreasonable risk of serious damage to his health); *see also Ward*, 2009 WL 102928, at *7 ("In this case, [the plaintiff] has failed to establish an Eighth Amendment claim based upon denial of kosher meals during his transport .... he has neither proven the existence of imminent danger to his health and well-being nor an actual injury.")

## 2. Denial of Laundry

**\*6** Plaintiff alleges COs Olivo and Vitarius refused to pick up his laundry throughout his stay in the SHU. (Dkt. No. 1 at 6, 16.) Defendants assert Unit Officers took requests for laundry service every Monday morning at Shawangunk and once cleaned, the laundry was returned on Thursday. (Dkt. No. 24-2 at 13.) Moreover, according to the SHU logs provided by Defendants, CO Olivo only worked one Monday and CO Vitarius only worked two Mondays during Plaintiff's SHU confinement. (Dkt. No. 24-2 at 13; Dkt. No. 24-4 at 3, 30, 34, 35; Dkt. No. 24-5 at 3, 30.)

"Prisoners are entitled to 'reasonably adequate sanitation' and 'personal hygiene' under the Eighth Amendment, particularly over long periods of time." *Lunney v. Brureton*, No. 04 CIV.

2438 (LAK) (GWG), 2005 WL 121720, at *8 (S.D.N.Y. Jan. 21, 2005) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)), *report and recommendation adopted*, 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005). This includes the "the right to adequate laundry services." *Id.*

There is no Eighth Amendment violation, however, when inmates are provided the opportunity and the supplies to wash their own clothes. *Id.*; *Benjamin v. Fraser*, 161 F. Supp. 2d 151, 178-79 (S.D.N.Y. 2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part*, 343 F.3d 35 (2d Cir. 2003); *Lunney v. Brureton II*, 04 Civ. 2438 (LAK) (GWG), 2007 WL 1544629, at *14 (S.D.N.Y. May 29, 2007) (alleging inadequate laundry services without alleging inability to wash clothing did not violate Eighth Amendment), *objections overruled*, 2007 WL 2050301 (S.D.N.Y. July 18, 2007); *Townsend v. Clemons*, No. 12-CV-03434 (RJS) (SN), 2013 WL 818662, at *8 (S.D.N.Y. Jan. 30, 2013) (finding plaintiff had not alleged a sufficiently serious deprivation because he did not plead he could not clean his clothes at all), *report and recommendation adopted*, 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013).

In his complaint, Plaintiff did not allege he could not clean his clothes at all, but only that Defendants would not pick up his laundry. [4] (*See* Dkt. No. 1 at 6-7, 13, 14-15, 16.) According to Lt. Connors, "[o]ftentimes, incarcerated individuals decline[ ] outside laundry, preferring to wash clothes in their cell sinks." (Dkt. No. 24-3 at 3.) Plaintiff did not allege he was denied the opportunity to do the same. [5] For the reasons discussed herein, the Court recommends granting summary judgment as to the Eighth Amendment claims against COs Olivo and Vitarius with regard to the alleged denial of laundry.

4       In his response to Defendants' summary judgment motion, Plaintiff claims he was denied "an alternate opportunity or means to clean-wash his linens and clothing himself." (Dkt. No. 28-1 at 25.) However, this alleged inability to clean his clothes in his cell is not referenced anywhere in Plaintiff's complaint. (*See* Dkt. No. 1 at 6-7, 13, 14-15, 16.); *see Lunney II*, 2007 WL 1544629 at *14; *Townsend*, 2013 WL 818662 at *8. Moreover, when he testified at his deposition as to the factual bases of this claim, he made no mention he was unable to clean his clothes at all. (Dkt. No. 24-6 at 19-21, 44-45.) Accordingly, the Court has not considered this new

fact in analyzing this claim on summary judgment. *See, e.g., Feldman v. Sanders Legal Grp.*, 914 F. Supp. 2d 595, 600 n.5 (S.D.N.Y. 2012) (declining to consider plaintiff's arguments in opposition brief that were "based on facts and theories that are not in the Complaint"); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011) (declining to consider facts raised for the first time in opposition papers, "as they do not form the basis for plaintiff's claims, and the complaint may not be amended simply by raising new facts in opposition to Defendants' motion"); *Scott v. City of N.Y. Dep't of Corr.*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (explaining facts and theories raised for the first time in opposition papers should not be considered in resolving a summary judgment motion), *aff'd* 445 Fed. App'x. 389 (2d Cir. 2011); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion [for summary judgment].").

[5] Even if Plaintiff had been denied laundry all eight Mondays he was in the SHU, "[a] successful § 1983 claim holds an individual personally responsible for the role his or her own acts or omissions played in violating someone's rights." *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 236 (N.D.N.Y. 2021) (alteration in original) (quoting *Dukes v. City of Albany*, 492 F. Supp. 3d 4, 12 (N.D.N.Y. 2020)) (internal quotation marks omitted). The record indicates CO Olivo only worked one Monday and CO Vitarius only worked two Mondays during Plaintiff's SHU confinement. (Dkt. No. 24-2 at 13; Dkt. No. 24-4 at 3, 30, 34, 35; Dkt. No. 24-5 at 3, 30.) Even taking into account the other five Mondays Plaintiff was allegedly denied laundry, there is simply no indication in the record the denial of laundry the weeks of July 9, July 30, and August 6, 2018, posed a serious risk to Plaintiff's health. *Id.*; *Zielinski*, 547 F. Supp. 3d at 236.

### 3. Denial of Cane and Medical Boots

**\*7** Plaintiff asserts Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius for denying him use of his cane and medical boots despite having a "valid permit" for them. (Dkt. No. 1 at 6, 7.) As set forth above, Plaintiff filed a grievance on July 16, 2018, requesting, in part, the return of his cane and medical boots after he was denied access to them in the SHU. (Dkt. No. 24-3 at 62, 64.) On August 17, 2018, in response to his grievance, Supt. Collado informed Plaintiff he would be issued his cane if he needed to leave the unit but could not keep it in the cell with him. (Dkt. No. 24-3 at 64.) However, he could keep his medical boots in his cell if he had a valid permit for them. *Id.* Plaintiff did in fact have a valid medical permit from Shawangunk dated April 3, 2018, authorizing his medical boots and cane. (Dkt. No. 1 at 54.) Yet in Plaintiff's grievance filed on September 2, 2018, he claimed when he presented the "COs in SHU" both Supt. Collado's grievance response and the valid permit for his medical boots, CO Vitarius refused to allow Plaintiff to keep his medical boots in his cell, telling him "no[ ] boots or cane here." (Dkt. No. 1 at 50.)

#### i. Denial of Medical Boots

The denial of Plaintiff's medical boots does not in and of itself trigger a constitutional violation. *See Curtis v. Lucia*, No. 9:15-CV-0718 (GLS/TWD), 2015 WL 13948917, at *7–8 (N.D.N.Y. Aug. 4, 2015) (finding plaintiff's vague allegations he suffered "harsh conditions" and the SHU staff refused to allow him to wear his medical boots or go to recreation failed to demonstrate the conditions were objectively serious to trigger constitutional protections); *Trapani v. Annucci*, No. 9:21-CV-0681 (LEK/ML), 2022 WL 7290107, at *10 (N.D.N.Y. June 21, 2022) (plaintiff's allegations that defendants placed him in punitive segregation, did not return the bulk of his personal belongings, and denied him his medically prescribed boots were "insufficient to plausibly suggest that he was incarcerated under conditions that objectively posed a substantial risk of serious harm."), *report and recommendation adopted*, 2022 WL 4008027 (N.D.N.Y. Sept. 1, 2022).

However, even if denial of his medical boots did meet the objective prong of the Eighth Amendment test, "Plaintiff's failure to allege any facts indicating that [Defendants] acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions." *See Loadholt v. Lape*, No. 9:09-CV-0658,

2011 WL 1135934, at *4 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted,* 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011); *see also Vaughan v. Erno,* 8 F. App'x 145, 146-47 (2d Cir. 2001) (finding complained conditions of confinement did not constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm).

Plaintiff alleges COs Olivo and Vitarius "did not allow[ ]" Plaintiff to "use his ... medical boots" inside his cell even though he had a valid permit for them. (Dkt. No. 1 at 6-7, 50, 53.) Although Plaintiff did in fact have a valid permit for his medical boots, his conclusory allegations, without more, are not enough to show COs Olivo and Vitarius were deliberately indifferent to Plaintiff's health or safety. (Dkt. No. 1 at 53); *see Houston v. Wright,* No. 9:10-CV-1009 (NAM/RFT), 2013 WL 5439826, at *10 (N.D.N.Y. Sept. 27, 2013) (quoting *Summerville v. Faciuna,* 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009)) ("Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to 'record evidence creating a genuine dispute' as to the facts regarding Defendants' culpable mental state") (internal quotation marks omitted); *see also Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir. 2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion."). Therefore, for the reasons set forth herein, the Court recommends granting summary judgment to COs Olivo and Vitarius on these claims.

### ii. Denial of Cane

**\*8**  Similarly, the denial of Plaintiff's cane does not meet the objective standard of the Eighth Amendment. *See Loadholt,* 2011 WL 1135934, at *4 ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or 'better shoes,' as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.") (citations omitted).

Further, it is undisputed that SHU policy prohibited Plaintiff from having his cane in his cell due to "safety and security reasons." (Dkt. No. 24-3 at 4; Dkt. No. 24-4 at 3-4; Dkt. No. 24-5 at 3.) Therefore, the denial of Plaintiff's cane in the SHU does not constitute deliberate indifference because there was a "legitimate penological reason" for doing so. *Rahman v. Artuz,* No. 95 CIV 0272 MGC, 1999 WL 600520, at *4 (S.D.N.Y. Aug. 10, 1999) (finding plaintiff failed to prove defendants, who would not permit the prisoner to wear his knee braces in the SHU for security reasons, showed deliberate indifference to his medical needs because "[t]here was a legitimate penological reason for not giving him his braces in the SHU"); *Roundtree v. City of New York,* No. 15-CV-8198, 2018 WL 1586473, at *9 (S.D.N.Y. Mar. 28, 2018) (finding prison officials' denial of Plaintiff's request for medical equipment due to security concerns was a "legitimate, penological reason" to do so.).

Because Plaintiff cannot meet the objective or subjective prongs of the conditions of confinement inquiry here, the Court recommends granting summary judgment as to these claims against COs Olivo and Vitarius.

### 4. Denial of Showers and Recreation

The Court comes to a different conclusion regarding the alleged denial of showers and recreation. Plaintiff asserts COs Olivo and Vitarius denied him "out-of-cell exercise" and showers throughout the duration of his time in the SHU. (Dkt. No. 1 at 6-7, 14-15.) COs Olivo and Vitarius claim they would ask inmates during their daily rounds whether they wanted to exercise and every second or third day, they would also ask the inmates if they wanted to shower. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) If the inmates wanted to shower or exercise, the COs would escort the inmates to the appropriate area. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) Normally, if an inmate declined recreation, the COs would mark the inmate's refusal on a "Go Around" slip, which they would maintain for seven days. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) On days where showers were also offered, any shower or recreation refusals were instead recorded on the SHU logs. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) Both CO Olivo and CO Vitarius claim Plaintiff "was regularly given the option to shower and exercise, but often refused." (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)

The records provided by Defendants reflect that on July 8, 2018, and August 17, 2018, Plaintiff was marked as "Hold Live" for shower and recreation, indicating he was "temporarily off the unit for other reasons (such as medical visits)." (Dkt. No. 24-1 at 3; Dkt. No. 24-3 at 2, 36.) On July 10, 13, 15, 17, 22, 27, and 29, 2018, and August 5, 14, 21, 24, and 28, 2018, the COs on duty reported Plaintiff "refused" both showers and recreation. (Dkt. No. 24-3 at 37-42, 44, 45, 51, 54, 55, 57.) On July 20 and 31, 2018, and August 3, 5, 7, and 12, 2018, the COs on duty recorded Plaintiff "refused" showers. (Dkt. No. 24-3 at 41, 46-50.) The Court notes it is unclear whether the refusals for showers also applied to recreation on those days, as the recreation columns were left blank. *Id.* On July 24, 2018, and August 26, 2018, both the shower and outside recreation columns were left blank for Plaintiff. (Dkt. No. 24-3 at 43, 56.) On August 19, 2018, the COs drew a line through the shower column and left the recreation column blank in Plaintiff's row. (Dkt. No. 24-3 at 53.) It is unclear to the Court whether the blank spaces and lines are equivalent to refusals or something else.

**\*9** However, Plaintiff gives a different version of events—mainly, he did not refuse showers and recreation, but he was unable to take a shower or go to recreation without assistance from his cane or medical boots. Plaintiff testified as follows:

Q. ... So you would ask to take a shower. They would refuse to give your cane and they would refuse to let you take a shower?

A. That's correct.

Q. Okay. Approximately how many showers did you take during your time at -- in the box at Shawangunk?

A. None.

Q. And is that because they refused to let you take a shower?

A. Well, first they denied giving me the cane, and then they said that if I couldn't go without the cane that I wasn't going to be able to take a shower.

Q. Okay. So you're saying then that you were unable to walk to the shower because you didn't have a cane?

A. That's – that's correct.

Q. So is it that they denied your shower because you couldn't walk to the shower?

A. Correct.

(Dkt. No. 24-6 at 36-37.)

Q. ... Could you explain why, in your opinion, they did not let you go to recreation?

A. Because they told me that they couldn't bring me the cane or the medical boot.

Q. Okay. So was this the same reason as in the -- with the showers?

A. That's correct.

Q. Okay. So is it right to say that because you could not walk to recreation or the showers, you were not permitted to go there?

A. That's correct, because without the boot or without the cane, I couldn't walk.

Q. Did you decline ... the opportunity to go to recreation, or was it they said you could not go at all?

A. They told me that I couldn't go because they weren't going to bring me the boots or the cane.

Q. And to confirm, during your time in the box, you never got to go to recreation?

A. That's correct.

Q. Same with the showers?

A. That's correct.

(Dkt. No. 24-6 at 38-39)

### i. Legal Standards Regarding Exercise and Recreation

"[E]xercise is one of the basic human needs protected by the Eighth Amendment." *Williams v. Goord I*, 111 F. Supp. 2d 280, 292 (S.D.N.Y. 2000); *McCray v. Lee*, 963 F.3d 110, 120 (2d Cir. 2020) ("In this Circuit the rights of prisoners to a meaningful opportunity for physical exercise had been clearly established."). "However, not every deprivation of exercise amounts to a constitutional violation. Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Williams v. Goord II*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) (hereinafter *Goord II*).

"Factors to consider in making this determination are: (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the deprivation." *Id.*

Courts have granted summary judgment to prisoners where the magnitude of the deprivation of exercise was "patent." *Id.*; *see, e.g., Williams v. Greifinger*, 918 F. Supp. 91, 98 (S.D.N.Y.) (holding plaintiff was entitled to summary judgment on Eighth Amendment claim because he was deprived of exercise for 589 days), *rev'd on other grounds,* 97 F.3d 699 (1996); *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996) (upholding preliminary injunction requiring prison officials to release inmate from medical keeplock when inmate was only allowed out of cell ten minutes per week for over three and a half years); *McCray v. Lee*, 963 F.3d 110, 117-18 (2d Cir. 2020) (finding plaintiff's Eighth Amendment damages claims for denial of physical exercise against certain defendants should not have been dismissed when plaintiff had alleged he did not have room to exercise in his cell and was denied any meaningful exercise opportunity for four months); *Goord II,* 142 F. Supp. 2d at 426-29 (finding genuine issues of material fact precluded summary judgment on inmate's Eighth Amendment claim he was deprived of meaningful exercise for 28 days).

**\*10** However, depriving a prisoner of exercise for a relatively brief period of time has resulted in summary judgment in defendants' favor. *Goord II,* 142 F. Supp. 2d at 426; *see, e.g., Barnes v. Craft,* No. 04-CV-1269, 2008 WL 3884369 (NAM/GHL), at \*9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation."); *Gibson v. City of N.Y.,* 96 Civ. 3409, 1998 WL 146688, at \*3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days" was not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment). Indeed, "an occasional day without exercise when weather conditions preclude outdoor activities ... is not cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985).

### ii. Legal Standards Regarding Showers

Inmates also have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013). District courts within the Second Circuit have held a temporary denial of access to showers does not rise to the level of a serious deprivation of a human need. *See George v. McGinnis,* No. 05-CV-84 (SR), 2008 WL 4412109, at \*4-5 (W.D.N.Y. Sept. 23, 2008) (deprivation of showers for thirteen days does not satisfy the objective element of an Eighth Amendment claim); *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (dismissing Eighth Amendment claims as insufficient under the objective test because "a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' ") (citation omitted); *Waring v. Meachum,* 175 F. Supp. 2d 230, 242 (D. Conn. 2001) ("[T]he prohibition of showers and failure to provide a change of clothing during the seven day lockdown period does not demonstrate that plaintiffs were deprived of a minimum civilized level of life's necessities"); *Rogers v. Faucher*, No. 3:18-cv-01809 (JCH), 2019 WL 1083690, at \*5 (D. Conn. Mar. 7, 2019) (five day deprivation of shower use did not constitute sufficiently serious deprivation of a human need).

### iii. Analysis

Construed liberally, Plaintiff alleges he was constructively denied recreation and showers because he physically could not walk to these activities and COs Olivo and Vitarius refused to give him his medical boots or cane. (Dkt. No. 1 at 6-7, 53; Dkt. No. 24-6 at 36-39.) As a result, his inability to walk to these activities was presumed to be a refusal. (*See id.*; Dkt. No. 24-3 at 37-42, 44-50, 51, 54, 55, 57.) The Court finds this case to be analogous to the Fourth Circuit case, *Rivera v. Mathena,* 795 F. App'x 169 (4th Cir. 2019), where plaintiff Rivera alleged he was denied a "meaningful opportunity to shower and exercise because he was asleep when corrections officers took the shower and exercise list and [he] was [thus] deemed to have 'refused' the opportunities." *Id.* at 173 (citation omitted). Rivera was an inmate in segregation who was often alone in his cell for twenty-four hours a day without an alarm clock. *Id.* Prison staff refused to wake Rivera during shower and recreation callouts or accept his shower and recreation requests made by leaving a note or asking staff in person at a later time. *Id.*

The Fourth Circuit held for Rivera to have waived his right to Eighth Amendment constitutional protections, he would need to have shown an "intentional relinquishment" of these protections because the court does "not presume acquiescence in the loss of fundamental rights." *Id.* (internal quotation marks and citations omitted) While the district court held it was Rivera's choice not to shower and exercise, the Fourth Circuit found Rivera did not "form the intention to waive Eighth Amendment protections against cruel and unusual punishments" while he was sleeping. *Id.* (internal quotation marks and citations omitted).

**\*11** The Fourth Circuit noted "two months without showers and recreation can be sufficient to support an Eighth Amendment claim." *Id.* at 174 (citing *Brown v. Lamanna*, 304 F. App'x 206, 208 (4th Cir. 2008)). Rivera demonstrated he had received far fewer than the five hours of recreation and three showers each week he should have been permitted while in segregation. *Id.* at 174-75. Notably, at one point, he did not shower for almost eight weeks and did not exercise for about two months. *Id.* at 175. The Court found there was sufficient evidence to establish genuine issues of material fact as to the objective prong of the conditions of confinement claim. *Id.* at 174-75. Specifically, "[t]he combination and duration of the shower and exercise deprivations were sufficiently lengthy and severe over the course of Rivera's four years in segregation to provoke" constitutional concerns. *Id.* at 175. Rivera suffered injuries and "faced a substantial risk of serious harm as a result of long periods without showers and recreation." *Id.*

The Court also found Rivera presented enough evidence to create a genuine issue of fact "as to whether prison staff had notice of both Rivera's shower and exercise deprivations and their impact on Rivera's physical and mental health" and once they were aware, whether they should have taken corrective action. *Id.* at 176. Rivera had filed numerous grievances challenging the denial of showers and recreation—alerting the staff to these issues. *Id.* When prison staff responded to these complaints, they showed "they knew Rivera was being denied showers and recreation against his will." *Id.* Additionally, Rivera had told prison staff how the denial of showers and exercise was adversely affecting his health; he left notes on his door requesting showers and recreation; and showed certain defendants a doctor's note stating he was required to wash off his fungal medication on the days showers were offered. *Id.* There were also log sheets posted on Rivera's cell door showing he had missed extensive shower and exercise opportunities, which prison staff "would have

seen." *Id.* Even if Rivera had not advised certain defendants he was suffering mental and physical harm as a result of the denial of regular recreation and showers, "the risks posed would have been obvious to them." *Id.*

Similarly, here, COs Olivo and Vitarius appear to have offered Plaintiff the opportunity to shower and exercise. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) However, there is a genuine issue of material fact whether Plaintiff intentionally relinquished his Eighth Amendment protections when he "refused" showers and recreation due to his inability to walk to those activities and, thus, whether he was given the meaningful opportunity to shower and exercise at all. (Dkt. No. 1 at 6-7; Dkt. No. 24-3 at 62.); *Rivera*, 795 F. App'x at 174-76.

As to the objective prong, the Court finds there is a genuine issue of material fact as to whether the denial of showers and recreation for 60 consecutive days in the SHU posed a substantial risk of serious harm to Plaintiff. The Court also finds the Fourth Circuit's assessment in *Rivera* to be persuasive. In other words, the Court holds that approximately 60 days without showers and exercise is "sufficiently lengthy and severe" to raise constitutional concerns and potentially pose "a substantial risk of serious harm" to Plaintiff. [6] *Rivera*, 795 F. App'x at 175.

[6]
> While Plaintiff did not explicitly allege he could not exercise in his cell, the Court finds Plaintiff's testimony he was unable to walk without his medical boots sufficient to demonstrate he was unable to exercise in his cell. (Dkt. No. 24-6 at 27.) *Contra Brogdon v. City of New York*, No. 16-CV-8076 (LAK)(RWL), 2018 WL 4762981, at \*11 (S.D.N.Y. Aug. 8, 2018) (internal quotation marks and citation omitted) ("Courts have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell"), *objections overruled* 2018 WL 4757947 (S.D.N.Y. Oct. 1, 2018); *see also Huggins v. Schriro*, No. 14 Civ. 6468, 2015 WL 7345750, at \*6-7 (S.D.N.Y. Nov. 19, 2015) (dismissing claim where plaintiff had not alleged that he could not exercise in his cell), *report and recommendation adopted* 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016).

**\*12** The Court further finds Plaintiff has presented enough evidence to create a genuine issue of fact as to whether COs Olivo and Vitarius were deliberately indifferent to his health

or safety. On July 16, 2018, Plaintiff filed a grievance in which he claimed he had been kept in his cell 24 hours a day since July 7, 2018. (Dkt. No. 24-3 at 62.) In said grievance, he requested he be allowed to shower and exercise and for his medical boots and cane to be returned to him. *Id.* On August 17, 2018, Supt. Collado responded while Plaintiff was not allowed his cane, he could have his medical boots if he had a valid permit. (Dkt. No. 1 at 53.) She also advised Plaintiff "must request recreation, and showers on appropriate days, during the morning go around. This is his responsibility." *Id.* This response demonstrates, at least to some extent, prison staff "knew [Plaintiff] was being denied showers and recreation against his will." *Rivera*, 795 F. App'x at 176. Furthermore, in his appeal statement dated August 29, 2018, Plaintiff reported it had been "54 days" in the SHU without being allowed to shower or exercise because "the officers refused to let [him] use[ ] [his] cane, and medical boots." (Dkt. No. 1 at 53.)

Plaintiff filed another grievance on September 2, 2018, requesting his medical boots which he needed "for daily activities." (Dkt. No. 1 at 50.) He reported showing his medical permit to the COs in the SHU, but CO Vitarius still refused to allow him to keep his medical boots in his cell. *Id.* Even if COs Olivo and Vitarius were unaware of Plaintiff's grievances, there appears to have been conversations between Plaintiff and, at least, CO Vitarius where he explained his need for his medical boots or cane to go shower or exercise. (Dkt. No. 24-6 at 36-39.) These conversations should have put COs Olivo and Vitarius on notice Plaintiff had not showered or exercised during his time in the SHU. *Rivera*, 795 F. App'x at 175. Moreover, the SHU logs showing Plaintiff had not showered or exercised for weeks should have put COs Olivo and Vitarius on notice of this ongoing issue. *Id.* Therefore, because there are issues of fact as to whether Plaintiff's lack of showers and recreation was objectively serious and whether COs Olivo and Vitarius were deliberately indifferent to Plaintiff's health or safety, the Court recommends denying summary judgment as to these claims.

### C. Harassment

Plaintiff alleges COs Olivo and Vitarius "harass[ed] him every time they pass[ed] in front of his cell." (Dkt. No. 1 at 6.) He had previously filed a grievance stating CO Olivo referred to him using racial and religious slurs and told him he did not "deserve to live." (Dkt. No. 24-5 at 44-46.) During the subsequent investigation, Sgt. Dangelewicz interviewed Plaintiff who "reinforced his statement and provided no witnesses to support his claim." (Dkt. No. 24-3 at 74, 75.) CO

Olivo also submitted a memorandum denying he threatened or harassed Plaintiff. (Dkt. No. 24-3 at 76.) Although CO Vitarius is included in Plaintiff's general allegations, Plaintiff does not appear to make any specific allegations of harassment against CO Vitarius. (*See* Dkt. No. 1 at 6-7.)

Nonetheless, even if COs Olivo and Vitarius verbally harassed Plaintiff "[i]t is well established in the Second Circuit that verbal harassment of inmates by prison officials, unaccompanied by any injury—no matter how inappropriate, unprofessional, or reprehensible it might seem—does not rise to the level of a violation of the Eighth Amendment." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 490 (N.D.N.Y. 2009). Threats, unaccompanied by any injury, also do not amount to such a violation. *Id.* Generally, injuries in these types of claims must be physical in nature. *Id.* However, "under certain circumstances, a prison official's infliction of psychological pain on an inmate may constitute an Eighth Amendment violation" if the psychological pain is "(1) intentionally inflicted and (2) more than *de minimis* in nature." *Id.* at 491. Psychological injuries considered more than *de minimis* in nature include "depression, nausea, hyperventilation, headaches, insomnia, dizziness, and/or weight loss." *Id.* at 492.

**\*13** Plaintiff has not demonstrated that, at any point during his stay in the SHU, CO Olivo's and/or CO Vitarius' harassment caused him more than *de minimis* psychological injuries. As a result, "[e]ven when construed with the utmost of special leniency" Plaintiff has not created a question of material fact as to whether CO Olivo's and CO Vitarius' alleged conduct violated the Eighth Amendment. *Id.* Therefore, for the reasons set forth above, the Court recommends granting summary judgment as to these claims.

### D. Retaliation

Plaintiff alleges CO Vitarius microwaved all the food on his kosher tray and threw out his medical boots in retaliation for Plaintiff filing a grievance against him. (Dkt. No. 1 at 7-8, 14-15, 53.) Plaintiff claims he had his medical boots for "outside medical trips" on August 16, 2018, and August 17, 2018. (Dkt. No. 1 at 50.) However, on August 29, 2018, when Plaintiff was moved from the SHU, he claims CO Vitarius "refused to brought to me the items in my SHU-Box he ... said that he put them together with the rest of my other property, but my medical boots was not there with my other property." *Id.* When he inquired about his medical boots, CO Vitarius "said that he couldn't found my medical boots in my SHU-box or in the SHU." *Id.* CO Vitarius claims he was unaware

of Plaintiff's grievances, he did not destroy or throw away Plaintiff's medical boots, and he did not tamper with Plaintiff's food. (Dkt. No. 24-4 at 4.)

To prove a First Amendment retaliation claim, "a prisoner must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011)) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

To demonstrate a prison official took adverse action against him, the plaintiff must show the defendant's retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights .... Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Id.* (internal quotation marks and citations omitted). In determining whether there is causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Id.* (internal quotation marks and citations omitted). Prisoners' claims of retaliation must be examined with skepticism and particular care because they are "prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* at 367 (internal quotation marks and citations omitted).

Here, Plaintiff has met the first prong of the retaliation inquiry because "[i]t is well settled that the filing of a prison grievance is a protected activity." *Id.* (quoting *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010)). However, Plaintiff has failed to show CO Vitarius actually took an adverse action against him. *Key v. Toussaint*, 660 F. Supp. 2d 518, 526 (S.D.N.Y. 2009). To prevail on a retaliation claim involving missing property, Plaintiff must show both (1) CO Vitarius "intentionally" or "deliberately" lost or destroyed his property and (2) that CO Vitarius was "personally involved" in doing so. *Id.* (internal quotation marks and citations omitted). In light of the Second Circuit's admonition that retaliation claims must be examined with skepticism and great care, the evidence in this case is not sufficient to allow a reasonable jury to find CO Vitarius intentionally lost or destroyed Plaintiff's property. *Id.*

*14   The record lacks any evidence CO Vitarius took adverse action against Plaintiff for the grievances he filed by intentionally losing or destroying his medical boots. Indeed, it is unclear to the Court whether CO Vitarius ever actually took possession of Plaintiff's medical boots. (*See* Dkt. No. at 1 at 50.) However, even if he had, there is no evidence to suggest CO Vitarius was the exclusive custodian of the boots; Plaintiff simply claims "[n]o prisoner had access to his box" containing his boots. (Dkt. No. 28-1 at 26); *see Roseboro,* 791 F. Supp. 2d at 375; *Key,* 660 F. Supp. 2d at 526. "The mechanism for storing [Plaintiff's] property and its chain of custody is simply unknown" and therefore the boots "might have been simply lost or misplaced ... and not intentionally destroyed." *Key,* 660 F. Supp. 2d at 526; *see also Roseboro,* 791 F. Supp. 2d at 375. Moreover, Plaintiff acknowledged he received his other property when leaving the SHU. (Dkt. No. 1 at 50; Dkt. No. 28-1 at 26.) The return of a portion of Plaintiff's property "suggests that there was no intentional act on any particular person's part to lose or destroy his property." *Key,* 660 F. Supp. 2d at 526.

In sum, the Court recommends granting summary judgment as to the retaliation claim because there is insufficient evidence for a reasonable jury to conclude CO Vitarius retaliated against Plaintiff. *See Key,* 660 F. Supp. 2d at 526–27 (granting summary judgment to defendant corrections officers on First Amendment retaliation claim alleging intentional loss or destruction of property where there "[wa]s no evidence that [the defendants] were the exclusive custodians of the property after they took possession of it" prior to the plaintiff's transfer to another correctional facility; "[t]he mechanism for storing [the plaintiff's] property and its chain of custody [wa]s simply unknown"; and the return of a portion of plaintiff's property suggested there was no intentional act to lose or destroy plaintiff's property.)

### E. Qualified Immunity

Defendants COs Olivo and Vitarius argue, in the alternative, they are entitled to qualified immunity on Plaintiff's claims. (Dkt. No. 24-2 at 18-19.) Because the Court has recommended granting summary judgment to all claims except the conditions of confinement claims with respect to Plaintiff's access to showers and recreation, the Court only addresses whether Defendants are entitled to qualified immunity as to those claims.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, taken in the light most

favorable to the party asserting the injury ... show the officer's conduct violated a federal right" and the second prong "asks whether the right in question was clearly established at the time of the violation." *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia v. Univ. of Connecticut Health Care Ctr.*, No. 3:16-CV-852 (JCH), 2018 WL 5830840, at *16 (D. Conn. Nov. 7, 2018) (internal quotation marks and citation omitted). The Supreme Court has held a court may consider these two questions in either order and, if it determines one prong is not satisfied, it need not reach the other. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Even where a right is clearly established, an officer is entitled to qualified immunity if "it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir. 2002). An officer's actions are objectively reasonable if "officers of reasonable competence could disagree on the legality of the defendants' actions." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001). "[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers [at the time of the alleged constitutional violation] would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995).

**\*15** Whether a defendant's conduct was objectively reasonable, that is, "whether a reasonable official in the defendant's position would reasonably believe his conduct did not violate a clearly established right," is a mixed question of law and fact. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts ... if there is such a dispute, the factual questions must be resolved by the factfinder." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (citations omitted).

Here, COs Olivo and Vitarius argue they are entitled to qualified immunity because their actions were "objectively reasonable" as to Plaintiff's allegation he was denied showers and recreation because "he knowingly refused these opportunities." (Dkt. No. 24-2 at 19.) "The court first addresses whether the facts, viewed in the light most

favorable to the [P]laintiff, show that the officers' conduct violated a constitutional right." *Garcia*, 2018 WL 5830840, at *16.

Plaintiff alleges COs Olivo and Vitarius denied him use of his medical boots after he showed them his valid medical permit.[7] (Dkt. No. 1 at 6.) As a result, Plaintiff was unable to walk to the showers or recreation and, therefore, was constructively denied the meaningful opportunity to partake in these activities during his entire 60 day stay in the SHU. (Dkt. No. 1 at 6-7, 53; Dkt. No. 24-6 at 36-39.) As noted in more detail above, long periods of time without a meaningful opportunity to shower or exercise can constitute conditions of confinement which violate the Eighth Amendment. *See Goord II*, 142 F. Supp. 2d at 426-29; *Rivera*, 795 F. App'x at 174-75. Defendants contend Plaintiff refused showers and recreation of his own accord. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) However, here, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes a rational jury could find CO Olivo and CO Vitarius constructively denied Plaintiff a meaningful opportunity to shower and exercise for 60 days and "[s]uch conduct was sufficiently serious to constitute a constitutional deprivation at the time." *Garcia*, 2018 WL 5830840, at *16.

[7]    As discussed in more detail above, Defendants denying Plaintiff the use of his medical boots or cane did not, in and of itself, violate the Eighth Amendment. *See supra* Section III.B.3. Moreover, because canes were prohibited in the SHU for valid safety and security reasons, the Court will only address the denial of Plaintiff's medical boots, as those were allowed with a valid medical permit. *See id.*

The second prong of the qualified immunity analysis is whether the right that the defendants allegedly violated was clearly established at the time of their conduct, that is, whether "the rights that plaintiff asserts were violated [were] clearly established in a particularized sense, so that a reasonable official would know that his actions violated plaintiff's rights." *P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990) (internal quotation omitted). As noted above, clearly established law at the time of the incident provided inmates are entitled to basic human needs, such as showers and recreation. *See Goord II*, 142 F. Supp. 2d at 426-29;

*Rivera*, 795 F. App'x at 174-75. Thus, the right upon which his claim is based was clearly established at the time in question.

**\*16** As previously mentioned, even where a right is clearly established, a defendant will be entitled to qualified immunity if, at the time of the alleged acts, it would have been "objectively reasonable for the defendant to believe that his action did not violate such law." *Poe v. Leonard*, 282 F.3d at 133. In other words, the defendants are entitled to qualified immunity if reasonable officers at the time would disagree that the defendants' conduct violated Plaintiff's constitutional rights. *See id.*

The first question in the "objectively reasonable" analysis "is whether it was objectively reasonable for the officers to believe [Plaintiff's] deprivation was not sufficiently serious to meet the objective element of an Eighth Amendment claim." *Garcia*, 2018 WL 5830840, at \*17. At the time of the alleged violations in question, the Second Circuit had held there was "no static test to determine whether a deprivation is sufficiently serious, and that the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)) (alterations and citation omitted). The Second Circuit had also held "prisoners may not be deprived of their basic human needs," including food, clothing, shelter, and reasonable safety. *Id.* (quoting *Jabbar*, 683 F.3d at 57.) The Court concludes, if the jury credits Plaintiff's testimony, the alleged denial of showers and recreation for 60 days would amount to a serious deprivation of basic needs sufficient to meet the first element of an Eighth Amendment claim.

The second question is whether COs Olivo and Vitarius "are entitled to qualified immunity because it was objectively reasonable for the defendants to believe their conduct did not violate [Plaintiff's] Eighth Amendment right." *Id.* As previously discussed, "to satisfy the subjective deliberate indifference element under the Eighth Amendment, a plaintiff must prove officers knew of, and disregarded, an excessive risk to health or safety." *Id.* Here, Plaintiff filed multiple grievances and appeals requesting showers and recreation and his medical boots which he needed "for daily activities." (Dkt. No. 1 at 50, 53; Dkt. No. 24-3 at 62.) He also reported showing the COs in the SHU his valid permit for his medical boots, but CO Vitarius still refused to permit him to keep his medical boots in his cell. (Dkt. No. 1 at 50.) Finally, the SHU logs showed Plaintiff had not showered or gone to recreation in weeks. (Dkt. No. 24-3 at 37-42, 44-50, 51, 54, 55, 57.)

As discussed in more detail above, Plaintiff's actions and the SHU logs should have put COs Olivo and Vitarius on notice of this ongoing issue. *Rivera*, 795 F. App'x at 175. Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court concludes a rational jury could find COs Olivo and Vitarius denied Plaintiff showers and recreation by denying him access to his medical boots. The Court also concludes a rational jury could find COs Olivo and Vitarius knew of and disregarded an excessive risk to Plaintiff's health and safety when they failed provide Plaintiff with a meaningful opportunity to shower and exercise, or that the risk to Plaintiff's health and safety was "obvious or otherwise must have been known to [the] defendants." *Walker*, 717 F.3d at 125.

Because a reasonable trier of fact could find CO Olivo's and CO Vitarius' actions were objectively unreasonable, the Court recommends denying COs Olivo and Vitarius summary judgment on qualified immunity grounds. *See Lennon*, 66 F.3d at 420 ("If any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment.").

## IV. CONCLUSION

**\*17** After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 24-2) be **GRANTED** in part and **DENIED** in part as follows: (1) the Eighth Amendment conditions of confinement claims against Lt. Connors be dismissed; (2) the First Amendment Retaliation claim against CO Vitarius be dismissed; (3) the Eighth Amendment harassment claims against COs Olivo and Vitarius be dismissed; (4) the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius regarding the alleged tampering with of Plaintiff's kosher meals, the denial of laundry, and the denial of Plaintiff's cane and medical boots be dismissed; and (5) the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius regarding the alleged denial of showers and recreation proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d

Cir. 2009) (*per curiam*); and that the Clerk correct the spelling of Defendant Vitarius' last name.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[8]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three

additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6546247

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by  Encarnacion v. Collado,  2nd Cir.,  October 23, 2023

2023 WL 6057393

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

Lt. CONNORS, Shawangunk Correctional Facility;
Vitarius, C.O., Shawangunk Correctional Facility;
Olivo, C.O., Shawangunk Correctional Facility;
Corrections Sergeant John Doe #1; John/Jane Doe
#s 2-7, corrections officers on hospital suicide watch
between July 7 and July 10, 2018; and John Doe
#s 8-12, SHU corrections officers, Defendants.

9:21-cv-986 (MAD/TWD)
|
Signed September 18, 2023

**Attorneys and Law Firms**

BERNABE ENCARNACION, 91-B-0943, Attica
Correctional Facility, Box 149, Attica, New York 14011,
Plaintiff pro se.

NICHOLAS W. DORANDO, AAG, OFFICE OF THE
NEW YORK STATE ATTORNEY GENERAL, The Capitol,
Albany, New York 12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 **\*1**  On September 3, 2021, Plaintiff, an inmate in the
custody of the New York State Department of Corrections and
Community Supervision, commenced this action pursuant to
42 U.S.C. § 1983. *See* Dkt. No. 1. Following an initial review
of the complaint, Plaintiff's remaining claims include a First
Amendment retaliation claim against Defendant Vitarius, and
Eighth Amendment conditions of confinement claims against
Defendants Connors, Olivo, and Vitarius. *See* Dkt. No. 8 at
17-21, 27, 33.

On January 18, 2023, Defendants moved for summary
judgment. *See* Dkt. No. 24. In an August 7, 2023 Order
and Report-Recommendation, Magistrate Judge Dancks
recommended that the Court grant in part and deny in
part Defendants' motion. *See* Dkt. No. 32. Specifically,
Magistrate Judge Dancks recommended as follows: (1)
the Eighth Amendment conditions of confinement claims
against Defendant Connors be dismissed; (2) the First
Amendment retaliation claim against Defendant Vitarius be
dismissed; (3) the Eighth Amendment harassment claims
against Defendants Olivo and Vitarius be dismissed; (4)
the Eighth Amendment conditions of confinement claims
against Defendants Olivo and Vitarius regarding the alleged
tampering with Plaintiff's meals, the denial of laundry, and the
denial of Plaintiff's cane and medical boots be dismissed; and
(5) the Eighth Amendment conditions of confinement claims
against Defendants Olivo and Vitarius regarding the alleged
denial of showers and recreation proceed to trial. *See id.* at
33-34.

Currently before the Court is Magistrate Judge Dancks'
Order and Report-Recommendation and Plaintiff's objections
thereto.

**II. BACKGROUND**

For a complete recitation of the relevant background, the
Court refers the parties to Magistrate Judge Dancks' Order
and Report-Recommendation.

**III. DISCUSSION**

**A. Standard of Review**

When a party files specific objections to a magistrate judge's
report-recommendation, the district court "make[s] a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." 28 U.S.C. § 636(b)(1)(C). However, when a party
files "[g]eneral or conclusory objections, or objections which
merely recite the same arguments [that he] presented to the
magistrate judge," the court reviews those recommendations
for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322,
2011 WL 933846, *2 (N.D.N.Y. Mar. 16, 2011) (citations
and footnote omitted). After the appropriate review, "the
court may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1)(C).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Id.* (quoting *Anderson*, 477 U.S. at 252 (emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, \*12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B. Personal Involvement of Defendant Connors**
In his objections, Plaintiff contends that Magistrate Judge Dancks erred in recommending that the Court should dismiss his Eighth Amendment conditions of confinement claims against Defendant Connors for his lack of personal involvement. *See* Dkt. No. 33 at 2-4. Specifically, Plaintiff alleges that not only was Defendant Connors aware of the constitutional violations he experienced "and failed to step in[,] fix or stop it, but also he personally ordered and witnessed the constitutional violations Plaintiff experienced." *Id.* at 2. Plaintiff contends that the evidence demonstrates that Defendant Connors knew that he had no bed, toilet or running water while housed in the Special Housing Unit ("SHU"), yet failed to stop these ongoing violations. *See id.*

It has long been established that there is no *respondeat superior* or vicarious liability in suits under Section 1983. *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 314-15 (2d Cir. 2015). Rather, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

**\*3** Previously, courts in this circuit applied a five-factor test set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), for determining whether a supervisory official was personally involved in a constitutional violation. *See, e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014); *Briglin v. Morley*, No. 19-CV-6927, 2020 WL 4059110, \*2 (W.D.N.Y. July 20, 2020). In *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020), however, the Second Circuit held that "[f]ollowing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

1937, 173 L. Ed. 2d 868 (2009), courts may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti*, 983 F.3d at 612 (quoting *Iqbal*, 556 U.S. at 676). The Second Circuit explained that " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* at 618 (quoting *Iqbal*, 556 U.S. at 676), but stated that "[t]he violation must be established against the supervisory official directly." *Id.*

Here, Magistrate Judge Dancks correctly determined that Defendant Connors, a lieutenant, was not personally involved in any of the alleged constitutional violations. Due to his rank, Defendant Connors was not responsible for confirming callouts or conducting escorts to showers and recreation. Dkt. No. 24-3 at 3. Nor was he responsible for collecting laundry or receiving, delivering, and/or inspecting Plaintiff's food. *See id.* at 3, 6. Further, Plaintiff does not allege, beyond general conclusory allegations, that Defendant Connors took part in tampering with his food or denying him showers, recreation, laundry, his medical boots, and his cane. *See* Dkt. No. 1 at 6-7. While Plaintiff generally alleges that Defendant Connors was aware of this activity due to the grievances he filed, as Magistrate Judge Dancks correctly noted, mere knowledge, and even failure to correct such behavior, is not enough to constitute personal involvement in the alleged violations. *See Tangreti*, 983 F.3d at 616-17; *see also Harrison v. Broderick*, No. 18-cv-821, 2022 WL 16837366, *11 (W.D.N.Y. Aug. 18, 2022).

Accordingly, the Court finds that Magistrate Judge Dancks correctly determined that Plaintiff's conditions of confinement claims against Defendant Connors must be dismissed for lack of personal involvement.

## C. Eighth Amendment Conditions of Confinement Claims

### 1. Food Tampering and Kosher Meals

Plaintiff asserts Eighth Amendment conditions of confinement claims against Defendants Olivo and Vitarius for allegedly tampering with his kosher meals. *See* Dkt. No. 1 at 6-7. Plaintiff claims that Defendants Olivo and Vitarius, and other unidentified corrections officers "opened his kosher meal trays and each food items [sic] in his kosher meals 3 times a day." *Id.* at 6. According to Plaintiff, "[a]s soon as they open it, that food is no longer Kosher." Dkt. No. 24-6 at

22. Plaintiff further claims that Defendants Olivo and Vitarius microwaved and heated up "everything inside his kosher tray" including "cold cereal, fresh fruits – banana, apple or orange and cold sal[a]d daily" making the food "unconsumable." Dkt. No. 1 at 7. In his objections, Plaintiff contends that Magistrate Judge Dancks improperly found that Plaintiff failed to submit evidence that the food tampering endangered his health or that the removal of the plastic covering was otherwise actionable under the Eighth Amendment. *See* Dkt. No. 33 at 5-6.

Initially, the Court finds that Magistrate Judge Dancks correctly determined that Plaintiff's claims that all of his food was microwaved and was therefore "unconsumable" fails to rise to the level of an Eighth Amendment violation because this food did not present an immediate danger to his health and well-being. *See Dove v. Broome Cty. Corr. Fac.*, No. 9:10-cv-2, 2011 WL 1118452, *11 (N.D.N.Y. Feb. 17, 2011). Further, the denial of kosher food does not necessarily rise to an Eighth Amendment violation. *See Ackridge v. Aramark Corr. Food Servs.*, No. 16-cv-6301, 2018 WL 1626175, *20 (S.D.N.Y. Mar. 30, 2018); *Ward v. Goord*, No. 9:06-cv-1429, 2009 WL 102928, *7 (N.D.N.Y. Jan. 13, 2009). In his grievance complaining about the alleged tampering with his food, Plaintiff complained the corrections officers were tampering with his kosher meals by removing the plastic wrappers "somewhere outside [his] presence" thus making the food non-kosher. *See* Dkt. No. 24-3 at 62. In response, Superintendent Collado explained that the cellophane used around the kosher trays is not allowed in the SHU and is therefore removed. *See* Dkt. No. 1 at 53. However, the "food inside the tray is still wrapped and the meal is considered Kosher." *Id.* As Magistrate Judge Dancks correctly notes, even if the food was not, in fact, kosher and "plaintiff may claim that he did not eat the non-kosher meals provided to him[,] such a claim, while perhaps cognizable under the First Amendment or the [Religious Land Use and Institutionalized Persons Act], does not also implicate cruel and unusual punishment in violation of the Eighth Amendment." *Dove*, 2011 WL 1118452, at *11. Moreover, Plaintiff acknowledged that he still ate some of the food provided to him. *See* Dkt. No. 24-6 at 24.

**\*4** Accordingly, the Court finds that Magistrate Judge Dancks correctly recommended granting Defendants' motion for summary judgment as to Plaintiff's conditions of confinement claim relating to food tampering and denial of kosher meals.

### 2. Denial of Laundry

In his complaint, Plaintiff alleges that, during his sixty days in the SHU, Defendant Olivo and Vitarius refused to pick up his laundry. *See* Dkt. No. 1 at 6, 16. Plaintiff argues that Magistrate Judge Dancks erred in recommending that this claim be dismissed. *See* Dkt. No. 33 at 6-7.

Upon review, the Court finds that Defendants are entitled to summary judgment on this claim. Defendants established that requests for laundry service were taken every Monday morning for prisoners in the SHU and that Defendant Olivo only worked one Monday, while Defendant Vitarius worked two Mondays during Plaintiff's SHU confinement. *See* Dkt. No. 24-2 at 13; Dkt. No. 24-4 at 3, 30, 34, 35; Dkt. No. 24-5 at 3, 30. Plaintiff has failed to demonstrate that the failure to provide laundry services during those three weeks posed a serious risk to Plaintiff's health. *See Zelinski v. Annucci*, 547 F. Supp. 3d 227, 236 (N.D.N.Y. 2021). Moreover, Plaintiff failed to allege in his complaint or during his deposition testimony that he was unable to wash his clothes in his cell and only makes this argument in response to Defendants' motion for summary judgment, which Magistrate Judge Dancks properly declined to consider in analyzing this claim. *See Feldman v. Sanders Legal Grp.*, 914 F. Supp. 2d 595, 600 n.5 (S.D.N.Y. 2012).

Accordingly, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's conditions of confinement claim relating to the denial of laundry.

### 3. Denial of Cane and Medical Boots

The Court further agrees with Magistrate Judge Dancks that the denial of Plaintiff's medical boots and cane did not, in and of itself, trigger a constitutional violation. *See Curtis v. Lucia*, No. 9:15-cv-718, 2015 WL 13948917, *7-8 (N.D.N.Y. Aug. 4, 2015); *Trapani v. Annucci*, No. 9:21-cv-681, 2022 WL 7290107, *10 (N.D.N.Y. June 21, 2022). Moreover, even if these denials did meet the objective prong of the Eighth Amendment test, Plaintiff failed to put forth any evidence demonstrating that Defendants acted with a wanton state of mind. *See Vaughan v. Erno*, 8 Fed. Appx. 145, 146-47 (2d Cir. 2001). Plaintiff's conclusory objections to this aspect of Magistrate Judge Dancks' Order and Report-Recommendation do not provide any further support as to these claims.

Accordingly, the Court grants Defendants' motion for summary judgment on these claims. [1]

[1]    The Court agrees with Magistrate Judge Dancks Defendants are not entitled to summary judgment on Plaintiff's Eighth Amendment claim relating to the alleged denial of exercise and showers while housed in the SHU. Notably, Plaintiff alleges the refusal to provide him with his medical boots and cane made it so that he was unable to walk to these activities.

### D. Harassment

In his complaint, Plaintiff alleges that Defendants Olivo and Vitarius "harass[ed] him every time they pass[ed] in front of his cell. *See* Dkt. No. 1 at 6. "It is well established in the Second Circuit that verbal harassment of inmates by prison officials, unaccompanied by any injury – no matter how inappropriate, unprofessional, or reprehensible it might seem – does not rise to the level of a violation of the Eighth Amendment." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 490 (N.D.N.Y. 2009). Similarly, threats, unaccompanied by any injury, do not amount to a such a violation. *See id.*

**\*5** As Magistrate Judge Dancks correctly determined, Plaintiff has not demonstrated that, at any point, Defendants Olivo's and Vitarius' harassment caused him more than *de minimis* psychological injuries. Accordingly, the Court grants this aspect of Defendants' motion for summary judgment.

### E. Retaliation

In his complaint, Plaintiff alleges that Defendant Vitarius microwaved all the food on his kosher tray and threw out his medical boots in retaliation for Plaintiff filing grievances against him. *See* Dkt. No. 1 at 7-8, 14-15, 53. Magistrate Judge Dancks correctly determined that Defendants are entitled to summary judgment as to this claim because Plaintiff failed to show that Defendant Vitarius took an adverse action against him or that there was a causal action between the protected speech and the adverse action. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quotation omitted). Specifically, Plaintiff has failed to put forth any evidence demonstrating that Defendant Vitarius ever had actual possession of Plaintiff's medical boots. Further, the record demonstrates that the remainder of Plaintiff's possessions were returned to him when he left the SHU, which "suggests that there was no intentional act on any particular person's part to lose or destroy his property." *Key v. Toussaint*, 660 F. Supp. 2d 518, 526 (S.D.N.Y. 2009).

Accordingly, the Court grants this aspect of Defendants' motion for summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, Magistrate Judge Dancks' Order and Report-Recommendation, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Dancks' August 7, 2023 Order and Report-Recommendation (Dkt. No. 32) is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 24) is **GRANTED in part and DENIED in part**; [2] and the Court further

2    As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Olivo and Vitarius regarding the alleged denial of showers and recreation.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6057393

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 90 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

2022 WL 16837366
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Stoney HARRISON, Plaintiff,

v.

Kelli BRODERICK, Stephany Miller,
James Johnson, Bishme Nelson, Frederick
Kintzel, and Kevin Brown, Defendants.

18-CV-821JLS(F)
|
Signed August 18, 2022

**Attorneys and Law Firms**

STONEY HARRISON, Pro se, 88T1745, Wende
Correctional Facility, Box 1187, Alden, New York
14004-1187

LETITIA A. JAMES, ATTORNEY GENERAL, STATE OF
NEW YORK, Attorney for Defendants, KATHLEEN M.
KACZOR, Assistant Attorney General, of Counsel, Main
Place Tower, Suite 300A, 350 Main Street, Buffalo, New York
14202

REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, UNITED STATES MAGISTRATE
JUDGE

### JURISDICTION

**\*1** This case was referred to the undersigned by Honorable
John L. Sinatra, Jr. on September 16, 2020, for all pretrial
matters including preparation of a report and recommendation
on dispositive motions. The matter is presently before the
court on Defendants' motion for judgment on the pleadings
filed October 14, 2021 (Dkt. 31).

### BACKGROUND

Plaintiff, an inmate in the custody of New York State
Department of Corrections and Community Supervision
("DOCCS") and proceeding *pro se*, commenced this civil
rights action pursuant to 42 U.S.C. § 1983 alleging that upon
being transferred to Wende Correctional Facility ("Wende"),

Defendants, all employees of DOCCS, denied Plaintiff his
rights to the free exercise of his religion, Nation of Islam,
in violation of the First Amendment and the Religious
Land Use and Institutionalized Persons Act of 2000, 42
U.S.C. § 2000cc, *et seq.* ("RLUIPA"), by confiscating a
religious pendant maintaining both the pendant and chain on
which it was hung exceeded the dimensions permitted by
the relevant DOCCS regulations. In an Order filed January
14, 2020 (Dkt. 11) ("January 14, 2020 Order"), District
Judge Lawrence J. Vilardo [1] granted Plaintiff's motion for
leave to proceed *in forma pauperis* (Dkt. 7), and screened
Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)
(B) and § 1915A, and ordered the Complaint be dismissed
unless Plaintiff, within 45 days, filed an amended complaint
specifically alleging that Defendants' actions substantially
burdened Plaintiff's exercise of his religion, noting that
although Plaintiff was not required to show he was prevented
from doing something expressly required by his religion,
or compelled to do something expressly forbidden by his
religion, Plaintiff "should ground his professed belief in some
Nation of Islam custom or teaching." January 14, 2020 Order
at 7 & n. 1. Judge Vilardo also dismissed with prejudice
Plaintiff's RLUIPA claims for money damages asserted
against Defendants in their official capacities because such
claims are foreclosed by sovereign immunity. *Id.* at 8-9.

[1]      By Text Order entered September 15, 2020, the
action was reassigned to District Judge Sinatra.

On February 3, 2020, Plaintiff filed an Amended Complaint
(Dkt. 13) ("Amended Complaint"), attaching exhibits 1
through 28 ("Plaintiff's Exh(s). __"). Plaintiff names as
Defendants DOCCS Correctional Officer ("C.O.") Kelli
Broderick ("Broderick"), C.O. Stephany Miller ("Miller"),
Correctional Sergeant James Johnson ("Johnson"), Wende
Coordinating Chaplain Bishme Nelson ("Imam Nelson"),
Inmate Grievance Program Sergeant Frederick Kintzel
("Kintzel"), and Wende Deputy Superintendent for Security
Kevin Brown ("Brown") (together, "Defendants"). On
February 7, 2020, Judge Vilardo screened the Amended
Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and §
1915A, February 7, 2020 Order (Dkt. 14) ("February 7,
2020 Order"), finding Plaintiff's repleaded First Amendment
and RLUIPA claims for injunctive and declaratory relief
could proceed, but that Plaintiff's claims for money damages
against Defendants in their official capacities were barred by
Eleventh Amendment immunity. February 7, 2020 Order at
2-3. On October 13, 2021, Defendants filed an answer to the
Amended Complaint (Dkt. 30).

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 91 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

**\*2**  On October 14, 2021, Defendants filed the instant motion for judgment on the pleadings (Dkt. 30) ("Defendants' Motion"), attaching the Memorandum of Law in Support of Defendants' Motion to Dismiss on the Pleadings Under Rule 12(c) (Dkt. 31-1) ("Defendants' Memorandum"). On November 10, 2021, Plaintiff filed his response generally opposing Defendants' Motion (Dkt. 33) ("Plaintiff's Response"). On November 29, 2021, Defendants filed the Reply Memorandum of Law in Further Support of Defendants' Motion for Judgement on the Pleadings (Dkt. 34) ("Defendants' Reply"). By letter to the undersigned filed February 25, 2022, Plaintiff, without obtaining the court's approval, filed a photograph which Plaintiff maintains depicts the subject pendant. (Dkt. 35) ("Plaintiff's Sur-Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion should be GRANTED in part and DENIED in part.

## FACTS [2]

[2]    Taken from the pleadings filed in this action.

On November 19, 2017, Plaintiff Stoney Harrison ("Plaintiff" or "Harrison"), an inmate in the custody of New York State Department of Corrections and Community Supervision ("DOCCS"), was transferred into Wende Correctional Facility ("Wende" or "the correctional facility"), and Plaintiff requested non-party C.O. Wyman ("Wyman") issue Plaintiff a permit for his personal property including, *inter alia*, a religious pendant ("pendant" or "medallion"). [3]  Plaintiff maintains wearing the pendant is central to his exercise of the Muslim religion because certain Islamic symbols, including the star and crescent moon depicted on the pendant, propagate Islamic ideology and distinguish Plaintiff from the many Christian inmates. Wyman advised Plaintiff the requested permits were issued by the package room. On November 21, 2017, Plaintiff was called to Wende's package room, where Plaintiff asked Defendant Broderick for a permit for his pendant and other items, prompting Broderick to request to see the pendant. Plaintiff complied, removing the pendant and the chain ("chain") on which it hung from his neck and handing the pendant and chain to Broderick who advised the chain exceeded the 18″ length permitted by the relevant DOCCS regulation. Plaintiff requested a copy of DOCCS Directive # 4911 ("Directive # 4911"), [4]  and showed Broderick the 18″ length limit pertains only to female

jewelry, and that there was no similar restriction for religious pendants under the "Religious Articles" section of Directive # 4911. At Broderick's request, Defendant Miller joined the discussion, but neither Broderick nor Miller conceded Plaintiff's construction of Directive # 4911 was correct, and Broderick confiscated the pendant and chain, providing Plaintiff with a receipt for both items. Plaintiff completed the required form to request a review of the confiscation, but the confiscation was upheld on review on November 23, 2017, with Plaintiff told Defendant Johnson advised the chain's length of 24″ exceeded the maximum 18″ length permitted.

[3]    Although Plaintiff requested a permit for the pendant, the context of the Amended Complaint establishes Plaintiff was wearing the pendant and the requested permit would permit Plaintiff to continue to wear the pendant at Wende.

[4]    A copy of the relevant portions of DOCCS Directive # 4911 is filed as Plaintiff's Exh. 2 (Dkt. 13 at 20-21). Although Directive # 4911 pertains to "Packages & Articles Sent or Brought to Facilities," DOCCS Directive # 4202 pertaining to "Religious Programs and Practices" specifically provides that the permitted size or design of "religious medallions, beads, and shrines" are "subject to the provisions of Directive # 4911 ...."

Later on November 23, 2017, Plaintiff provided Miller with a copy of a March 16, 2016 decision issued by DOCCSs' Inmate Grievance Program ("IGP") Central Office Review Committee ("CORC") ("March 16, 2016 CORC Decision") [5] finding with regard to a previously filed inmate grievance [6] that Directive # 4911 does not limit the length of a religious chain [7] to 18″; rather, a security review should be conducted to determine whether a religious chain posed a security threat based on its length or thickness. Miller asked why she did not have a copy of the March 16, 2016 CORC Decision, and Plaintiff again asked Miller to return his chain and pendant, but Miller refused, telling Plaintiff to have for a visitor to pick up the chain within 14 days, or to arrange for an alternative method for disposing of the chain and pendant. Amended Complaint ¶ 12. Plaintiff filed an inmate grievance ("the grievance") regarding the confiscation of his chain and pendant on November 23, 2017.

[5]    Plaintiff's Exh. 7 (Dkt. 13 at 30-31).

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 92 of 128

[6]    Nothing in the record indicates, nor does Plaintiff argue, that the March 16, 2016 CORC Decision pertained to an inmate grievance filed by Plaintiff. That the March 16, 2016 CORC Decision states the inmate sought restitution for the unwarranted confiscation of a cross and religious chain, suggesting the Plaintiff in the instant action, who alleges he is a Muslim, was not the grievant relative to the March 16, 2016 CORC Decision.

[7]    The term "religious chain" pertains to a chain on which a religious pendant or medallion is hung.

**\*3** Plaintiff maintains he was advised by the inmate grievance clerk that Defendants Imam Nelson and Kintzel would investigate the grievance after which Plaintiff's chain would be returned to him. Plaintiff saw Imam Nelson at orientation where Plaintiff asked Imam Nelson if he had seen Plaintiff's grievance. Imam Nelson responded he had seen the grievance and intended to advise Wende's package room staff that Directive # 4911 did not prohibit Plaintiff from possessing the chain. According to Imam Nelson, Wende's package room staff "felt some kind of way [*sic*] because Plaintiff reached over the counter and tried to take the chain out of CO Broderick's hand." Amended Complaint ¶ 18. Imam Nelson further advised Plaintiff the package room staff was then asserting the pendant measured more than the allowed 2″ in diameter. At a hearing on Plaintiff's grievance ("grievance"),[8] Plaintiff was advised by the hearing officer, Defendant Kintzel, that the pendant's diameter exceeded 2″, but Plaintiff's request to have the pendant measured to confirm the pendant's diameter was refused, and Plaintiff was advised that he could have the chain but not the pendant, and the chain would be held by the Inmate Records Coordinator ("IRC") until Plaintiff received a pendant that complied with the permitted dimensions, *i.e.*, a "compliant pendant," and that Plaintiff had to send home the pendant that was confiscated from him. Grievance Decision.[9] Plaintiff did not then arrange for the pendant to be sent home, but appealed the grievance decision to the Superintendent who, on December 12, 2017, upheld the decision ("Superintendent's Decision").[10]

[8]    The date of the grievance hearing is not in the record.

[9]    Plaintiff's Exh. 12 (Dkt. 13 at 42).

[10]    Plaintiff's Exh. 14 (Dkt. 13 at 47).

On April 18, 2018, Plaintiff completed paperwork to have the pendant be sent to the store from which it was purchased, requesting the pendant be measured, and the pendant was mailed out of the correctional facility. On February 27, 2019, CORC, upon further review, issued a decision ("CORC Decision"),[11] affirming the Superintendent's Decision and noting Plaintiff's grievance was granted with regard to the chain which was provided to Plaintiff after Plaintiff was issued a religious pendant that complied with the specifications of Directive # 4911. Additional letters Plaintiff wrote to Defendants Brown and the facility superintendent did not provide Plaintiff with any further relief.

[11]    Plaintiff's Exh. 15 (Dkt. 13 at 51).

## DISCUSSION

### 1. Judgment on the Pleadings

Defendants move pursuant to Fed.R.Civ.P. 12(c) ("Rule 12__"), for judgment on the pleadings. " 'The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim.' " *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)). " 'To survive a Rule 12(c) motion, [the plaintiff's][12] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (bracketed material in original)). " 'The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief ... calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct.' " *Id.* (quoting *Lynch*, 952 F.3d at 75 (internal quotation marks omitted)). In making this assessment, all reasonable inferences must be drawn in the plaintiff's favor. *Id.* (citing *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). Like a motion under Rule 12(b)(6), a motion under Rule 12(c) may be filed before discovery is complete. *See* Fed. R. Civ. P. 12(c) (permitting motion "[a]fter the pleadings are closed —but early enough not to delay trial"). Nevertheless, "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, we must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Lively*, 6 F.4th at 301.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 93 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

12     Unless otherwise indicated, bracketed material has been added.

" '[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial.' " *Lively*, 6 F.4th at 301 (quoting *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 761 (D.C. Cir. 2019) (internal quotation marks omitted)); *see also Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (explaining that dismissal under Rule 12(c) is appropriate for self-defeating complaints—*i.e.*, complaints "whose allegations show that there is an airtight defense"). Accordingly, "where a 'question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings.' " *Id.* at 302 (quoting *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir. 1994); and citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 (3d ed. 2021) ("[J]udgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.")). A court thus "may consider undisputed allegations of fact on a Rule 12(c) motion under the same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations." *Id.*

   **\*4** In considering a Rule 12(b)(6) motion, the Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at

570, 127 S.Ct. 1955). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678, 129 S.Ct. 1937); *see Twombly*, 550 U.S. at 570, 127 S.Ct. 1955 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face"). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

"In ruling on a 12(b)(6) motion, and thus on a 12(c) motion, a court may consider the complaint as well as 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.' " *Kalyanaram v. American Ass'n of University Professors at New York Institute of Technology, Inc.*, 742 F.3d 42, 44 n. 1 (2d Cir. 2014) (quoting *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001)) (bracketed material in original). On a motion for judgment on the pleadings, " 'a court may consider ... matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted; bracketed material and ellipses in original)).

In the instant case, Plaintiff's claims are asserted pursuant to 42 U.S.C. § 1983 ("§ 1983"), which permits imposing civil liability upon persons who, acting under color of state law, deprive an individual of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983). Section 1983, however, " 'is not itself a source of substantive rights.' " *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred' ...." *Id.* To succeed on a § 1983 claim, a plaintiff must establish the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). Because Plaintiff's claims assert violations of the First Amendment and the RLUIPA, § 1983 is the proper vehicle for asserting the claims.

**Harrison v. Broderick, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 94 of 128

Defendants argue in support of judgment on the pleadings that Plaintiff lacks standing to bring claims for prospective relief or any claim against Defendants Broderick, Miller and Johnson against whom Plaintiff fails to allege any injury-in-fact, Defendants' Memorandum at 7-9, sovereign immunity bars Plaintiff's claims for prospective relief, *id.* at 9-10, Plaintiff's claim for money damages fails because no physical injury is alleged, *id.* at 10-11, Plaintiff fails to allege the requisite substantial burden on the exercise of his religion, *id.* at 11-13, Plaintiff's own allegations attribute any alleged violation of his religious freedom to Defendant Nelson, and Defendants Broderick, Miller, and Johnson were, at most, negligent which does not support a § 1983 claim, *id.* at 13-15, no personal involvement is alleged against Defendants Brown, *id.* at 15-17, and Kintzel, *id.* at 17-19, and all of Plaintiff's claims are barred by qualified immunity. *Id.* at 19-22. Plaintiff's Response consists of a general denial of Defendants' arguments in support of judgment on the pleadings. Plaintiff's Response, *passim.* In further support of judgment on the pleadings, Defendants present a summary of their initial arguments. Defendants' Reply, *passim.* The court addresses each of Defendants' arguments in turn.

**\*5**  Preliminarily, insofar as Defendants maintain Plaintiff attaches no religious significance to the chain, because the pendant was hanging from the chain when the chain was confiscated, Defendants' seizure of the chain necessarily included the seizure of the pendant. Accordingly, the court's use of the term "chain" refers the chain with the pendant.

### 2. Standing

Defendants argue that because Plaintiff has received both the chain Broderick confiscated from Plaintiff on November 21, 2017, as well as a religious pendant that indisputably complies with Directive # 4199, Plaintiff has no continuing First Amendment or RLUIPA claim supporting Plaintiff's request for injunctive and declaratory relief, Defendant's Memorandum at 7-8, nor has Plaintiff alleged any injury in fact traceable to Defendants Broderick, Miller, and Johnson insofar as Plaintiff alleges no religious significance to the chain which Broderick, Miller, and Johnson refused to allow Plaintiff to possess, and the records Plaintiff attached to the Amended Complaint show Plaintiff was not allowed to possess the pendant because the pendant exceeded the permitted 2″ in diameter, a determination that was made by Defendant Iman Nelson. *Id.* at 8-9. In opposition, Plaintiff references *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1985), for the proposition that an inmate may

assert an Eighth Amendment claim based on the prospect of future harm. Plaintiff's Response at 1 ¶ 1. In further support of judgment on the pleadings, Defendants differentiate that in *Helling*, the inmate plaintiff was alleging both a current health problem based on exposure to cigarette smoke, as well as the possibility of future physical harm in contrast to Plaintiff who has not and cannot allege any physical harm based on the confiscation of his chain and religious pendant. Defendants' Reply at 6-7.

It is basic that standing is required for subject matter jurisdiction by this court. *Strubel v. Comenity Bank*, 842 F.3d 181, 187–88 (2d Cir. 2016) (addressing challenge to constitutional standing raised for the first time on appeal because standing is "necessary" to subject matter jurisdiction). To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate (1) "injury in fact," (2) a "causal connection" between that injury and the complained-of conduct, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). "[T]he case-or-controversy prerequisite to federal jurisdiction means that " 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed ....' " *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997))). "[A] case becomes 'moot,' and beyond federal jurisdiction, if there ceases to be an actual controversy...." *Id.* (citing *Chafin v. Chafin*, 568 U.S. 165, 171-72, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013). In contrast, " 'the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.' " *Id.* (quoting *Davis*, 554 U.S. at 734, 128 S.Ct. 2759).

In the instant case, Defendants argue the Amended Complaint and the exhibits attached thereto establish that Plaintiff fails to allege an injury-in-fact traceable to Defendants Broderick, Miller, and Johnson who are alleged to have confiscated only Plaintiff's chain to which Plaintiff alleges no religious significance. Defendants' Memorandum at 8. Nor did Defendants Broderick, Miller, or Johnson determine the pendant was more than 2″ in diameter, but such determination was made by Defendant Imam Nelson. *Id.* at 9. Accordingly, Defendants maintain Plaintiff lacks standing to pursue his First Amendment Free Exercise Clause and RLUIPA claims

against Broderick, Miller, and Johnson. *Id.* Because the pendant was attached to the chain, it is not clear from the record that the confiscation of the chain by Broderick, Miller, and Johnson did not also include confiscation of the pendant. Accordingly, Defendants' Motion should be DENIED as to this aspect of their argument.

**\*6** With regard to Defendants' argument that Plaintiff is in possession of both his chain and a compliant pendent, although Defendants couch their challenge to subject matter jurisdiction as a lack of standing, it is not clear from the record whether Plaintiff was in possession of the chain and religious pendant when Plaintiff commenced this action on July 27, 2018; rather, Defendants reference in support of their standing argument that when Plaintiff filed the Amended Complaint, he was in possession of his chain and religious pendant the February 27, 2019 Inmate Grievance Committee CORC Decision reviewing Plaintiff's grievance which states that "the chain in question was held until an allowable pendant was received, and [Plaintiff] has since been issued both." Plaintiff's Exh. 15 (Dkt. 13 at 51). Significantly, the CORC Decision does not specify when Plaintiff received the chain and religious pendant such that it is not possible to determine whether Plaintiff had standing to commence the instant action, filed July 27, 2018. Nevertheless, because Plaintiff does not deny he is now in possession of both the chain and a compliant pendant, the court considers whether the case is now moot.

"The federal courts are courts of limited jurisdiction, their powers circumscribed at their most basic levels by the terms of Article III of the Constitution, which state that they may hear only 'Cases' or 'Controversies.' " *Russman v. Board of Education of the Enlarged City School District of the City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001) (quoting U.S. Const. art. III, § 2 cl. 1). For the "case or controversy" requirement to be met, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Id.* Specifically, "[t]he requisite dispute must persist throughout the litigation ... from first filing in the district court through its many ascents and descents of the appellate ladder—and if the dispute should dissolve at any time due to a change in circumstances, the case becomes moot." *Id.* (citing cases). Whenever a case becomes moot, the court loses jurisdiction over it requiring the case be dismissed. *Id.* As such, "under the mootness doctrine, 'if an event occurs ... that makes it impossible for the court to grant any effectual relief whatever to a prevailing party,' [the court] must dismiss the case, rather than issue an advisory opinion."

" *ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir. 2004) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)).

There exists, however, an exception to the mootness doctrine "where the case is 'capable of repetition, yet evading review.' " *Russman*, 260 F.3d at 119 (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). "The capable-of-repetition principle applies only 'where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.' " *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). "A recurrent dispute will 'evade review' if it could not be entirely litigated before again becoming moot, including prosecution of appeals as far as the Supreme Court." *Id.* (citing *Honig v. Does*, 484 U.S. 305, 322-23, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (noting the likely mooting "by the time review can be had in this Court" of any future lawsuit brought by plaintiff)). "Given these strictures, it has been said that the exception 'applies only in exceptional situations.' " *Id.* (quoting *Spencer*, 523 U.S. at 17, 118 S.Ct. 978). As the party seeking application of the exception, Plaintiff "bears the burden of demonstrating that this controversy is indeed 'capable of repetition, yet evading review.' " *Video Tutorial Services, Inc. v. MCI Telecommunications Corp.*, 79 F.3d 3, 6 (2d Cir. 1996) (citing cases).

In the instant case, Plaintiff does not deny that his receipt of both the chain and compliant religious pendant has rendered moot his claims. Nor does Plaintiff maintain that the alleged wrongful confiscation of his chain and pendant falls within the mootness doctrine exception because there is a reasonable expectation that Plaintiff will again be subject to the same challenged action. Accordingly, Plaintiff has failed to meet his burden of establishing the mootness doctrine exception applies.

**\*7** Accordingly, Defendants' Motion should be GRANTED insofar as Plaintiff's claims are moot, rendering the court without subject matter jurisdiction over them.

### 3. Eleventh Amendment/Sovereign Immunity

Defendants argue that because Plaintiff has already received both his chain and a compliant religious pendant, Plaintiff seeks only prospective relief which is barred by the doctrine of sovereign immunity and is not subject to *the Ex*

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 96 of 128

*Parte Young* exception to Eleventh Amendment Immunity. Defendants' Memorandum at 9-10. In opposition, Plaintiff argues state officials may be held personally liable for damages under § 1983 based on actions taken in Defendants' official capacities. Plaintiff's Response at 1 ¶ 1. In further support of judgment on the pleadings, Defendants argue even if Plaintiff could proceed on a First Amendment Free Exercise Clause claim, Plaintiff's remedy is limited to nominal damages, which Plaintiff has not requested, because Plaintiff has conceded being issued both his chain and a compliant pendant, such that Plaintiff is not subject to ongoing or prospective harm. Defendants' Reply at 5-6.

As previously stated, Background at 3, after screening the Amended Complaint, Judge Vilardo ordered that Plaintiff's repleaded First Amendment and RLUIPA claims for injunctive and declaratory relief could proceed, but that Plaintiff's claims for money damages against Defendants in their official capacities were barred by Eleventh Amendment immunity. February 7, 2020 Order at 2-3. Accordingly, any money damages for which Plaintiff maintains state officials can be personally liable under § 1983 are limited to nominative or punitive damages, neither of which Plaintiff seeks. *See* Amended Complaint at 16-17 (Relief).

Further, "[t]he Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of 'sovereign immunity' .... This immunity extends not only to the states, but also to state agencies .... The Eleventh Amendment also bars suits for damages against state officials acting in their official capacities." *Bell v. N.Y. State Dep't of Corr.*, 2018 WL 11219948, *3 (N.D.N.Y. Mar. 20, 2018) (citing cases and quoting U.S. Const. amend. XI). This Eleventh Amendment immunity "bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception." *NAACP v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019). "[A]pplication of the *Young* doctrine is straightforward: A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against *individual state officers, as opposed to the state*, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (italics added) (citing *Ex parte Young*, 209 U.S. 123, 155-56, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). In the instant case, because Plaintiff is in receipt of the chain and a compliant pendant, Plaintiff is not alleging an ongoing violation of federal law, requiring dismissal of his claims.

**\*8** Defendants' Motion should be GRANTED on this aspect of Plaintiff's claims.

### 4. Money Damages

Defendants argue Plaintiff's claim for compensatory damages against each Defendant in the amount of $ 500 fails because no physical injury is alleged as required. Defendants' Memorandum at 10-11. Plaintiff's Response does not address this argument.

42 U.S.C. § 1997e(e) ("§ 1997e(e)") "provides that '[n]o federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' That provision bars recovery of compensatory damages for mental and emotional injuries, absent physical injury, in § 1983 actions." *Nash v. McGinnis*, 2008 WL 4898999, at *6, 585 F.Supp.2d 455 (W.D.N.Y.2008) (quoting 42 U.S.C. § 1997e(e)). " 'Courts have strictly construed this requirement, barring claims by prisoners who demonstrate solely emotional or mental injury and barring physical injury claims where the injury alleged is *de minimis*.' " *Abdur–Raqiyb v. Erie County Medical Center*, 536 F.Supp.2d 299, 304 (W.D.N.Y.2008). "Section 1997e(e) applies to all federal civil actions including claims alleging constitutional violations. Section 1997e(e) is a limitation on recovery of damages for mental and emotional injury in the absence of or showing of physical injury, but does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir.2002). *See also Amaker v. Goord*, 2015 WL 3603970, at * 1 (W.D.N.Y. June 5, 2015) (holding § 1997e(e) bars awarding compensatory damages for violations of religious rights under the First Amendment unaccompanied by any physical injury). Further, as discussed, Background at 3, Judge Vilardo already dismissed with prejudice Plaintiff's claims for money damages under the RLUIPA as barred by sovereign immunity. January 14, 2020 Order (Dkt. 11) at 8-9.

Accordingly, Defendants' Motion should be GRANTED as to Plaintiff's request for money damages.

### 5. Substantial Burden

**Harrison v. Broderick, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 97 of 128

Defendants argue in support of judgment on the pleadings that Plaintiff fails to allege the seizure of his religious pendant and chain constituted the requisite substantial burden on the exercise of his religion. Defendants' Memorandum at 11-13. In opposition, Plaintiff argues Defendants' seizure of his pendant constituted a violation of his First Amendment rights. Plaintiff's Response at 1.

Although incarcerated persons within prison facilities are not entitled to the full gamut of rights guaranteed under the United States Constitution, the free exercise clause of the First Amendment, as well as the RLIUPA, do afford them at least some measure of protection, *Pell v. Procunier,* 417 U.S. 817, 822 (1974). *See Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir. 2006).(citing RLIUPA, 42 U.S.C. § 2000cc-1)a)), and *Ford v.McGinnis,* 352 F.3d 582, 587 (2d Cir. 2003) (discussing requirements under First Amendment Free Exercise Clause). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing cases). Nevertheless, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (internal citations and quotation marks omitted). Such limitations "arise both from the fact of incarceration and from the valid penological objectives ...." *Id.* (citations omitted).

**\*9**  Accordingly, as a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and, in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Upon plausibly alleging the impeded belief was sincerely held, the plaintiff must plausibly allege such belief was subjected to a substantial burden which "exists where the state put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir. 1996) (quotation omitted) (alteration in original). Once a plaintiff satisfies this burden,

defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275,. Whether an inmate's asserted religious beliefs are sincerely held, however, "is subjective and requires a determination of genuine issues of material fact." *Odom v. Dixion,* 2008 WL 466255, at * 7 (W.D.N.Y. Feb. 15, 2008).

In the instant case, Plaintiff alleges that "wearing the Islam pendant is central to Islamic Ideology, and has importance to [Plaintiff's] Islamic Family as pin-pointed at Qur'aanic Verse (sura 12:4) and that it was a gift that was purchased for me by Family during the Holy Month of Ramadhan [*sic*] from the ... Islamic store." Amended Complaint at 13 ¶ 4. Plaintiff further explains the symbolic meaning of the images on the pendant, as well as that the seized pendant bears great sentimental meaning to Plaintiff because it was gifted to him during the month of Ramadhan. *Id.* ¶¶ 2-3, 5. These allegations plausibly allege Plaintiff's sincere belief that wearing the seized pendant was central to his religious belief.

Nevertheless, Plaintiff has not "ground[ed] his professed belief in some Nation of Islam custom or teaching," as Judge Vilardo directed. January 14, 2020 Order at 7 & n. 1 (noting that although Plaintiff was not required to show he was prevented from doing something expressly required or compelled to do something expressly forbidden by his religion, Plaintiff "should ground his professed believe in some Nation of Islam custom or teaching."). Although Plaintiff references "Qur'aanic Verse (sura 12:4)," as the source of his sincere belief that wearing the pendant is central to his religious belief, Amended Complaint at 13 ¶ 4, a plain reading of the referenced verse establishes the verse, as recited by Plaintiff, *id.* at 13 ¶ 3, merely establishes that in the context of Islam, the sun, moon, and stars signify members of the Islamic family including, respectively, the father, mother, and children. The verse does not, however, require any adherent to the faith wear a pendant depicting these symbols. Nor does the article attached as Plaintiff's Exh. 20 to the Amended Complaint explaining that the Flag of Islam depicts the sun, moon, and eleven stars require such flag or any pendant or medallion containing such symbols be worn to practice the faith. Moreover, even if, as Plaintiff suggests, Amended Complaint at 16 ¶ 13, the wearing of the pendant depicting the symbols, allowed Plaintiff to visibly separate himself from the many Christian inmates, not only does Plaintiff fail to allege that separating himself from Christians is a necessary part of his religion, but it is simply implausible that Plaintiff could achieve such ends when he

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 98 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

was required to wear the pendant underneath his clothing as Plaintiff admits. Amended Complaint at 14 ¶ 6. Plaintiff thus has failed to allege Defendants, by denying Plaintiff his religious pendant, substantially burdened Plaintiff's exercise of his religious beliefs. *Jolly*, 76 F.3d at 477. *See also Mitchell v. Annucci*, 2019 WL 3253192, at * 6 (N.D.N.Y. July 19, 2019) (dismissing inmate plaintiff's First Amendment claim based on the plaintiff's failure to allege how his inability to proselytize to other inmates substantially burdened his religious rights).

**\*10** As such, Plaintiff fails to plausibly allege Defendants' confiscation of his chain and religious pendant substantially burdened Plaintiff's sincerely held religious beliefs and Defendants' Motion should be GRANTED on this ground.

### 6. Negligence

Defendants argue Plaintiff's allegations attribute any alleged violation of his religious freedom by Defendant Imam Nelson, and that Defendants Broderick, Miller, and Johnson, by improperly construing Directive # 4911 were, at most, negligent which does not support a § 1983 claim. Defendants' Memorandum at 13-15. Plaintiff does not specifically argue in opposition on this point.

"[A] prison official must *knowingly* place a substantial burden on a prisoner's religious beliefs to incur liability for damages under RLUIPA or the Constitution." *Hamilton v. Countant*, 2016 WL 881126, at \*4 (S.D.N.Y. Mar. 1, 2016) (italics in original and citing cases). Therefore, "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under either the First Amendment or RLUIPA." *Id.* Claims alleging violation of an inmate plaintiff's rights under the First Amendment and the RLUIPA resulting from negligence or mistake have been dismissed. *See, e.g.*, *id.* at \*6 (granting summary judgment where the alleged violation of plaintiff's rights was "the result of errant paper work and a miscommunication," which "resulted from, at most, negligence"); *Scott v. Shansiddeen*, 2013 WL 3187071, at \*4 (N.D.N.Y. June 20, 2013) (granting summary judgment where defendants' error did not "amount[ ] to anything more than negligence," which is "not actionable under the First Amendment" or "sufficient to support a claim under [RLUIPA]"). Similarly, in the instant case, Plaintiff claims violations of his religious rights under the First Amendment and the RLUIPA based on a mistaken construction of Directive # 4911 regarding the length of a chain permitted for a religious pendant, as well as a mistaken measurement of Plaintiff's religious pendant.

Accordingly, Defendants' Motion should be GRANTED insofar as Plaintiff's claims can be construed as asserting negligence or mistake which does not support a § 1983 claim.

### 7. Personal Involvement

Defendants maintain the action must be dismissed as against Brown and Kintzel against whom Plaintiff fails to allege any personal involvement in the asserted First Amendment and RLUIPA violations. Defendants' Memorandum at 15-17 (Brown), and 17-19 (Kintzel). Plaintiff has not responded in opposition to this argument.

#### A. Defendant Brown

Plaintiff's claims against Defendant Brown are based on Brown's failure to take any corrective action relative to the confiscation of Plaintiff's religious pendant and chain after Plaintiff wrote to Brown regarding the same. Amended Complaint at 12 ¶ 27, and 15 ¶ 11. " 'It is well settled in this circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite' to a section 1983 claim." *Delee v. Hannigan*, 729 Fed.Appx. 25, 31 (2d Cir. 2018) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted)). Before the Supreme Court decided *Iqbal*, supervisory liability claims for § 1983 claim were analyzed according to the framework set forth in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), specifically providing that

> **\*11** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 99 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

The Second Circuit recently clarified that following *Iqbal*, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachman*, 983 F.3d 609, 618-19 (2d Cir. 2020). Relevantly, "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id.* (quotations and citations omitted). Failing to correct another officer's violation does not suffice; rather, after *Iqbal*, the "active conduct" standard necessary to impose § 1983 liability on a supervisor requires the supervisor either directly participate in the alleged constitutional violation or create a policy or custom under which the alleged unconstitutional practices occurred, *i.e.*, only the first and part of the third categories of supervisory liability identified in *Colon* survive. *Tangreti*, 983 F.3d at 617 n.4 (citing cases). Since *Tangreti* was decided, courts within the Second Circuit repeatedly have dismissed claims based on an asserted wrong by way of a letter, grievance, or appeal of a disciplinary action. *See, e.g.*, *Smart v. Annucci*, 2021 WL 260105, at * 5 (S.D.N.Y. Jan. 26, 2021) (dismissing *pro se* complaint alleging defendants, both high-ranking prison officials who were alleged to have failed to act on the plaintiff's complaints, because such allegations did not support an inference that the defendants, through their own individual actions, violated the Constitution, stating "[f]ailing to correct another officer's violation does not suffice" to establish a supervisor's direct violation of a plaintiff's constitutional rights).

In the instant case, Plaintiff alleges that he wrote to Defendant Brown complaining about the denial of his religious pendant, but that Brown failed to correct the asserted misconduct. Amended Complaint at 12 ¶ 27, and 15 ¶ 11. Accordingly, Plaintiff's sole allegation against Defendant Brown is that Brown failed to remedy a wrong, caused by the actions of others, about which Plaintiff complained in a letter to Brown. The Second Circuit, however, has repeatedly held that alerting a supervisory official to an asserted wrong through correspondence, grievance, or disciplinary appeal does not state a § 1983 claim against such supervisory official. *See McCrary v. Marks*, 836 Fed.Appx. 73, 74 (2d Cir. 2021) (holding the plaintiff's claim that the defendant supervisory official received the plaintiff's letter complaining of a violation of the plaintiff's First Amendment right to judicial documents was insufficient to state a claim against such defendant) (citing *Tangreti*, 983 F.3d 618-19). *Cf. Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (concluding that the Commissioner of the New York State Department of Correctional Services was not personally involved in an alleged constitutional violation where the plaintiff addressed two letters to the Commissioner, the first of which the Commissioner forwarded to another official, and the second of which was simply a request for a status update).

**\*12** Accordingly, Plaintiff fails to plausibly state a claim against Defendant Brown and Defendants' Motion should be GRANTED as to Defendant Brown.

### B. Defendant Kintzel

Plaintiff's claims Defendant Kintzel, as the hearing officer for Plaintiff's grievance, denied Plaintiff's request that the pendant be measured. Amended Complaint at 15 ¶ 10. Defendants argue that because prison inmates have no constitutional right of access to any internal grievance process, nor to an adequate investigation of a grievance, Plaintiff has not and cannot state a claim against Kintzel. Defendants' Memorandum at 17-19. Plaintiff has not responded to this argument.

"It is well-established that a prison inmate has no constitutional right of access to an internal grievance process, or to an investigation of his grievance that he deems adequate." *James v. Poole*, 2013 WL 132492, at *5 (W.D.N.Y. Jan. 9, 2013) (citing cases). Moreover, the denial of an inmate's grievance has repeatedly been held insufficient to establish personal involvement in the alleged underlying constitutional violation. *See, e.g.*, *Logan v. Graham*, 2021 WL 4440344, at * 5 (N.D.N.Y. Sept. 28, 2021) (dismissing inmate plaintiff's claim that defendant, as inmate grievance hearing officer, was not personally involved in the alleged constitutional deprivation). Accordingly, Plaintiff's allegation that Defendant Kintzel failed to measure the pendant, as Plaintiff requested, during the grievance hearing, fails to plausibly state a constitutional deprivation.

As such, Defendants' motion seeking judgment on the pleadings should be GRANTED as to Defendant Kintzel.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 100 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

### 8. RLUIPA

Plaintiff's RLUIPA claims also should be dismissed for because the RLUIPA does not provide for a private cause of action for money damages against state official in their official or individual capacities. In particular, the Supreme Court has "held that sovereign immunity forecloses the availability of money damages as a remedy against states and state actors in their official capacities under RLUIPA." *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (citing *Sossamon v. Texas*, 563 U.S. 277, 285-86, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver.")). Plaintiff therefore cannot his sustain his RLUIPA claim against Defendants in their official capacities.

Nor can Plaintiff sustain his RLUIPA against Defendants in their individual capacities because the "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Washington*, 731 F.3d at 145. *See also Tanvir v. Tanzin*, 894 F.3d 449, 465 (2d Cir. 2018) (observing "RLUIPA prohibits both the recovery of money damages from *state* officers sued in their official capacities and in their individual capacities." (citing *Gonyea*, 731 F.3d at 145)), *aff'd*, — U.S. ——; —— U.S. ——, 141 S. Ct. 486, 208 L.Ed.2d 295 (2020).

Defendants' Motion should thus be GRANTED insofar as Plaintiff seeks monetary damages for an alleged violation of the RLUIPA.

### 9. Qualified Immunity

Defendants alternatively argue Defendants Broderick, Miller and Johnson are qualifiedly immune from liability on Plaintiff's First Amendment claim.[13] Defendants' Memorandum at 19-22. Plaintiff's Response does not address this argument.

[13]    Insofar as Plaintiff alleges violations of the RLIUPA, qualified immunity does not apply to lawsuits against individuals sued in their official capacity, *Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (Brennan, J., concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). Further, there is

no cognizable private right of action against state officers sued in their individual capacities, and the RLUIPA does not allow for the award of monetary damages against state officers sued in their official capacities. *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013) (citing cases).

**\*13**  "Qualified immunity shields law enforcement officials from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), and *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "An officer is entitled to qualified immunity if '*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful.' " *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 70-71 (2d Cir. 2018) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (italics in original)). A qualified immunity analysis asks two questions including whether "the facts show that the office's conduct violated plaintiff's constitutional rights," and, if so, whether "the right was clearly established at the time of defendant's actions." *Zalaski*, 723 F.3d at 388 (citing *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074, and *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)). Courts are no longer required to sequentially answer these two questions; rather, it is particularly appropriate to address the second question first where the first question "turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct 'was not objectively unreasonable in light of existing law.' " *Id.* at 389 (quoting *Coolick v. Hughes*, 699 F.3d 211, 219-20 (2d Cir. 2012)), and citing *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074.

"To determine whether a right was clearly established, we consider 'whether the right in question was defined with reasonable specificity,' 'whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question,' and 'whether under preexisting law a reasonable defendant officer would have understood that his or her acts were unlawful.' " *Barnes v. Furman*, 629 Fed.Appx. 52, 55-56 (2d Cir. Oct. 22, 2015) (quoting *Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir. 2009)). Even if the right at issue were clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 101 of 128

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

*Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996). This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on the [legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Dir. 1991) (internal quotation marks and citation omitted). Also to be considered in determining whether a defendant is qualifiedly immune from personal liability under the First Amendment is whether the defendant had a good faith belief they were carrying out a lawful policy. *See Barnes v. Fedele*, 813 Fed.Appx. 696, 700 (2d Cir. 2020) (affirming district court's determination that state prison officers were qualifiedly immune from liability on Plaintiff's First Amendment and RLUIPA claims asserted under § 1983 based on the defendants' confiscation of the plaintiff's religious head covering in reliance on a DOCCS Directive restricting the wearing of such head coverings to members of certain religions, and the plaintiff identified with a different religion). Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991).

Accordingly, "qualified immunity provides a broad shield. It does so to ensure 'that those who serve the government do so with the decisiveness and the judgment required by the public good.' " *Zalaski*, 723 F.3d at 389 (quoting *Filarsky v. Delia*, 566 U.S. 377, 390, 132 S.Ct. 1657, 182 L.Ed.2d 662 (2012)). "Toward that end, it affords officials 'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." *Id.* (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012)). "In sum, qualified immunity employs a deliberately 'forgiving' standard of review," providing " 'ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), and *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

**\*14** " '[T]he matter of whether a defendant official's conduct was objectively reasonable, *i.e.*, whether a reasonable official [in the defendant's position] would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact.' " *Outlaw v. City of Hartford*, 884

F.3d 351, 367 (2d Cir. 2018) (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (bracketed material on original). Factual questions material to qualified immunity are to be resolved by the fact finder. *Id.* (citing *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). " 'Once the [factfinder] has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.' " *Id.* (quoting *Zellner*, 494 F.3d at 368).

In the instant case, the court takes judicial notice that Directive # 4202 permits inmates to possess a "pendant" or "medallion" including "[c]rescents with stars and/or moons," which complied with the size and design specified by Directive # 4911. [14] Directive # 4911 does not limit the length of chain on which a religious pendant or medallion may hang, but provides such pendant or medallion may not contain stones, and the diameter may not exceed 2″. Although Directives # 4202 and 4911 do not necessarily establish Defendants Broderick, Miller, and Johnson would have reasonably believed their conduct was not adverse to any of Plaintiff's constitutional rights, the Directives establish the seizure of Plaintiff's religious pendant and chain was not lawful. *See Morse v. Annucci*, 2015 WL 5725046, at * 8 (N.D.N.Y. Sept. 29, 2015) (adopting report and recommendation recommending denying defendants' motion to dismiss inmate plaintiff's First Amendment claim based on seizure of crucifix, which complied with Directive # 4202, as barred by qualified immunity). Accordingly, Defendants Broderick, Miller, and Johnson should have been aware that confiscating Plaintiff's religious pendant was contrary to Directive # 4202, such that it was not objectively reasonable for Broderick, Miller, and Johnson to believe they were not violating Plaintiff's constitutional rights.

[14]     See *James v. Annucci*, 2021 WL 3367530, at * 6 (W.D.N.Y. Aug. 3, 2021) ("The Court may also take judicial notice of DOCCS directives."). *See also Williams v. Fisher*, 2015 WL 1137644, at * 4 n. 7 (N.D.N.Y. Mar. 11, 2015) (adopting report and recommendation taking judicial notice of Directive # 4202).

Defendants' Motion should be DENIED with regard to the qualified immunity argument.

## 9. Dismissal with Prejudice

Although dismissal of a *pro se* plaintiff's claims for failure to state a claim is generally without prejudice and with

Case 9:22-cv-00711-BKS-TWD   Document 69   Filed 01/26/24   Page 102 of 128

**Harrison v. Broderick, Not Reported in Fed. Supp. (2022)**

leave to replead, "[w]here it appears that granting leave to amend is unlikely to be productive,...it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, the problems with Plaintiff's claims, as pleaded, are substantive such that further pleading cannot cure them and would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of *pro se* plaintiff's claim for failure to state a claim with prejudice and without leave to replead where even liberal reading of complaint failed to suggest plaintiff had merely inadequately or inartfully pleaded and plaintiff, speaking through counsel on appeal, suggested no new material that could be pleaded to sufficiently reframe claim, such that repleading would be futile).

Specifically, despite Judge Vilardo's requirement that Plaintiff "ground his professed belief in some Nation of Islam custom or teaching," January 14, 2020 Order at 7 & n. 1, Plaintiff has not done so and, as such, has failed to allege Defendants' confiscation of the religious pendant and chain substantially burdened Plaintiff's religious beliefs, which claim, even if Plaintiff could sufficiently allege, is now moot because Plaintiff is in possession of both the religious pendant and chain such that Plaintiff is without standing to pursue this action. Nor is there any private right of action under the RLUIPA against Defendants in their individual capacity, nor for money damages in their official capacities.

 **\*15** Accordingly, the dismissal of Plaintiff's claims should be with prejudice and without leave to replead.

## CONCLUSION

Based on the foregoing, Defendants' Motion (Dkt. 31), should be GRANTED in part and DENIED in part. The Amended Complaint should be DISMISSED with prejudice and without leave to replead. The Clerk of Court should be directed to close the file.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the Plaintiff and the attorneys for the Defendants.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 16837366

---

Harrison v. Broderick, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 103 of 128

2022 WL 16836406
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Stoney HARRISON,

v.

Kelli BRODERICK, Stephany Miller,
James Johnson, Bishme Nelson, Frederick
Kintzel, and Kevin Brown, Defendants.

18-CV-821 (JLS) (LGF)
|
Signed November 8, 2022

**Attorneys and Law Firms**

Stoney Harrison, Dannemora, NY, Pro Se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY,
for Defendants.

**DECISION AND ORDER**

JOHN L. SINATRA, JR., UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff Stoney Harrison commenced this action on July
27, 2018. Dkt. 1. Pursuant to an Order issued by District
Judge Lawrence J. Vilardo on January 14, 2020 (Dkt. 11),
Plaintiff filed an Amended Complaint on February 3, 2020.
Dkt. 13. The Amended Complaint asserts claims under 42
U.S.C. § 1983 and alleges that Defendants violated his rights
under the First Amendment and the Religious Land Use and
Institutionalized Persons Act ("RLUIPA") in confiscating his
religious pendant. *Id.*

On February 7, 2020, Judge Vilardo issued an Order
dismissing Plaintiff's claims for money damages against
Defendants in their official capacities as barred by Eleventh
Amendment immunity. Dkt. 14. The case was reassigned

to the undersigned on September 15, 2020. Dkt. 21. On
September 16, 2020, this Court referred the case to United
States Magistrate Judge Leslie G. Foschio for all proceedings
under 28 U.S.C. §§ 636(b)(1)(A), (B), and (C). Dkt. 22.

On October 14, 2021, Defendants filed a Motion for Judgment
on the Pleadings. Dkt. 31. Plaintiff opposed the motion, and
Defendants replied. Dkt. 33, 34. On August 18, 2022, Judge
Foschio issued a Report and Recommendation ("R&R")
recommending that this Court grant Defendants' motion (Dkt.
31) and dismiss the Amended Complaint with prejudice and
without leave to amend. Dkt. 36. On September 12, 2022,
Plaintiff objected to the R&R. Dkt. 39. Defendants responded
to the objections, and Plaintiff replied. Dkt. 41, 42.

A district court may accept, reject, or modify the findings or
recommendations of a magistrate judge. 28 U.S.C. § 636(b)
(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct
a *de novo* review of those portions of a magistrate judge's
recommendation to which a party objects. See 28 U.S.C. §
636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). But neither 28 U.S.C. §
636 nor Federal Rule of Civil Procedure 72 requires a district
court to review the recommendation of a magistrate judge to
which no objections are raised. *See Thomas v. Arn*, 474 U.S.
140, 149–50 (1985).

This Court carefully reviewed the R&R, the objection,
response, and reply, and the materials submitted by the
parties. Based on its *de novo review*, the Court accepts Judge
Foschio's recommendation.

For the reasons stated above and in the R&R, the Court
GRANTS Defendants' Motion (Dkt. 31). As a result, the
Amended Complaint is DISMISSED without leave to amend.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 16836406

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2711349
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Nasean BONIE, Plaintiff,
v.
Anthony ANNUCCI, et al., Defendants.

No. 20-CV-640 (KMK)
|
Signed March 30, 2023

**Attorneys and Law Firms**

Nasean Bonie, Auburn, NY, Pro se Plaintiff.

Amanda Yoon, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants Anthony Annucci, Mark Royce, Ileshema Thomas, David Mazzalla & Timothy Brogan.

Anthony J. Harwood, Esq., Harwood Law PLLC, New York, NY, Counsel for Defendant Adana Matthews.

Stacey Ann Van Malden, Esq., Bronx, NY, Counsel for Defendant Adana Matthews.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Nasean Bonie ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983, against Commissioner Anthony Annucci ("Annucci"), Superintendent Mark Royce ("Royce"), Correctional Officer Ileshema Thomas ("Thomas"), Sergeant Latasha Cobb ("Cobb"), Correctional Officer Joshua Ruiz ("Ruiz"), Sergeant David Mazzalla ("Mazzalla"), Correctional Officer Timothy Brogan ("Brogan"), and Correctional Officer Adana Matthews ("Matthews"; collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims. (See Am. Compl. ¶¶ 1, 18 (Dkt. No. 19).) [1] Before the Court are three separate Motions to Dismiss: one filed by Annucci, Royce and Thomas (collectively, "First Defendants"), (see Notice of First Defs.' Mot. to Dismiss ("First Mot.") (Dkt. No. 147)), the other filed by Cobb, Mazzalla, Brogan and Ruiz, (collectively, "Second Defendants"), (see Notice of Second Defs.' Mot. to Dismiss ("Not. of Second Mot.") (Dkt. No. 161)), and the third filed by

Matthews (see Notice of Matthews Mot. to Dismiss ("Not. of Matthews Mot.") (Dkt. No. 267)). For the following reasons, Defendants' Motions To Dismiss are granted in part and denied in part.

[1]  Plaintiff's Amended Complaint, as filed, comprises fill-in-the-blank paperwork, a handwritten complaint with numbered paragraphs, and exhibits thereto. (See generally Am. Compl.) For clarity, when the Court cites the Amended Complaint using paragraph numbers, this is in reference to the numbered paragraphs of the handwritten complaint on ECF-stamped pages 9–20. When the Court cites other portions of this filing, it uses page numbers outside of this range.

Plaintiff's Amended Complaint also fails to specify the first names of all Defendants and as such, the Court adopts Defendants' first names from court filings. (See Not. of Appearance (Dkt. No. 135); Letter from Defendant to Court (Dec. 1, 2020) (Dkt. No. 158); Letter from Plaintiff to Court (Mar. 9, 2022) (Dkt. No. 247).)

I. Background

A. Factual Background
The following facts are drawn from Plaintiff's Amended Complaint as well as attached exhibits and are assumed to be true for the purpose of deciding the instant Motions.

At the time Plaintiff commenced this Action, he was incarcerated at Green Haven Correctional Facility ("GHCF" or "Green Haven"), located in Stormville, New York. (Am. Compl. ¶ 3.) Plaintiff alleges that Defendants are each employed in different capacities at the New York Department of Corrections and Community Supervision ("DOCCS"). (See id. ¶¶ 4–11.) Annucci is the Acting Commissioner of DOCCS, "legally responsible for the overall operation of [DOCCS] and each institution under its jurisdiction." (Id. ¶ 4.) Royce is GHCF's Superintendent and is responsible for its operation as well as the "welfare of [all] the inmates." (Id. ¶ 5.) Mazzalla is a Sergeant at GHCF, (id. ¶ 8), while Thomas, Brogan, and Matthews are correctional officers at GHCF, (see id. ¶¶ 6, 9, 11).

"Upon [Plaintiff's] arrival at [GHCF] in early [2017] around February/March, [he] met [Thomas] in G-Block housing area." (Id. ¶ 13 (quotation marks omitted).) Thomas informed

Plaintiff that he had legal mail, prompting Plaintiff to step out of his cell and "walk[ ] down [his] company." (*Id.*) Once at his final destination, Plaintiff alleges Thomas informed Plaintiff that she was aware of his case, knew his family, and told Plaintiff "I know you['re] Innocent and Going Home." (*Id.* (quotation marks omitted).) Plaintiff alleges that Thomas proceeded to place Plaintiff's hand "on her behind," kiss him, touch him, and engage in intercourse. (*Id.*) Upon Plaintiff's objection, Thomas informed Plaintiff that it was a "direct order" and threatened Plaintiff that she would "scream [rape] and pull the [emergency] pin" if he failed to comply. (*Id.*) Plaintiff, scared for his life, complied with Thomas's sexual demands, which included oral sex and intercourse. (*Id.*)

**\*2** After the experience with Thomas, Plaintiff alleges that he was scared, embarrassed, and depressed. (*See id.*) Plaintiff also alleges, however, that this experience became routine, as Thomas regularly demanded Plaintiff engage in the same actions. (*See id.*) Plaintiff alleges that on several occasions, Plaintiff pleaded with Thomas to "leave [him] alone," but Thomas continued to request Plaintiff's compliance, threatening to kill him if he protested. (*Id.*)

Eventually, Plaintiff decided to reach out to his attorney for help. (*Id.*) However, Plaintiff was still too scared and embarrassed to reveal to his attorney the underlying cause of his outreach, i.e. the repeated sexual assaults, choosing only to say that he "was in fear of [his] life due to the victim in [his] case['s] family member threatening to ... harm me." (*Id.*) Plaintiff seems to allege that, out of fear, he concocted a scheme to obtain protection without revealing what Thomas was doing to him. (*See id.*) With assistance from Plaintiff's attorney, Plaintiff was removed from G-Block to "the West[s]ide (A-Block)." (*Id.*)

Plaintiff alleges that his removal to cell block A lasted for a "few short months," as he was moved back to G-Block. (*Id.*) Plaintiff alleges, however, that he was moved to a separate company of G-Block, which he felt was safer vis-à-vis Thomas insofar as another officer was present, thereby making it difficult for Thomas to resume her sexual assaults. (*Id.*)

In October 2018, Plaintiff's cousin had passed away, after which, Plaintiff alleges, Thomas reached out to Plaintiff, asking if he was "OK." (*Id.*) Plaintiff alleges that in response to her outreach, he "snapped on her and cursed at her to get away." (*Id.*) Plaintiff also alleges that Thomas began "to demand money ... and started to threaten [him]." (*Id.*) Plaintiff

alleges that Thomas' younger sister, Corrections Officer Huggins ("Huggins") "had officers falsely lock me up for [32] days during the (Christmas & New Year) Holidays." (*Id.*) Ultimately, Plaintiff alleges that he had the ticket pursuant thereto "dismissed." (*Id.*)

Around this time, Plaintiff avers that he decided to come forward about the assaults. (*Id.*) Specifically, Plaintiff alleges that he wrote a letter to his mother. (*Id.*) Following receipt of this letter, Plaintiff's mother contacted Plaintiff's attorneys as well as DOCCS's Office of Special Investigations. (*Id.*) On or about December 28, 2018, Plaintiff met with Investigator Thorton, who assured Plaintiff that "he would get to the bottom" of the situation. (*Id.*)

On February 1, 2020, Plaintiff alleges that he began to experience a post-traumatic stress disorder attack. (*Id.* ¶ 15.) [2] Plaintiff and his neighbors yelled to get corrections officers' attention and to be taken to the mental health department, but Plaintiff avers that he waited for over 30 minutes before Brogan responded. (*Id.*) Plaintiff informed Brogan of his "need to go to [m]ental-[h]ealth" and "to see the [s]ergeant on [d]uty." (*Id.* (quotation marks omitted).) Brogan initially refused to call the sergeant because it was "too late." (*Id.*) However, Brogan agreed when Plaintiff continued "yelling to see the [sergeant]," though Plaintiff alleges that Brogan cursed at Plaintiff and informed Plaintiff that he would write Plaintiff up and "keeplock[ ]" him. (*Id.*) Plaintiff then states that Sergeant Cobb arrived 15 minutes later to escort Plaintiff to mental health and kept Plaintiff in handcuffs during the duration of the mental health visit, even after the nurse on duty had informed Cobb that Plaintiff was not harmful to himself and others in the facility. (*Id.*) Upon returning to his cell, Plaintiff noticed that his wrist was bleeding due to a cut from the "overly tight [h]andcuffs." (*Id.*) Plaintiff claims that he "still ha[s] permanent scars till this [d]ay." (*Id.*) The next morning, Plaintiff was served with a tier two ticket written by Brogan stating that Plaintiff had threatened him. (*Id.*) As a result, Plaintiff was keeplocked, and at the time Plaintiff filed this Action, had "yet to get any [d]isposition[ ] of the ticket." (*Id.*)

[2]      Plaintiff states that this attack occurred while he was in " 'E-Block #6 company' at or around 8pm." (Am. Compl. ¶ 15.) However, Plaintiff does not indicate in his Amended Complaint when or under what circumstances he was removed from

Cell Block G and placed in Cell Block E. (*See generally Id.*)

**\*3** Plaintiff asserts that on February 3, 2020, at or around 4pm in "E-Block #6 company," Thomas "stole [Plaintiff's] personal [and] [l]egal [m]ail" while she was working on Plaintiff's company. (*Id.* ¶ 14.) Later that day, Matthews walked past Plaintiff's cell and threatened Plaintiff because he had decided to sue, allegedly saying, "You wanna [sic] sue, I'll show you tomorrow how nasty I can get!" (*Id.*) The next morning, Plaintiff claims that he was told to "pack up [his] things and move to [G-Block]." (*Id.*) Upon being escorted to G-Block by Ruiz, Plaintiff requested to see mental health professionals; Ruiz denied Plaintiff's request. (*Id.*) Plaintiff then found himself "housed [ ] on the same floor [that] [he] was [ ]sexually assaulted [and] raped[ ] [and] had to walk past the same area [he] was abused." (*Id.*) Thereafter, Plaintiff alleges, he was "keeplocked" and had four pairs of his sneakers thrown out by Matthews and Ruiz. (*Id.*) Upon returning to his cell, Plaintiff attempted to explain the "theft of [his] belongings" to Mazzala, who proceeded to threaten Plaintiff, stating he would physically attack him "when the camera was '[off].' " (*Id.*) Due to Plaintiff's fear, he requested to see a higher authority and was escorted by a lieutenant to the mental health department. (*Id.*)

Plaintiff alleges he exhausted the grievance process (*id.* ¶ 16), and to that end, Plaintiff attached exhibits to the Amended Complaint, one dated February 3, 2020 regarding denial of medical care and legal mail and retaliation (*see id.* at 114–15 ("Retaliation Grievance dated February 3, 2020")), and one dated March 3, 2020 regarding retaliation and the ineffectiveness of the grievance department (*see id.* at 116–18 ("Retaliation Grievance dated March 3, 2020")). Plaintiff also attaches several grievances in which he detailed several incidents of harassment from correctional officers that Plaintiff believes are retaliation for his complaints. (*See generally id.* at 38–119.) These incidents include: the intentional flooding of Plaintiff's cell by Thomas leading to the loss of Plaintiff's personal property, legal mail, and legal documents, (*see id.* at 61–63 ("Retaliation Grievance dated April 26, 2019")); stalking and overt threats, (*see id.* at 65, 66 ("Retaliation Grievance dated May 3, 2019")); and denial of notary services, (*see id.* at 86 ("Retaliation Grievance dated January 10, 2020")).

Since the incidents giving rise to his complaint, Plaintiff has been moved between different facilities and is currently located at Upstate Correctional Facility. (*See* Letter from Plaintiff to Court (May 25, 2021) (Dkt. No. 193); Letter from

Plaintiff to Court (Oct. 19, 2021) (Dkt. No. 201); Letter from Plaintiff to Court (Dec. 9, 2021) (Dkt. No. 223).)

**B. Procedural History**

Plaintiff commenced this Action by filing a Complaint against Annucci, Royce and Thomas on January 22, 2020. (Compl. (Dkt. No. 2).) On the same day, Plaintiff filed a motion for assignment of counsel. (Mot. for Assign. of Counsel (Dkt. No. 3).) Plaintiff reiterated his request for assignment of counsel in a letter filed on March 5, 2020. (Letter from Plaintiff to Court (Feb. 29, 2020) (Dkt. No. 12).) On April 2, 2020, the Court denied Plaintiff's request for assignment of counsel without prejudice. (Order Den. Mot. to Appoint Counsel (Dkt. No. 21).) [3]

[3]     The Court informed Plaintiff that he may renew his request at a later day should circumstances materially change. (*Id.* at 7.) Since the initial denial of counsel, Plaintiff has made additional requests for appointment of counsel which have been denied for lack of a change in circumstances. (*See, e.g.*, Dkt. Nos. 98, 167, 323, 324, 332, 333, 335.)

On March 30, 2020, Plaintiff filed an Amended Complaint, adding Cobb, Mazzala, Brogan, Ruiz and Matthews as defendants. (Am. Compl. (Dkt. No. 19).) On November 3, 2020, First Defendants filed their Motion To Dismiss. (*See* Mem. of Law in Supp. of Mot. ("First Defs.' Mem.") (Dkt. No. 148).) Plaintiff filed his Opposition on November 30, 2020. (*See* Mem. of Law in Opposition to Mot. to Dismiss ("Pl.'s Opp'n to First Mot.") (Dkt. No. 157).) First Defendants filed their Reply Memorandum in support of the Motion on December 22, 2020. (*See* Reply Mem. ("First Defs.' Reply") (Dkt. No. 163).) [4]

[4]     Plaintiff's Opposition to First Defendants' Motion to Dismiss and accompanying documents are contained within a letter addressed to Court dated November 10, 2020. (Letter from Plaintiff to Court (Nov. 30, 2020) (Dkt. No. 157).) In the letter, Plaintiff requests the Court to enter default judgement against Matthews due to her failure to obtain representation and respond. (*Id.* at 1.) Matthews has obtained representation and an appearance has been entered on her behalf.

**\*4** On December 20, 2020, Second Defendants filed their Motion to Dismiss. (*See* Mem. of Law in Supp. of Mot. ("Second Defs.' Mem.") (Dkt. No. 162).) Plaintiff filed

his Opposition on January 22, 2021. (*See* Mem. of Law in Opposition to Mot. to Dismiss ("Pl.'s Opp'n to Second Mot.") (Dkt. No. 169).) Second Defendants filed their Reply Memorandum in support of the Motion on February 5, 2021. (*See* Reply Mem. ("Second Defs.' Reply") (Dkt. No. 176).)

On December 22, 2020, Plaintiff filed a letter requesting the Court dismiss Cobb, (Letter from Plaintiff to Court (Dec. 22, 2020) (Dkt. No. 164)), which the Court granted on December 31, 2020, (Order (Dkt. No. 166)). In another letter filed on March 11, 2020, Plaintiff requested the Court dismiss Ruiz. (Letter from Plaintiff to Court (Mar. 11, 2021) (Dkt. No. 187).) The Court dismissed Ruiz on March 16, 2021. (Order (Dkt. No. 188).)

On June 15, 2021, Plaintiff filed a letter requesting to voluntarily dismiss the case, (Letter from Plaintiff to Court (June 15, 2021) (Dkt. No. 195)), which the Court granted, (*see* Dkt. No. 196). On July 27, 2021, Plaintiff requested his case be reopened, (Dkt. No. 196), which the Court granted, (*id.*). [5] In a letter filed on December 15, 2021, Defendants requested that the Court deem the filed Motions as fully briefed. (Letter from Defendant to Court (Dec. 15, 2021) (Dkt. No. 226).) The Court obliged, deeming the Motions fully briefed in reliance upon the briefing materials previously submitted.

[5] Plaintiff's letter requesting was not filed separately on the Docket.

On April 15, 2022, Matthews filed her Motion to Dismiss. (*See* Mem. of Law in Supp. of Mot. ("Matthews Defs.' Mem.") (Dkt. No. 269).) Plaintiff was ordered to submit his Opposition to Matthews' Motion by February 7, 2023. (Dkt. No. 310.) The Court extended Plaintiff's deadline to oppose to February 28, 2023, however Plaintiff did not file an opposition. (Dkt. No. 332.)

## II. Discussion

### A. Standard of Review
The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, *Rule 8 of the Federal Rules of Civil Procedure* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting *Fed. R. Civ. P. 8(a)(2)*)); *id.* at 678–79 ("*Rule 8* marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*5** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano,* 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]."

*Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them.") (italics and quotation marks omitted).

B. Analysis

It appears that Plaintiff attempts to plead two categories of claims: (1) claims under 42 U.S.C. § 1983, based on violations of his rights under the Constitution; and (2) state law tort claims for assault, battery, false imprisonment, and negligence. (Am. Compl. ¶¶ 1, 18.) Defendants contend the Eleventh Amendment bars Plaintiff's claims against them in their official capacities. (First Defs.' Mem. 3–4; Second Defs.' Mem. 13–14; Matthews Def.'s Mem. 18–20.) First Defendants additionally argue that claims against Annucci and Royce should be dismissed for lack of personal involvement and on qualified immunity grounds, and that claims against Thomas regarding withholding of Plaintiff's mail should be dismissed. (*See generally* First Defs.' Mem.) Second Defendants and Matthews contend that Plaintiff failed to exhaust his administrative remedies. (Second Defs.' Mem. 6–7; Matthews Def.'s Mem. 7–11.) Second Defendants and Matthews additionally argue that Plaintiff has failed to state a constitutional claim against them and that they are entitled to qualified immunity. (Second Defs.' Mem. 7–13; Matthews Def.'s Mem. 11–16.) Matthews additionally argues that Plaintiff has no viable state law claim. (Matthews Def.'s Mem. 16–18.)

1. Annucci and Royce

Annucci and Royce argue that Plaintiff has failed to allege they were personally involved in any constitutional violation and that they are entitled to qualified immunity. (*See generally* First Defs.' Mem.) This Court agrees.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling v. Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at *4 (S.D.N.Y. July 8, 2022) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citation and quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because "Plaintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant) (quotation marks and citation omitted). Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

**\*6** Plaintiff has not made any specific allegations against Annucci or Royce in his Amended Complaint. The claims against them in the Amended Complaint appear to be based entirely on the allegation that, as Acting Commissioner of DOCCS and Superintendent of Green Haven, Annucci and Royce were responsible for the operation of the facility. (*See* Am. Compl. ¶¶ 4–5.) In his Opposition, Plaintiff states that he "gave a detailed report to DOCCS [O]ffice of Special Investigations" and filed multiple grievances. (Pl.'s Opp'n to First Mot. 2.) Plaintiff appears to argue that Annucci and Royce were aware of the grievances, and they failed to protect him. (*Id.*) In the attachments to Plaintiff's Amended Complaint, there are multiple grievances where Annucci is included as a recipient of the grievance. (*See* Am. Compl. 92, 104, 106.) However, "[t]he receipt of letters or grievances, by itself, does not amount to personal involvement." *Leneau*, 2018 WL 566456, at *14–15 (citation and quotation marks omitted); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding DOCS Commissioner had no personal involvement when plaintiff wrote him two letters, one an appeal the Commissioner had referred to the prison superintendent for decision); *Allah v. Annucci*, No. 16-CV-1841, 2018 WL 4571679, at *6 (S.D.N.Y. Sept. 24, 2018) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." (quotation marks and citation omitted); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-

letter law that § 1983 does not impose respondeat superior liability." (italics, quotation marks, and citation omitted)).

Plaintiff additionally states in his Opposition to First Defendants' Motion that Annucci and Royce "created a policy or custom under which [Plaintiff's] constitutional rights were violated, or allowed such a policy or custom to continue." (Pl.'s Opp'n to First Mot. 2.) Specifically, Plaintiff contends that "Plaintiff being (denied/delayed) '[m]edical/ [m]ental [h]ealth [s]ervices' was a (policy and/or custom)" that Annucci and Royce "implemented and never changed even when they were well aware of (Plaintiff's) 'grievances.' " (*Id.*) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by,* No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (internal citation omitted). Plaintiff appears to only allege a single instance of delayed mental health care in his Amended Complaint. (*See generally* Am. Compl.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Accordingly, this single alleged instance of delay is insufficient to plausibly allege personal involvement on the basis of a policy. *See Tubbs v. Venettozzi,* No. 19-CV-126, 2019 WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made aware of complaints about due process violations and allowed a custom of due process violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler,* 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part,* No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege personal involvement "[w]ithout more than the allegations related to the single incident in the station house").

Plaintiff also seeks to establish personal liability by arguing that Annucci and Royce were "grossly negligent" and did not "adequately supervise the subordinates who violated" his rights. (Pl.'s Opp'n to First Mot. 3.) However, the Second Circuit has made clear that in the wake of *Iqbal,* plaintiffs cannot rely on supervisory liability to establish personal involvement. *Tangreti,* 983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had" for the purposes of personal involvement).

**\*7** Plaintiff additionally attaches grievances filed against Royce to his Amended Complaint. (Am. Compl. Ex. B, E, F, 72, 75, 77, 82, 114.) One grievance is for harassment, retaliation, and unprofessional conduct dated December 13, 2019, (Am. Compl. Ex. B), another for denial of notary services dated January 10, 2020 (Am. Compl. Ex. E), two for denial of medical care dated November 29, 2019 (Am. Compl. Ex. F) and December 4, 2019 (Am. Compl. 77), another for harassment and retaliation dated November 13, 2019 (*id.* at 72), another for security failure (*id.* at 75), one for retaliation, denial of shower and phone and unprofessional conduct dated December 20, 2019 (*id.* at 82), and one for retaliation and denial of mental health services dated February 3, 2020 (*id.* at 114). However, these grievances do not specifically detail any allegations against Royce, thus, insofar as Plaintiff relies on these grievances to establish Royce's personal involvement, Plaintiff's constitutional claims against Royce must fail because "complaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Leneau,* 2018 WL 566456, at *15 (dismissing a defendant for lack of personal involvement because "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant) (quotation marks and citation omitted); *see also Iqbal,* 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In the absence of any specific allegation establishing Annucci and Royce's personal involvement in any alleged violation, Plaintiff's constitutional claims against them cannot survive. *Haywood v. Annucci,* No. 18-CV-10913, 2020 WL 5751530, at *5 (S.D.N.Y. Sept. 25, 2020) (dismissing claims against Annucci for failure to allege personal involvement when the plaintiff "offer[ed] no factual allegations suggesting that Annucci was present for, knew of, or even had any reason to know about the alleged" constitutional violation); *Falls v. Pitt,* No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly"

in or "somehow permitted" the alleged violation) (citation omitted); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (finding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

### 2. Thomas

Plaintiff alleges that on February 3, 2020, Thomas stole his personal and legal mail. (Am. Compl. ¶ 14). Thomas moves to dismiss claims against her regarding denial of mail. (First Defs.' Mem. 6.)

"To state a claim for denial of access to the courts — in this case due to interference with legal mail — a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation and quotation marks omitted). "[A] plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Actual injury includes "claims that systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting specific examples within each category). "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *5 (S.D.N.Y. Mar. 27, 2019) (quotation marks and citation omitted).

Plaintiff does not allege that he was prevented, or even delayed, from making legal filings. More to the point, there is no claim that Thomas "obstruct[ed] [Plaintiff's] legitimate efforts to seek judicial redress" or otherwise prejudiced Plaintiff's legal actions. *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation, alteration, and quotation marks omitted); *see also Christopher*, 536 U.S. at 413 (noting right-of-access concerns are implicated when

"systemic official action frustrates a plaintiff ... in preparing and filing suits at the present time"). Accordingly, Plaintiff's access-to-courts claim fails. *See Matthews v. Barq*, No. 18-CV-855, 2019 WL 1025828, at *10 (N.D.N.Y. Mar. 4, 2019) (dismissing access-to-courts claim alleging that the defendant "denied [the plaintiff] access to a legal bag prior to his transport to another facility, and that certain legal materials within the bag were subsequently removed," where no showing of actual injury was made); *Wisdom v. Griffin*, No. 17-CV-4837, 2019 WL 452057, at *4 (S.D.N.Y. Feb. 4, 2019) (dismissing access-to-courts claim where the plaintiff did "not allege he was prevented from bringing his habeas corpus petition — which plaintiff in fact successfully filed, and which remains pending — or that any existing legal claim would have succeeded but irreparably was harmed by a defendant's alleged conduct") (citation omitted); *Chavis v. Chappius*, No. 06-CV-543, 2015 WL 1472117, at *10 (W.D.N.Y. Mar. 31, 2015) (dismissing access-to-courts claim where the plaintiff failed to allege that he "was actually hindered or prejudiced by the denial of a legal advance"); *Simmons v. Adamy*, 987 F. Supp. 2d 302, 307–08 (W.D.N.Y. 2013) (dismissing access-to-courts claim where, "[b]y plaintiff's own reckoning, he received an average of at least one or two library call-outs per week," which is "inherently reasonable," and where he "offer[ed] no evidence that he was harmed by the lack of more frequent law library access"); *Rivera v. Pataki*, No. 04-CV-1286, 2005 WL 407710, at *18 (S.D.N.Y. Feb. 7, 2005) (dismissing access-to-courts claim where the "plaintiff [did] not specify any injury").

**\*8** Plaintiff also alleges interference with his personal mail. (Am. Compl. ¶ 14). "[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis*, 320 F.3d at 351. "[C]ourts have consistently afforded greater protection to legal mail than to non-legal mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (quoting *Davis*, 320 F.3d at 351). A prisoner's rights to send and receive mail may be regulated if it is "reasonably related to legitimate penological interests." *Id.* (quoting *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir. 1987)).

To show a plaintiff's First Amendment right is violated, a "prisoner must show that the interference with his mail was both regular and unjustified." *Antrobus v. City of N.Y.*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014). Indeed, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. "Rather, the inmate must show that prison officials 'regularly

and unjustifiably interfered with the incoming legal mail.' " *Davis*, 320 F.3d at 351 (quotation marks and citations omitted).

Here, Plaintiff has alleged a single incident of interference with his personal mail on February 3, 2020, where Thomas allegedly stole Plaintiff's personal mail. (Am. Compl. ¶ 14.) Accordingly, Plaintiff has not sufficiently alleged the interference with his mail was both regular and unjustified and the claim is therefore dismissed. *Genao v. City of N.Y.*, No. 20-CV-2441, 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (holding two alleged instances of mail interference did not sufficiently allege a First Amendment mail interference claim).[6]

[6]    In his Opposition, Plaintiff alleges that he has been deprived of his mail for many years. (Pl.'s Opp'n to First Mot. 7.) However, Plaintiff does not explain who has been responsible for the deprivation, and instead states that this denial was done by "Defendants." (*Id.*) "[C]omplaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Leneau*, 2018 WL 566456, at *15 (quotation marks and citation omitted).

### 3. Matthews

#### a. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). This requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so *properly* .... Proper exhaustion demands

compliance with a prison grievance system's deadlines and other critical procedural rules." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and quotation marks omitted) (emphasis in original).

*9 To satisfy the exhaustion requirements, a prisoner "must exhaust all levels" of DOCCS's "Inmate Grievance Program" ("IGP"). *Little v. Mun. Corp., City of N.Y.*, No. 12-CV-5851, 2017 WL 1184326, at *11 (S.D.N.Y. Mar. 29, 2017). The IGP provides for a three-step grievance process. *See* 7 N.Y.C.R.R. § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. *See* 7 N.Y.C.R.R. § 701.5(a)(1). Once filed, the representatives of the IGRC have up to 16 calendar days to resolve the grievance informally. *Id.* § 701.5(b)(1). If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii). The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the IGRC's written response. *See id.* § 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the Central Office Review Committee ("CORC"), which the prisoner must do within seven days of the superintendent's written response to the grievance. *Id.* § 701.5(d)(1)(i).

For grievances involving harassment, the procedure and timeline are slightly different: the grievance is sent to the superintendent who determines whether the grievance would represent a bona fide case of harassment. 7 N.Y.C.R.R. § 701.8(c). If the grievance does constitute a harassment grievance, the superintendent must then rule on the grievance within 25 days calendar days, and if the inmate wishes to appeal that ruling, the inmate must appeal to CORC within seven calendar days after receipt of the ruling, or if the superintendent does not rule, then within seven calendar days of the end of the twenty-five day period. *Id.* §§ 701.8(e)–(h).

Given the aforementioned requirement to exhaust all levels of administrative remedies, *see Little*, 2017 WL 1184326,

at *11," only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted," *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008). Alternatively, "an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

However, the PLRA "contains its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642. As the Supreme Court has explained "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies.... an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.' " *Id.* (quoting *Booth*, 532 U.S. at 738).

The Supreme Court has identified at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 643–44. Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but has declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2. Nonetheless, these three circumstances "guide the Court's inquiry." *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

**\*10** Failure to exhaust is an affirmative defense. *See Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009). As with other affirmative defenses, therefore, dismissal may be granted at the pleading stage for failure to exhaust if the defense "appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see also Hosannah v. Nassau Cnty. Crim. Supreme Ct. Sergeant Officer*(s), No. 16-CV-1045, 2017 WL 3207966, at

*5 (E.D.N.Y. July 5, 2017) ("Despite the fact that Plaintiff is not required to plead exhaustion, non-exhaustion may be apparent on the face of a complaint, thereby warranting dismissal."), *report and recommendation adopted sub nom. Hosannah v. Sposato*, No. 16-CV-1045, 2017 WL 3207750 (E.D.N.Y. July 26, 2017).

### i. Exhaustion of Administrative Remedies

Plaintiff attached to the Amended Complaint his grievance filed against Matthews, dated March 3, 2020, which alleges that Matthews stole his sneakers. (Am. Compl. 116–18.) This filing with the IGP was untimely because it is more than 21 days after the alleged incident, which occurred on February 4, 2020, according to both the Amended Complaint (*id.* at ¶ 14) and the grievance (*id.* at 116-18). An untimely filing with the IGP fails to exhaust administrative remedies under the PLRA. *Woodford v. Ngo*, 548 U.S. 81, 83–84, 90–91 (2006) (holding that "proper exhaustion of administrative remedies is necessary" therefore "filing an untimely or otherwise procedurally defective administrative grievance" does not satisfy the exhaustion requirement); *Gottesfeld v. Anderson*, No. 18-CV-10836, 2020 WL 1082590, at *9 (S.D.N.Y. Mar. 6, 2020) (dismissing claims related to grievance because that grievance was untimely). Nothing in Plaintiff's March 3, 2020 grievance against Matthews indicates that he had filed an earlier grievance that would have been timely. Accordingly, Plaintiff failed to exhaust his administrative remedies against Matthews as to the sneaker incident because he failed to file a timely grievance. However, as Plaintiff has not attached a grievance regarding Matthews' alleged threat in retaliation for the lawsuit Plaintiff filed against other corrections officers, the Court cannot determine whether Plaintiff properly exhausted that claim against Matthews, and therefore cannot dismiss on that basis. *See Miller v. Annucci*, No. 17-CV-4698, 2019 WL 4688539, at *12 (S.D.N.Y. Sept. 26, 2019) (holding that because the "[c]ourt [ ] cannot be certain from the pleadings alone that it has all the relevant grievances necessary to determine whether Plaintiff exhausted" his claims, it could not grant a motion to dismiss on the basis of exhaustion).

Additionally, courts routinely dismiss claims as a matter of course when it would have been temporally impossible for the plaintiffs to have exhausted their administrative remedies before filing the complaints. *See Amaker v. Bradt*, 745 F. App'x 412, 413 (2d Cir. 2018) (holding that plaintiff could not have exhausted where "he filed the complaint at issue

here 11 days after filing the grievance"); *Gayot v. Perez*, No. 16-CV-8871, 2018 WL 6725331, at *6 (S.D.N.Y. Dec. 21, 2018) (holding that it was clear from the date of an appeal to the CORC, which occurred seven days after the date of the filing of the initial complaint, that the plaintiff could not have exhausted all administrative remedies); *Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *3 (S.D.N.Y. June 11, 2015) (dismissing for failure to exhaust where the plaintiff stated in his complaint that he had not appealed from the "first step of the IGRP's administrative procedure" and the plaintiff filed his complaint only one week after the incident occurred); *Pierre-Louis v. Martinez*, No. 12-CV-2240, 2014 WL 4161960, at *4 (E.D.N.Y. Aug. 19, 2014) (holding that "it is apparent from the face of the [c]omplaint" that plaintiff did not exhaust all administrative remedies because it was filed "a mere three weeks after the alleged date of the incident"); *Price v. City of N.Y.*, No. 11-CV-6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) (same).

 *11  Accordingly, even if Plaintiff had timely filed his grievance, he did not exhaust his administrative remedies as to the sneaker incident because he filed his Amended Complaint with this Court before his grievance could be resolved by prison officials. A plaintiff's complaint is considered filed as of the date it was given to the prison official for forwarding, and "the Court assumes that [the prisoner] gave his petition to prison officials for mailing on the date he signed it." *Johnson v. Coombe,* 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) (alteration in original) (quotation marks and citation omitted). Plaintiff's Amended Complaint is dated March 13, 2020. It includes a letter dated March 13, 2020 to the Court's Pro Se Office, and a post-marked envelope of the same date to the same office, indicating that he mailed the Amended Complaint for filing through the prison system on March 13, 2020. (Am. Compl. 120-21.) That is only 10 days after the date of his grievance against Matthews. Plaintiff has not plausibly alleged he completed New York's three-step IGP program within 10 days. *Wing v. Myers*, No. 18-CV-11056, 2019 WL 6732967, at *5 (S.D.N.Y. Dec. 11, 2019) (holding that it was "clear from the face of the complaint" that plaintiff failed to exhaust when his complaint was filed without sufficient time to exhaust all levels of the IGP process).

### ii. Availability of Administrative Remedies

Once a defendant has met the burden of demonstrating that a grievance process exists, the plaintiff bears the burden of "demonstrating that other factors rendered a nominally

available procedure unavailable as a matter of fact." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (alterations omitted). Plaintiff writes in his grievance against Matthews, attached to the Amended Complaint, that the grievance process is "basically non-existent, nobody follows up on your complaint," and grievances are denied "without anything in writing nor any reason why denied." (Am. Compl. 116-17.) His grievance additionally states that the sergeants " '[t]hreaten' you by calling you to come see them ... and several officers threaten you to sign-off on your grievance." (*Id.*) Construing Plaintiff's Amended Complaint liberally, the Court interprets these statements as allegations that administrative remedies were not available to Plaintiff.

To constitute an "available" remedy, a process requires only "the possibility of some relief." *Ross*, 578 U.S. at 643 (quotation marks and citation omitted). Accordingly, to claim a grievance process operated as a dead end, a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. New York State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022). Indeed, the example provided by the Court in *Ross* as a dead end involved a scenario where a prison handbook directed inmates to submit grievances to a particular administrative office when, in practice, the office disclaimed the capacity to consider grievances. *Ross*, 578 U.S. at 643.

Plaintiff has not shown that the grievance process "operates as a simple dead end." *Id.* He has provided no facts suggesting that the IGP cannot produce results. Even assuming that Plaintiff has filed initial grievances which have received no response, "this alone is insufficient to show that the IGRP acted as a mere dead end," especially "in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance." *Mena v. City of N.Y.*, No. 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016); *see also Massey v. Sapp*, No. 19-CV-11902, 2021 WL 4461825, at *4 (S.D.N.Y. Sept. 29, 2021) (holding that receiving no response to previous grievance is insufficient to show grievance procedure is dead end).

Moreover, Plaintiff has attached to his Amended Complaint documentation regarding many grievances he has filed which demonstrate that his grievances have received responses

and determinations. For example, Plaintiff's attachments demonstrate that he was given a hearing for a grievance on April 25, 2019, (Am. Compl. 64), he received a ruling denying a grievance he made about telephone access that he appealed, (*id.* at 44), and he received an Acknowledgement of Receipt for a grievance he filed about roaches in March 2019, (*id.* at 57). Plaintiff also attached a response to a grievance dated October 18, 2018, in which the IGP Supervisor returned a grievance to Plaintiff for him to supplement and resubmit because the original grievance did not request action. (*Id.* at 102.) Plaintiff included the returned grievance which shows that, in fact, it did not request action. (*Id.* at 99–100.) Plaintiff additionally attached to his Amended Complaint a memorandum from Captain Norton, dated January 15, 2019, responding to Plaintiff's complaint about a misbehavior report against Plaintiff that resulted in Plaintiff being placed on Pre-hearing confinement status. (*Id.* at 88.) The memorandum states, "[t]his misbehavior Report was dismissed at a later date and you were released as a result." (*Id.*) That Plaintiff provides documentation demonstrating that he has successfully filed several grievances, that determinations were made, and that he received responses to his grievances, undermines his assertion that the grievance process is "basically non-existent, nobody follows up on your complaint," and grievances are denied "without anything in writing nor any reason why denied." (*Id.* at 116-17.) *See Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) (summary order) ("[S]everal of his past grievances containing the notation "Grievance Accepted"—undermines his argument that prison staff had made the prison grievance system a dead end by not collecting and processing grievances as required."); *Cicio v. Alvarez*, No. 19-CV-9883, 2022 WL 1003796, at *5 (S.D.N.Y. Apr. 4, 2022) ("[T]he superintendent and CORC considered and ruled on Plaintiff's petitions, albeit belatedly; his pleas did not go into a black hole.").

**\*12** Furthermore, courts have found that affirmative participation in the grievance process demonstrates that the grievance process is not a dead end. *See, e.g., Smith v. Jaynes*, No. 18-CV-1107, 2022 WL 686627, at *3 (N.D.N.Y. Feb. 18, 2022) ("[A plaintiff's prior filing of grievances] shows that [the] [p]laintiff did not view the filing of grievances as a dead end." (quotation marks and citation omitted)); *Lapierre v. LaValley*, No. 15-CV-1499, 2019 WL 4015689, at *5 (N.D.N.Y. Aug. 26, 2019) (holding that the plaintiff's prior filings "show[ ] that [he] did not view the filing of grievances as a dead end" (citation omitted)), *report and recommendation adopted*, 2019 WL 4686415 (N.D.N.Y. Sept. 26, 2019), *aff'd*, 847 F. App'x 47 (2d Cir. 2021);

*Gonzalez v. Coburn*, No. 16-CV-6174, 2017 WL 6512859, at *5 (W.D.N.Y. Dec. 20, 2017) (holding that the plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was not a dead end). Not only did Plaintiff affirmatively participate in the grievance process on multiple occasions, he also (1) filed a grievance on February 3, 2020 regarding some of the incidents alleged in the Amended Complaint (Am. Compl. 114) and (2) filed a grievance about the particular incident at issue here, albeit untimely, demonstrating that he did not view the filing of grievances as a dead end, *Whittington v. Ponte*, No. 16-CV-1152, 2020 WL 2750372, at *9 (S.D.N.Y. May 27, 2020) (holding that the fact that plaintiff filed grievances contemporaneously with the challenged incidents "cuts strongly against any theory of unavailability").

Plaintiff's intimidation claim fails for similar reasons. Courts in the Second Circuit hold that "when an inmate files a grievance, notwithstanding the threats of retaliation and intimidation of which that inmate complains, the failure to fully exhaust under the PLRA will not be excused on this ground." *Cicio*, 2022 WL 1003796, at *5 (quotation marks and citation omitted). Accordingly, that Plaintiff filed a grievance on February 3, 2020 and then later filed a grievance regarding Matthews' conduct undermines any contention that intimidation prevented Plaintiff from using the grievance process. *Grant v. Kopp*, No. 17-CV-1224, 2019 WL 368378, at *6 (N.D.N.Y. Jan. 3, 2019) (holding administrative remedies were available when "[d]espite any threats that plaintiff allegedly perceived, he nonetheless filed a grievance"), *report and recommendation adopted*, No. 17-CV-1224, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019); *McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. 2017) (summary order) ("Appellant asserted that defendants tried to intimidate him, and intimidation can excuse the failure to exhaust. However, none of the actions allegedly taken by the defendants actually prevented Appellant from submitting his complaint letter. Appellant was able to take the first step in the grievance process." (citations omitted)).

### b. First Amendment Retaliation

Plaintiff also alleges that Matthews threatened him in retaliation for the lawsuit Plaintiff filed against other corrections officers. (Am. Compl. ¶ 14.)

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *13 (S.D.N.Y. Mar. 18, 2019) (citation and quotation marks omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted).

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (quotation marks and citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, alterations, and quotation marks omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (citation and quotation marks omitted). Accordingly, a First Amendment retaliation claim must be supported by a "specific and detailed factual allegations" and not stated in "wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation and quotation marks omitted); *Tutora*, 2019 WL 1382812, at *6 (same).

**\*13** "[V]erbal threats may qualify as adverse actions" in the prison retaliation context *only* where they are "sufficiently specific and direct." *White v. Westchester Cnty.*, No. 18-CV-730, 2018 WL 6726555, at *17 (S.D.N.Y. Dec. 21, 2018) (quotation marks and citation omitted) (collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018) (same); *Mateo v. Fischer*, 682 F. Supp.2d 423, 434 (S.D.N.Y. 2010) (explaining that "[t]he less direct and specific a threat, the less likely it will deter

an inmate from exercising his First Amendment rights"); *Hofelich v. Ercole*, No. 06-CV-13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) (concluding that "whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered" (citation and quotation marks omitted)).

Matthews' alleged comment to Plaintiff, "You wanna sue, I'll show you tomorrow how nasty I can get," is insufficiently specific, direct, and detailed enough to constitute an adverse action. (Am. Compl. ¶ 14.); *See Tutora*, 2019 WL 1382812, at *7 (holding the statement "I have a 16 inch rope with your name on it. I was a slave owner for Halloween," while reprehensible, was "insufficiently specific, direct, and detailed enough to state a First Amendment claim"); *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (dismissing First Amendment retaliation claims because an officer's statements to a plaintiff that his "grievances were unlikely to succeed" and that he "would handle things 'his way' " were insufficiently specific or direct (citation and quotation marks omitted)); *Barrington v. N.Y.*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that '[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations omitted)), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (finding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *cf. White*, 2018 WL 6726555, at *18 ("This allegation constitutes a specific, clear threat made in response to [the p]laintiff's prospective grievance against [the d]efendant.... [The defendant] threatened physical harm to [the p]laintiff, and did so with particularity, by pointing to the inmates who would harm [the p]laintiff and explaining why they would harm him at her direction."). Accordingly, Plaintiff's retaliation claim against Matthews is dismissed.

#### 4. Brogan

Plaintiff alleges in the Amended Complaint that Brogan was deliberately indifferent to his medical needs and retaliated against him for making a request for medical treatment by issuing him a "tier two" ticket which resulted in him being keeplocked. (Am. Compl. ¶ 15.) In his Opposition to Second Defendants' Motion, Plaintiff also alleges that Brogan retaliated against Plaintiff for filing a grievance against Thomas. (Pl.'s Opp'n to Second Mot. 1.)

#### a. Exhaustion

**\*14** Brogan argues that because Plaintiff commenced his action against Brogan 43 days after the alleged incident with Brogan, Plaintiff cannot have exhausted his administrative remedies. (Second Defs.' Mem. 5–6.) However, none of the cases that Brogan cites stands for the proposition that an action commenced 43 days after an alleged incident demonstrates that lack of exhaustion is apparent on the face of a complaint. (*Id.*) "Courts have concluded that *as much as* 21 days between the underlying event and filing of the complaint clearly indicates that the petitioner failed to exhaust." *Caraballo v. Dep't of Corr. City of N.Y.*, No. 22-CV-971, 2022 WL 16555313, at *3 (S.D.N.Y. Oct. 31, 2022) (emphasis added); *McKinney v. City of N.Y.*, No. 19-CV-5320, 2020 WL 5775664, at *4 (S.D.N.Y. July 23, 2020) (dismissing complaint for failure to exhaust where only three weeks elapsed between the filing of the grievance on May 6, 2019 and signing of the complaint on May 28, 2019), *report and recommendation adopted*, 2020 WL 5775194 (S.D.N.Y. Sept. 28, 2020); *Miller*, 2019 WL 4688539, at *12 (noting that courts dismiss claims for lack of exhaustion when the "period between the date of the alleged incident and the filing of the complaint was 21 or fewer days"); *Price v. City of N.Y.*, No. 11-CV-6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) ("[G]iven the timelines for the grievance procedure outlined in the DOC's regulations, it would have been impossible for him to do so in the 21 days between the alleged incident and the filing of his complaint."). This Court has not found a case where lack of exhaustion was demonstrated on the face of the complaint on the basis that the complaint was filed 40 or more days after the alleged incident. Accordingly, Brogan has not carried his burden of demonstrating Plaintiff failed to exhaust this claim before he filed the Complaint. [7]

[7]    Mazzlla's identical exhaustion argument, namely that Plaintiff commenced his action against

Mazzalla only 41 days after the alleged incident involving Mazzalla, fails for the same reason. (Second Defs.' Mem. 5–6.)

#### b. Deliberate Indifference to Medical Needs

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To state a claim of deliberate indifference, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (citations omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280 (citation omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone

in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis omitted) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases). Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

**\*15** Plaintiff has only alleged that Brogan did not respond to his request for medical attention for 30 minutes and that once Brogan agreed to send Plaintiff to medical care, an officer arrived 15 minutes later to escort Plaintiff to mental health. (Am. Compl. ¶ 15.) Plaintiff has not shown that this brief delay exposed him to an unreasonable risk of harm, caused extreme pain, or exacerbated a serious illness. Accordingly his claim must be dismissed. *See Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 658 (E.D.N.Y. 2021) (holding that while six-day delay before plaintiff received a substitute pain medication caused plaintiff some degree of pain or discomfort, that brief delay is not constitutionally deficient where plaintiff suffered neither death nor degeneration of his condition); *Johnson v. City of N.Y.*, No. 12-CV-8265, 2014 WL 5393181, at *6 (S.D.N.Y. Oct. 21, 2014) ("Even assuming that plaintiff suffered a hairline fracture to his ankle, he has provided no evidence that the four and one-half hour delay between his arrest and his being seen [ ] resulted in any worsening of his condition or resulted in

the exacerbation of his injury."), *report and recommendation adopted*, 12-CV-8265, 2014 WL 6455162 (S.D.N.Y. Nov. 17, 2014), *aff'd*, 633 F. App'x 37 (2d Cir. 2016); *Ferguson*, 2012 WL 2865474, at *4 (holding plaintiff failed to satisfy the objective prong based on one-day delay in receiving insulin, which caused temporary blindness, pain, and swelling in leg).

### c. First Amendment Retaliation

Brogan argues that a request for medical attention is not protected activity, or, at minimum that he is entitled to qualified immunity regarding Plaintiff's retaliation claim. (Second Defs.' Mem. 9.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (quotation marks and citation omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and quotation marks omitted). Otherwise

stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity ... 'at the earliest possible stage in litigation.' " *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004). As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] ... the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 (quotation marks omitted).

**\*16** Brogan argues that a prisoner's right to seek or demand medical attention has not been clearly established. (Second Defs.' Mem. 9.) The Court agrees. *See Brown v. White*, No. 08-CV-200, 2010 WL 985184, at \*12 (N.D.N.Y. Mar. 15, 2010) ("The court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention[,] and courts in the Second Circuit have not decided the issue."); *see also Gilmore v. Blair*, No. 18-CV-463, 2020 WL 5792467, at \*5 (N.D.N.Y. June 30, 2020) ("Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim."), *report and recommendation adopted*, No. 18-CV-463, 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020); *Ross v. Koenigsmann*, No. 14-CV-1321, 2016 WL 11480164, at \*18 (N.D.N.Y. Sept. 8, 2016) ("[T]he [c]ourt is aware of no authority holding that [an] inmate's request for medical attention is protected conduct under the First Amendment."), *report and recommendation adopted adopted by* 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016). Indeed, when faced with such a claim, district courts in the Second Circuit frequently assume, but do not decide, that requests for medical attention are protected by the First Amendment

for the purpose of analyzing the merits of a retaliation claim. *See, e.g.*, *Green v. Venettozzi*, No. 14-CV-1215, 2019 WL 624922, at \*2 (N.D.N.Y. Feb. 14, 2019) (noting that the magistrate judge "assumed for the purposes of the motion[ ] that [the] plaintiff's request [for medical treatment] constitute[d] protected activity" (quotations and alteration omitted)); *Brown*, 2010 WL 985184, at \*13 ("We will assume, for the purpose of the motion for summary judgment with respect to a retaliation claim, that the First Amendment recognizes an inmate's right to demand necessary medical care or complain about inadequate care."); *Maxwell v. City of N.Y.*, 272 F. Supp. 2d 285, 299–300 (S.D.N.Y. 2003) (noting the absence of relevant Second Circuit authority, and stating, "one court in this district held that although doubtful that a prisoner has a protected interest in repeatedly complaining about medical ailments, the protected nature of a right to seek basic medical treatment is assumed" (citation omitted)), *aff'd in part, vacated in part*, 380 F.3d 106 (2d Cir. 2004). Given the absence of guidance from the Supreme Court and the Second Circuit, Brogan is entitled to qualified immunity "because there is no 'clearly established right' under the First Amendment for inmates to request medical attention." *Ross*, 2016 WL 11480164, at \*18; *see James v. Gage*, No. 15-CV-106, 2019 WL 6251364, at \*7 (S.D.N.Y. Nov. 21, 2019) (holding defendant was entitled to qualified immunity because "a constitutional right to request medical attention is not clearly established").

Plaintiff additionally alleges in his Opposition that "Mazzalla, Brogan, [and] Ruiz maliciously [i]ntentionally [r]etaliated/ [h]arassed" Plaintiff for his filing a grievance against Thomas. (Pl.'s Opp'n to Second Mot. 1.)

In determining whether there is a causal connection between a protected activity and an adverse action, "a court may infer an improper or retaliatory motive in the adverse action from: the temporal proximity of the protected activity and the adverse action ... and statements by the defendant regarding his motive for injuring the plaintiff." *Lovett v. Bennett*, No. 22-CV-5462, 2022 WL 2986776, at \*4 (S.D.N.Y. July 27, 2022) (alterations, quotation marks, and citation omitted). Here, Plaintiff has not provided any statements that would tie Brogan's actions to Plaintiff's filing of grievances against Thomas, nor has he alleged that Brogan knew of Thomas or the grievance against her. Additionally, while it is not entirely clear precisely when his grievance against Thomas was filed, an attachment to the Amended Complaint indicates that Plaintiff "reported [his] [g]rievance to [ ]Investigator[ ] [ ]Thorton[ ] of the [ ]DOCCS Office of

Special Investigations[ ] on 12/28/2018." (Am. Compl. 117.) Accordingly, it appears that the alleged protected activity occurred over a year before the February 2020 allegations against Brogan, which courts have held is insufficient to establish a causal connection. *Girard v. Cuttle*, No. 15-CV-187, 2018 WL 4190140, at *7 (N.D.N.Y. Aug. 10, 2018) (holding nine months between protected activity and the alleged retaliation was not indicative of a causal connection), *report and recommendation adopted sub nom. Girard v. Chuttey*, No. 15-CV-187, 2018 WL 4188431 (N.D.N.Y. Aug. 31, 2018), *aff'd*, 826 F. App'x 41 (2d Cir. 2020); *Crawford v. Braun*, No. 99-CV-5851, 2001 WL 127306, at *6 (S.D.N.Y. Feb. 9, 2001) (describing a lapse of seven months as too "attenuated" for purposes of temporal proximity). Accordingly, because Plaintiff has not alleged any causal connection between his grievance against Thomas and Brogan's actions, the retaliation claim fails. *See Lovett*, 2022 WL 2986776, at *4 (holding causal connection not sufficiently alleged when it was unclear that there was temporal proximity between the protected activity and adverse action or that plaintiff was threatened "*because of* his previous testimony") (emphasis in original); *Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *11 (S.D.N.Y. Mar. 27, 2015) (granting motion to dismiss retaliation claim where plaintiff "fail[ed] to allege any facts that would support a finding that [the defendants] were personally motivated by the dismissal of an earlier grievance they have no apparent connection with"); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 517 (S.D.N.Y. 2012) (holding that "repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the part of the defendants," without "any specific and detailed factual allegations to support that assertion," is insufficient to establish a causal connection, particularly given the higher scrutiny applied in the prison context (quotation marks and citations)); *Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the defendant "wrote me up for revenge" is "mere speculation" and therefore insufficient to plausibly establish "the requisite causal connection"). [8]

[8]    Plaintiff's identical retaliation claim against Mazzalla fails for the same reason.

### 5. Mazzalla

**\*17** Plaintiff's sole allegation against Mazzalla in the Amended Complaint is that after Plaintiff attempted to explain the theft of his belongings to Mazzalla, Mazzalla threatened Plaintiff, stating he would physically attack Plaintiff when his body camera was off. (Am. Compl. ¶ 14.) In a single three sentence paragraph, Mazzalla simply contends that a verbal threat is insufficient as a matter of law to state a constitutional claim. (Second Defs.' Mem. 12.) It is true that courts have held "[v]erbal harassment or threats alone do not constitute a violation of any federally protected right and are therefore not actionable pursuant to 42 U.S.C. § 1983." *Lawtone-Bowles v. Katz*, No. 14-CV-606, 2016 WL 6834018, at *8 n. 12 (S.D.N.Y. Nov. 17, 2016); *see also Khalil v. City of N.Y.*, No. 17-CV-1729, 2019 WL 1597315, at *5 (E.D.N.Y. Apr. 15, 2019) ("Verbal threats alone are insufficient to give rise to a constitutional violation that is cognizable under § 1983."). However, while true that a verbal threat *alone* is not actionable under Section 1983, verbal threats can constitute adverse actions in the retaliation context. *See Stapleton v. Pagano*, No. 19-CV-952, 2020 WL 4606320, at *6 (S.D.N.Y. Aug. 11, 2020) (noting that "verbal threats may qualify as adverse actions" in the prison retaliation context); *White*, 2018 WL 6726555, at *17 (same). Mazzalla does not address the possible claim that Mazzalla's threat was made in retaliation for Plaintiff's reporting his belongings stolen by an officer. Given that Second Defendants fail to address this claim in their Memorandum, the Court will not dismiss this claim here because "it is not sufficiently argued by Defendants, who are represented by counsel and attempting to dismiss a pro se [Amended] Complaint." *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018) (citation and quotation marks omitted); *see also Am. Tissue, Inc. v. DLJ Merch. Banking Partners, II, L.P.*, No. 03-CV-6913, 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (dismissing claims with prejudice because the party's brief "fail[ed] to address with any seriousness the legal sufficiency of those claims"). [9]

[9]    Similarly, Second Defendants simply state that Mazzalla is "entitled to qualified immunity because reasonable officials in [his] position[ ] could have reasonably believed that the actions [he has] allegedly taken did not violate plaintiff's clearly established rights." (Second Defs.' Mem. 13.) There is no mention of the retaliation claim against Mazzalla.

### 6. Official Capacity

All Defendants argue claims against them in their official capacity are barred by the Eleventh Amendment. (*See* First Defs.' Mem.; Second Defs.' Mem.; Matthews Defs.' Mem.) The Court agrees.

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity ...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (same). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F. 3d at 366 (quotation marks and citation omitted). The Eleventh Amendment therefore also bars the claims for damages against individual Defendants in their official capacity. *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985)); *Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 436 (S.D.N.Y. 2017) (same); *Perciballi v. N.Y.*, No. 09-CV-6933, 2010 WL 3958731, at *4 (S.D.N.Y. Sept. 28, 2010) (same). Thus, all claims filed against the remaining Defendants in their official capacity are dismissed.

### 7. Injunctive and Declaratory Relief

Plaintiff seeks "[a] declaration that the acts and omissions described herein violated [P]laintiff's rights under the Constitution [and] laws of the United States" and a "preliminary and permanent injunction ordering Defendants ... to stop '[a]ny [and] [all] [h]arassment, [t]ampering with [p]ersonal [and] [legal mail], [d]enial of [p]rograms, [t]heft of [p]ersonal [b]elongings, [d]enial/ [d]elay of [m]edical/[m]ental [h]ealth [s]ervices, [and] ([i]ntentional [r]etaliation).' " (Am. Compl. ¶¶ 20–21.) Plaintiff alleges that he was incarcerated at Green Haven during the events that gave rise to his Amended Complaint. (*See generally id.*) Plaintiff has informed this Court that he has

since been transferred to a different facility and is currently located in Upstate Correctional Facility. (*See* Letter from Plaintiff to Court (May 25, 2021) (Dkt. No. 193); Letter from Plaintiff to Court (Oct. 19, 2021) (Dkt. No. 201); Letter from Plaintiff to Court (Dec. 9, 2021) (Dkt. No. 223).)

**\*18** Because Plaintiff is no longer incarcerated at Green Haven, his request for declaratory and injunctive relief is moot. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Hydara v. Burger*, No. 14-CV-1415, 2018 WL 1578390, at *6 (S.D.N.Y. Mar. 29, 2018) (dismissing plaintiff's claims for declaratory and injunctive relief against Defendants, who were or are employed at Orange County, as moot when plaintiff was transferred to a different correctional facility).

### 8. State Law Claims

This Court does not have subject matter jurisdiction over Plaintiff's state claims, as they are precluded from being litigated in this court by New York Correction Law § 24 ("Section 24"). Section 24 provides:

1. No civil action shall be brought in any court ... against any officer or employee of the [Department of Corrections] ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the [Department of Corrections] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Corr. Law § 24(1) & (2). The Second Circuit has long held that Section 24 precludes a plaintiff from raising state law claims in federal court against state employees in their personal capacities for actions arising within the scope of their employment. *See, e.g., Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir. 1997) ("It is well settled that Section 24 shields employees of a state correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope

of the statute."); *Baker v. Coughlin*, 77 F.3d 12, 16 (2d Cir. 1996) ("Because a New York court would have dismissed [the] claims against [the defendants] pursuant to § 24, the district court should have done so."); *accord Lyons v. Davis*, No. 17-CV-4504, 2018 WL 4759742, at *5 (S.D.N.Y. Sept. 30, 2018) ("Plaintiff's remaining state law claims are also dismissed because the Court lacks subject matter jurisdiction by virtue of Section 24 of the New York Correction Law which designates the New York State Court of Claims as the only venue for maintaining an action against employees of DOCS."); *Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) ("Because such [state law] claims would be barred in New York state courts, this Court equally lacks jurisdiction over the claims."); *Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 138–39 (S.D.N.Y. 2002) (dismissing a plaintiff's state-law claims because it was undisputed that all of the alleged acts or omissions of the defendants occurred within the scope of their employment with the Department of Corrections). [10]

[10]    In 2009, the United States Supreme Court declared New York Correction Law § 24 unconstitutional to the extent it was applied to preclude plaintiffs from bringing § 1983 claims in the New York Supreme Court. *Haywood v. Drown*, 556 U.S. 729, 740 (2009). *Haywood* "does not, however, prevent [Section 24] from stripping New York state courts of jurisdiction over a plaintiff's analogous state law claims against [Department of Corrections] officials." *Hassell*, 96 F. Supp. 3d at 385 n.14 (emphasis omitted). Therefore, "the Second Circuit's holding in *Baker v. Coughlin*—that federal courts cannot exercise pendent jurisdiction over state law claims that a plaintiff could not bring in state court—is unaffected by the *Haywood* decision." *Id.*; *May v. Donneli*, No. 06-CV-437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009)

("A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.").

<hr>

### III. Conclusion

**\*19**   For the foregoing reasons, Defendants' Motions are denied in part and granted in part. First Defendants' and Matthews Motions are granted. Second Defendants' Motion is granted for the claims against Brogan but denied as to the claim against Mazzalla. Because this is the first adjudication of Plaintiff's claims on the merits, Plaintiff's claims against First Defendants, Matthews, and Brogan are dismissed without prejudice. If Plaintiff wishes to file a second amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff is further advised that the second amended complaint will completely replace, not supplement, the instant Amended Complaint. The second amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider. If Plaintiff fails to timely file a second amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on May 9, 2023 at 2:30 PM. The clerk of the court is respectfully requested to terminate the pending Motions.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2711349

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Young v. Annucci, Not Reported in Fed. Supp. (2017)

2017 WL 11569210
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jamel W. YOUNG, Plaintiff,
v.
Anthony ANNUCCI, et al., Defendants.

9:16-CV-566 (DNH/ATB)
|
Signed 03/09/2017

**Attorneys and Law Firms**

JAMES W. YOUNG, Plaintiff pro se.

AIMEE M. PAQUETTE, ESQ., Attorney for Defendant.

**DECISION and ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** Presently before the court is plaintiff's motion for appointment of counsel and his request for "subpoenas" and for the court to grant him permission to correspond with specified inmates. (Dkt. Nos. 24, 25) For the following reasons, this court will deny plaintiff's motions without prejudice to refiling.

**I. Appointment of Counsel**

**A. Legal Standards**

Unlike criminal defendants, in forma pauperis ("IFP") plaintiffs bringing civil actions have no constitutional right to the appointment of counsel. _Wali v. One Source Co._, No. 07-7550, 2009 WL 3170110, at *1 (S.D.N.Y. Sept. 30, 2009) (citation omitted). "Appointment" of counsel in a civil action involves the court requesting an attorney to represent an IFP party pro bono under 28 U.S.C. § 1915(a)(1). _Id._ In determining whether to make such a request for the indigent party, courts do not utilize a bright-line test. _Hendricks v. Coughlin_, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered.

As a threshold matter, the court should ascertain whether the indigent's claims seem likely to be of substance. If so, the court should then consider:

The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

_Terminate Control Corp. v. Horowitz_, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting _Hodge v. Police Officers_, 802 F.2d 58, 61 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. _Velasquez v. O'Keefe_, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing _Hodge_, 802 F.2d at 61).

**B. Application**

This is plaintiff's second request for appointment of counsel. (_See_ Dkt. No. 4). On July 29, 2016, Judge Hurd reviewed plaintiff's request and denied his original motion without prejudice in accordance with the above _Hodge_ analysis. (Dkt. No. 12 at 16-17). In addition to finding that the case was in its early stages, and therefore the merits were "difficult to assess," Judge Hurd stated that there was nothing in the record demonstrating that plaintiff was unable to effectively pursue this action. (_Id._ at 16-17). Judge Hurd also stated that "if the case survives a dispositive motion," it is "highly probable" that trial counsel would be appointed to assist the plaintiff. (_Id._ at 17).

In plaintiff's current motion, he states that he needs counsel because his imprisonment will greatly limit his ability to litigate, the issues are complex, and he has limited access to the law library. (Dkt. No. 24 at 2). Plaintiff also states that the trial will likely involve conflicting testimony and counsel would be able to assist plaintiff in presenting the evidence. Plaintiff states that he has been diagnosed with antisocial personality disorder and alcohol use disorder, and he feels disabled by his medications. (_Id._) Finally, plaintiff claims that he has made "repeated efforts" to obtain an attorney, but has been unsuccessful.[1] (_Id._)

1    Although plaintiff states that he has attached the relevant correspondence, he has failed to do so. (Dkt. No. 24 at 3).

**\*2** This court has considered plaintiff's request, but will not appoint counsel at this time. On December 8, 2016, I issued a Mandatory Pretrial Discovery and Scheduling Order ("MPTO"). (Dkt. No. 22). This order requires defendants to automatically provide certain discovery to plaintiff as well as directing plaintiff to turn over specified documents to defendants. (Dkt. No. 22 at 1-2 & Attachment A). The order specifies the mandatory discovery that is to be provided by both parties, based upon the particular type of action. (*Id.*) This will help to frame the issues in the case, and will help plaintiff investigate the "crucial facts" without the need for counsel.

Although plaintiff alleges that his action is complex, the remaining issue is whether defendants used excessive force against him. This is not a complex issue, although the court understands that the issue may involve conflicting testimony. However, as stated by Judge Hurd, if the case survives a dispositive motion and goes to trial, a pro bono attorney will likely be appointed at that time, and plaintiff will be able to question witnesses and present evidence through counsel. The problem of imprisonment or "limited" use of the law library is a problem common to all inmates who bring pro se actions. Thus, this fact does not create a special circumstance justifying appointment of counsel at this time. Plaintiff also alleges that he has been diagnosed with a mental disorder and feels "disabled" by his medications. There is no indication that plaintiff's diagnosis has impaired his ability to prosecute this action to this point, and there is no evidence to support his allegation. Thus, the court will deny plaintiff's motion without prejudice to renewal at a time that is closer to trial in this case.

## II. Communication with Other Inmates

Plaintiff's second motion asks the court to "subpoena" inmate witnesses and "grant correspondence for affidavits and declarations." Plaintiff does not need "subpoenas" at this time. If the case goes to trial, and inmate witnesses are needed, the court will address the issue at the appropriate time. Plaintiff's other request is that he be able to communicate with other inmates in order to obtain their statements. Plaintiff has listed four inmates by name and inmate number, and has stated that they "are very relevant to his claim." (Dkt. No. 25 at 1-2). However, plaintiff has not indicated how these individuals are "relevant" to his remaining claim.

The court understands that inmates may not communicate with each other without permission from the corrections officials. There are security reasons for these rules. Plaintiff will have to very clearly state how each of the requested witnesses would be relevant to his remaining claim of excessive force. In addition, plaintiff has not stated that he has requested this permission from defense counsel or DOCCS. Thus, plaintiff's motion is incomplete and premature, and the court must deny it at this time. Plaintiff should request the appropriate permission from defense counsel and/or DOCCS. Plaintiff should specify his reasons for requesting communication with other inmates, and DOCCS may not be required to allow such communication if it is not appropriate.

**WHEREFORE**, it is hereby

**ORDERED**, that plaintiff's motion for appointment of counsel, (Dkt. No. 24), is **DENIED** without prejudice to renew at some future time for the reasons stated above; and it is

**ORDERED**, that plaintiff's motion to subpoena witnesses and for permission to correspond with other inmates (Dkt. No. 25) is **DENIED WITHOUT PREJUDICE**, and it is

**ORDERED**, that the Clerk serve a copy of this Order on the plaintiff.

## All Citations

Not Reported in Fed. Supp., 2017 WL 11569210

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 124 of 128

Stegemann v. Rensselaer County Sheriff's Office, Not Reported in Fed. Supp. (2017)

2017 WL 11716632
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joshua STEGEMANN, Plaintiff,

v.

RENSSELAER COUNTY SHERIFF'S
OFFICE, et al., Defendants.

1:15-CV-21 (TJM/CFH)
|
Signed October 2, 2017

**Attorneys and Law Firms**

Joshua Stegemann, 205522-052, F.C.I. Berlin, Inmate Mail/Parcels, P.O. Box 9000, Berlin, N.H. 03570, Plaintiff pro se.

BRUCE J. BOIVIN, ESQ., Office of Attorney General - Albany, State of New York, The Capitol, Albany, New York 12224, Attorneys for Rensselaer County defendants, Air National Guard, Sloma, Clifford, Warren County defendants, York, Perilli, N.Y. S. Police, N.Y.S. Police Sort, Kiley.

JAMES A. RESLIA, ESQ., Carter Conboy Case, Blackmore, Maloney & Laird, P.C., 20 Corporate Woods Blvd., Albany, New York 12211, Attorneys for Mahar, Russo, Hyd, Wohlleber, Webster, Holcomb, Robelotto, Geracitano, Blodgett, Walread, Panichi.

THOMAS K. MURPHY, ESQ., Murphy Burns LLP, 407 Albany Shaker Road, Loudonville, New York 12211, Attorneys for Fulton County defendants, Warren County, York, Perilli.

SHAWN F. BROUSSEAU, ESQ., Napierski, Vandenburgh Law Firm, 296 Washington Avenue Extn., Albany, New York 12203, Attorneys for Pittsfield Police Department, Wynn, Price, Mazzeo, Deckler, Civello.

STACY A. LUTKUS, ESQ., Drinker, Biddle Law Firm - Albany Office, 321 Great Oaks Blvd., Albany, New York 12203, Attorneys for AT & T Wireless.

ABIGAIL L. FEE, ESQ., Office of Attorney General - Massachusetts, One Ashburton Place, 18th Floor, Boston, MA 02108-3076, Attorneys for Berkshire County Sheriff's Office, Berkshire County, Bowler, Colbert, Massachusetts State Police, Foley, Berkshire County D.A.'s Office, Capeless, Locke, Smith.

## DECISION AND ORDER

CHRISTIAN F. HUMMEL, United States Magistrate Judge

### I. Background

**\*1** On June 16, 2017, Senior District Judge Thomas J. McAvoy adopted the undersigned's April 17, 2017 Report-Recommendation and Order.[1] Dkt. No. 24, 26. The Decision and Order permitted plaintiff Joshua Stegemann's Fourth Amendment property damage claims to proceed, and dismissed without prejudice all other causes of action raised in the complaint. Dkt. No. 26. On July 14, 2017, plaintiff filed a Motion to Vacate and Amend Judgment, pursuant to Federal Rule of Civil Procedure (Fed. R. Civ. P.) 60(b). Dkt. No. 32. On August 23, 2017, the Court denied plaintiff's Motion to Vacate and Amend Judgment. Dkt. No. 43. On August 30, 2017, plaintiff filed an interlocutory appeal of the Court's denial of his Motion to Vacate and Amend Judgment to the United States Court of Appeals for the Second Circuit. Dkt. Nos. 51, 52. To the Court's knowledge, that appeal is still pending before the Second Circuit.

[1]    Plaintiff filed objections to the Report-Recommendation and Order. Dkt. No. 25.

Presently pending before the Court is plaintiff's Motion to Appoint Counsel filed September 8, 2017 and "Emergency Motion for Appointment of Counsel" filed on September 13, 2017. Dkt. Nos. 61, 75. Plaintiff has previously filed Motions for Appointment of Counsel, which have been denied without prejudice. Dkt. No. 2, 4, 12, 25.

### II. Legal Standard

"A party has no constitutionally guaranteed right to the assistance of counsel in a civil case." Leftridge v. Connecticut State Technical Officer No. 1283, 640 F.3d 62, 68 (2d Cir. 2011) (citations omitted). Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. Hendricks v. Coughlin, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. As a threshold matter, the court should ascertain whether the indigent's claims seem likely to be of substance. A motion for appointment of counsel may be properly denied if

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 125 of 128

Stegemann v. Rensselaer County Sheriff's Office, Not Reported in Fed. Supp. (2017)

the court concludes that the plaintiff's "chances of success are highly dubious." Leftridge, 640 F.3d at 69. If the court finds that the plaintiff's claims have substance, the court should then consider:

> The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling; rather, each case must be decided on its own facts. Velasquez v. O'Keefe, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (citing Hodge, 802 F.2d at 61).

### III. Plaintiff's Motions for Counsel

#### A. Prior Motions for Counsel

 **\*2**  Plaintiff has previously filed motions for appointment of counsel in this action. Dkt. Nos. 2, 4, 12, 25. Plaintiff, in his most recently-filed motions, raises nearly identical arguments to those raised on his prior motions for counsel, but fails to demonstrate a change in circumstances. See Dkt. Nos. 2, 4, 12, 25, 61, 75. In the September 9, 2017 Motion for Counsel, plaintiff alleges that the Court "granted" his prior Motion for Appointment of Counsel insofar as the Court stated that his "motion for appointment of counsel and service of summons is denied with leave to renew following resolution of whether legally viable claims remain pending in this Court." Dkt. No. 12 (citing dkt. no. 23); see also dkt. no. 25 at 4 (making same argument). Thus, plaintiff appears to suggest that because his Fourth Amendment property claims were permitted to proceed, the Court has determined that he has a "legally viable claim," and, thus, counsel must be granted. Dkt. No. 61 at 16; Dkt. No. 25 at 4.

Plaintiff's reading of this Court's statement in the June 26, 2017 Decision and Order is incomplete and incorrect. Dkt. No. 26. The Decision and Order denied the Motion for Counsel with leave to renew "at an appropriate time." Id. at 3. In doing so, the Court specifically acknowledged: "while the Court has permitted at least one claim to go forward, discovery has not yet occurred and the nature of the factual issues has not yet been clarified. Plaintiff has proved himself capable of litigating the issues in this case to this point, and the Court is convinced that he can to so for the present." Id. Thus, the Court's denying plaintiff's Motions for Counsel without prejudice and with leave to renew at a future date and permitting one claim to proceed does not entitle plaintiff to an appointment of counsel at this time. Although the Court permitted plaintiff's Fourth Amendment claim to proceed past the initial review stage, that does not mean that the Court has made any determination as to whether his Fourth Amendment due process claim is likely to survive a properly-filed dispositive motion. In fact, as noted, the Court explicitly stated in the June 16, 2017 Decision and Order that its decision to permit the Fourth Amendment property claim to proceed did not require appointment of counsel due to the early juncture of the case. Dkt. No. 26 at 3. Although plaintiff is correct that this civil action has been pending for three years, as was the case at the time of the Court's June 16, 2016 Decision and Order, defendants have only just been served and have begun to appear, and discovery has not yet begun. Thus, it is too soon in this case to determine whether counsel should be appointed.

#### B. Plaintiff's Sentence of Thirty Years to Life

Plaintiff contends in the September 8, 2017 filing that counsel, as he has argued in prior Motions for Counsel, that his current motion must be granted because he is

> under sentence of thirty (30) years to LIFE. The wrongful disclosure of private communications, and the testimonial uses to which those communications have been put, directly implicates his Fifth Amendment rights. His continued self-representation in the instant matter, in absence of appointment of counsel, further implicates his Fifth, Sixth, and Fourteenth Amendment

Case 9:22-cv-00711-BKS-TWD    Document 69    Filed 01/26/24    Page 126 of 128

Stegemann v. Rensselaer County Sheriff's Office, Not Reported in Fed. Supp. (2017)

rights. Therefore, counsel should be appointed.

Dkt. No. 61 at 17 (citing Guggenheim Capital, LLC v. Birnbaum, 722 F.3d 444, 453 (2d Cir. 2013)); Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986); see also dkt. no. 25 at 5 (same argument). In plaintiff's September 13, 2017 Motion for Counsel, plaintiff again argues that he should be assigned counsel because: (1) he was sentenced to thirty years to life in prison, (2) his "circumstances have grown consistently more dire throughout the pendency of these proceedings" insofar as his direct lof his criminal conviction has been denied; and (3) "he has yet to venture into post-conviction proceedings via a § 2255 motion, or some other procedure." Dkt. No. 75 at 4. Plaintiff further argues that the matters he set forth in this civil action "directly impact his conviction." Id. Plaintiff again cites Guggenheim to argue that, because he is in prison for his related criminal conviction, he has legal right to counsel in this civil action. Id.

*3 In plaintiff's most recent motions, as in his past motions where he raised this argument unsuccessfully, plaintiff misinterprets or overstates this case law. In Guggenheim, the Court held that the plaintiff was not entitled to counsel, but noted in dicta that "it is well-settled that, except when faced with the prospect of imprisonment, a litigant has no legal right to counsel in civil cases." 722 F.3d at 453 (Hodge v. Police Officers, 802 F.2d at 59); In re DiBella, 518 F.2d 955, 958-99 (2d Cir. 1975). Guggenheim relied, in part, on In re DiBella, wherein the Second Circuit reviewed "whether an individual is entitled to counsel in a contempt proceeding under 28 U.S.C. s 1826." 518 F.3d 955, 958 (2d Cir. 1975). [2] The other case Guggenheim cites for this proposition is Hodge v. Police Officers, which does not address the appointment of counsel in a civil action where the plaintiff faces imprisonment, but instead sets forth the general considerations a court is to assess when determining whether to appoint counsel in a civil action. In Hodge, the plaintiff commenced a section 1983 action, alleging that police officers used excessive force against him during an arrest. Hodge v. Police Officers, 802 F.2d at 59. After filing that action, the plaintiff was "prosecuted ... for the actions that had led to his arrest" and faced a lengthy sentence. Id. However, Hodge did not conclude that a plaintiff who faces jail time arising out of a matter that is merely related to the civil action before the Court is entitled to counsel. Instead, Hodge held that the lower Court, in denying counsel, "did not use the appropriate criteria in exercising under discretion

under 28 U.S.C. § 1915(d) [3] in declining to appoint counsel. Id. at 60-61.

[2]    The DiBella Court noted that a contempt proceeding "is basically civil in nature. The purpose of holding a witness in contempt is to coerce him to answer the grand jury's questions, not to punish him for reprehensible conduct. Yet, the burden of imprisonment is just as great, regardless of what we call the order that imposed it. It is this fact that fosters the need for procedural protection." Id. at 959 (internal citation omitted).

[3]    The current statute for appointment of counsel is now located under 28 U.S.C. § 1915(e).

Here, plaintiff does not face imprisonment as a result of this civil action. This Court has concluded that only plaintiff's Fourth Amendment property damage may proceed as all other claims are barred by Heck as his success on such claims could invalidate his criminal conviction. [4] Plaintiff's property damage claims do not call into question the validity of his underlying convictions nor do they impact the length of the sentence he is currently serving. In no way does plaintiff's success or failure on the Fourth Amendment property claim impact his conviction or length of his sentence nor could it impose any further sentence. Although plaintiff has appealed the Court's denial of his Motion to Vacate the June 16, 2017 Decision and Order dismissing all claims other than his Fourth Amendment property claim to the Second Circuit, and the Second Circuit may disagree with this Court's Decision and Order and reinstate his other claims, such has not happened at this time.

[4]    Plaintiff appears to acknowledge that this civil action is limited to his Fourth Amendment property claim insofar as he states. "[w]hile the instant controversy turns on whether they [defendants] acted reasonably in destroying his residence and property over the course of a three (3) day search and seizure by over fifty (50) members of law enforcement," Dkt. No. 75 at 6, he appears to contend that because he "charged" defendants with "wrongfully executing the very actions that brought about Stegemann's prosecution and conviction[,]" "it certainly gives more incentive for these defendants to be untruthful, evasive, and uncooperative." Dkt. No. 75 at 6.

To the extent plaintiff is suggesting that he must be assigned counsel because he fears that defendants will not actively and truthfully proceed in this action, any defendant properly served who has not been dismissed in this action, as well as their counsel, will be required to follow the Federal Rules of Civil Procedure and the Local Rules of the Northern District of New York. Indeed, once defendants appear in this action and a pretrial conference has been completed, a Uniform Pretrial Scheduling Order will be set "setting deadlines for joinder of parties, amendment of pleadings, production of expert reports, completion of discovery, and filing of motions; a trial ready date; the requirement for all trial submissions...." N.D.N.Y. L.R. 15.1(e). Should plaintiff, at some point, reasonably believe that defendants or counsel are not following any Orders or deadlines set by the Court, he may seek to bring those specific instances of noncompliance, if they are meritorious and non-frivolous, to the Court's attention and they will be addressed at that time.

**\*4** Thus, as this Court dismissed all claims other than plaintiff's Fourth Amendment property claim, plaintiff's other issues arising out of his arrest and prosecution are not presently before this Court. Because plaintiff faces no additional incarceration related to his Fourth Amendment property damage claim nor would the outcome of this civil action impact his sentence or conviction, the Court cannot conclude at this time that this case falls within the narrow sliver of cases where a pro se plaintiff is entitled to representation in a civil action as plaintiff does not face imprisonment in connection with this claim. See Guggenheim, 722 F.3d at 453. Thus, Guggenheim and its progeny do not require a contrary result.

### C. Plaintiff's status as an Inmate

Plaintiff next argues that his status as an inmate and his limited access to resources renders him unable to effectively litigate this action. See Dkt. Nos. 61, 75. First, plaintiff contends that inability to use electronic filing makes him unable to "monitor the docket" or know whether defendants have been served as "he has not been served with any papers from any defendant or from the U.S. Marshals Service." Dkt. No. 75 at 5-6. [5] Plaintiff further suggests that the complex nature of this

action, including the large number of defendants, also renders him unable to effectively litigate this matter on his own. Id. He contends that he has limited access to "resources" and he has no ability to "investigate" or engage in "discovery" is because he is incarcerated. Id. at 6 ("Stegemann has no ability to adequately investigate the case, or participate in discovery."). Finally, plaintiff points to the merits of his case, pointing out that his civil action is complex and contending that "[i]t is beyond cavil that these defendants effected the searches & seizures complained of in this action, and the legality of those actions 'raises factual issues that turn on credibility.' " Id. at 5-6.

[5]     The undersigned observes that since plaintiff's filing of these two Motions to Amend, an acknowledgment of service has been filed by several defendants, and many have appeared. Dkt. Nos. 62-74; 78, 80, 81, 82, 85, 86, 87, 95, 96, 113.

Although the fact that plaintiff is a layman and apparently has limited access to limited legal resources are considerations this Court may consider in assessing whether to assign counsel, these factors do not require a different finding. Dkt. No. 75 at 6. Although plaintiff indicates that he has had difficulty tracking this action because he does not have access to electronic filing, the Court has sent plaintiff a copy, via mail, of every filing that is made in this action, including all notices of appearance, acknowledgments of service, and process receipts. See p. 8, n.5, supra. Similarly, although plaintiff claims he has limited resources due to his status as an inmate, he has been able to successfully litigate this matter thus far. As the Court concluded in its June 16, 2017 Decision and Order, plaintiff has been able to effectively litigate the matter thus far. Dkt. No. 26 at 3. He has successfully filed a complaint and application for in forma pauperis relief. Dkt. Nos. 1-2. He has filed objections to prior Report-Recommendations and Orders. Dkt. No. 6, 20, 25. He has filed two appeals in this action to the Second Circuit. Dkt. Nos. 9, 10, 11, 13, 51, 52. He has filed several Motions for Counsel which he supports with arguments and case law. Dkt. No. 2, 4, 12, 25, 61, 75. He has also filed several letters of correspondence to the Court asking for other various relief. See, e.g., Dkt. Nos. 17, 21, 28, 54. Thus, as the Court stated in the June 16, 2017 Decision and Order, the Court finds no reason why, at this time, appointment of counsel would lead to a more just determination of this case.

**\*5** Further, as noted, once this Court holds its initial conference, it will require parties to follow a Uniform Pretrial Scheduling Order. This Scheduling Order will require

defendants to automatically provide certain discovery to plaintiff as well require plaintiff to turn over specified documents to defendants. The Scheduling Order will specify the mandatory discovery that is to be provided, based on the particular type of action. Thus, this Scheduling Order will help to frame the issues in the case, and assist plaintiff investigate the "crucial facts" without the need for counsel. Further, this Court dismissed all claims in plaintiff's civil action excepting his Fourth Amendment property damages claim; thus, there is only one cause of action currently pending before this Court, which should be more manageable for a pro se plaintiff. *Plaintiff may only file another motion for appointment of counsel in the event he can demonstrate that, in light of* <u>specific</u> *changed circumstances relevant to this civil action, consideration of the above factors warrants the granting of such an application.*

### D. Efforts of Obtain Counsel

Prior to evaluating a request for appointment of counsel, the plaintiff must make a threshold showing – that he is unable to obtain counsel through the private sector or public interest firms. Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 173-74 (2d Cir. 1989) (quoting Hodge, 802 F.2d at 61). Such a showing has not yet been made in the instant action. In previous motions, plaintiff contended that he has contacted many attorneys and has not found one willing to assist; however, he has not provided any evidence of these efforts. Dkt. No. 2 at 2 ¶4. Plaintiff has failed to show any efforts he has made to obtain counsel on his own. That a pro se plaintiff is incarcerated does not excuse him from taking this step. Should plaintiff file any future Motions for Counsel, he must include evidence of steps he has taken to obtain an attorney from the private and/or public sectors.

### IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that plaintiff's motions for appointment of counsel, Dkt. Nos. 61, 75, are **DENIED without prejudice** to renew at some future time should plaintiff be able to demonstrate *specific changed circumstances.* Any future motion for appointment of counsel must be accompanied by documentation that substantiates plaintiff's efforts to retain counsel on his own; and it is further

**ORDERED**, that the Clerk of the Court provide plaintiff with an updated docket sheet; and it is further

**ORDERED** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

### IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11716632

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.